Appeal No. 20-6060

===

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

| | |
|---|---|
| JOHN TOMPKINS, M.D.,<br><br>    Appellant<br>v.<br><br>1. UNITED STATES DEPARTMENT<br>OF VETERANS AFFAIRS,<br><br>2. ROBERT WILKIE, in his Official Capacity,<br><br>3. RALPH T. GIGLIOTTI, in his Official<br>Capacity, and,<br><br>4. KRISTOPHER WADE VLOSICH, in his<br> Official Capacity.<br><br>    Appellees. | **In accordance with 10TH CIR.<br>R. 28.2(C)(4), Appellant does<br>request oral argument.** |

---

## APPELLANT'S APPENDIX

---

Appeal from the United States District Court
for the Western District of Oklahoma
Honorable Bernard Jones, District Judge
Case No. 18-CIV-1251-J

---

Danny K. Shadid, OBA No. 8104
Of Counsel with Riggs Abney Neal Turpen Orbison & Lewis Law Firm
528 NW 12th Street, Oklahoma City, Oklahoma 73103
Telephone: (405) 843-9909; Facsimile: (405) 842-2913
dshadid@riggsabney.com
*Attorneys for Appellant John Tompkins, M.D.*
– August 23, 2020 –

---

## APPENDIX TABLE OF CONTENTS

| Tab No. | Document | Page Nos. |
|---|---|---|
| i | Appendix Table of Contents | i |
| ii | Certificate of Digital Submission and Certificate of Compliance with Court's ECF Requirements | ii |
| ii | Certificate of Service | ii |
| 1. | U.S. District Court Western District of Oklahoma Civil Docket for Case No. #5:18-cv-01251-J | 1-5 |
| 2. | Amended Complaint (Filed: 12/21/2018) | 6-80 |
| 3. | Defendant's Motion to Dismiss Plaintiff's Amended Complaint with Brief in Support (Filed: 12/20/19) | 81-115 |
| 4. | Plaintiff's Motion for Leave to File Response in Excess of 25 Pages (Filed: 1/29/20) | 116-117 |
| 5. | Order (Filed: 1/30/20) | 118 |
| 6. | Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Filed: 1/31/20) | 119-153 |
| 7. | Correction to Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Substitution of Language (Filed: 2/04/20) | 154-157 |
| 8. | Defendants' Reply in Further Support of Their Motion to Dismiss with Brief in Support (Filed: 2/14/20) | 158-174 |
| 9. | Order (Filed: 4/03/20) | 175-181 |
| 10. | Judgment (Filed: 4/03/20) | 182 |
| 11. | Notice of Appeal (Filed: 4/30/20) | 183-184 |

## CERTIFICATE OF DIGITAL SUBMISSION AND CERTIFICATE OF COMPLIANCE WITH COURTS ECF REQUIREMENTS

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Endpoint Protection, August 23, 2020; and according to the program are free of viruses.

*s/Danny K. Shadid*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2020, I electronically filed the foregoing using the Court's CM/ECF system which will send notification of such filing to the following:

Rebecca Frazier
United States Attorney's Office
E-mail: Rebecca.Frazier@usdoj.gov

Tom Majors
United States Attorney's Office
E-mail: Tom.Majors@usdoj.gov

*s/Danny K. Shadid*
Danny K. Shadid, OBA No. 8104
Of Counsel, Riggs, Abney, Neal,
Turpen, Orbison & Lewis
528 NW 12th Street,
Oklahoma City, Oklahoma 73103
Telephone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail: dshadid@riggsabney.com
*Attorneys for Appellant*
*John Tompkins, M.D.*

ii

APPEAL,CLOSED,ERWIN,_BS

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: 5:18–cv–01251–J

Tompkins v. Department of Veterans Affairs et al
Assigned to: Honorable Bernard Jones
Case in other court:  Tenth Circuit, 20–06060
Cause: 05:702 Administrative Procedure Act

Date Filed: 12/21/2018
Date Terminated: 04/03/2020
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: Federal Question

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/21/2018 | 1 | | COMPLAINT against Department of Veterans Affairs, Ralph T Gigliotti, Richard A Stone, Kristopher Wade Vlosich, Robert Wilkie, Steve Young filed by John Tompkins. (Attachments: # 1 Appendix A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Civil Cover Sheet)(em) (Entered: 12/26/2018) |
| 12/26/2018 | 2 | | Summons Issued Electronically as to Department of Veterans Affairs. (em) (Entered: 12/26/2018) |
| 12/26/2018 | 3 | | Summons Issued Electronically as to Ralph T Gigliotti, Richard A Stone, Kristopher Wade Vlosich, Robert Wilkie, Steve Young. (em) (Entered: 12/26/2018) |
| 12/27/2018 | 4 | | Receipt for Money Received from John Tompkins in the amount of $400.00, receipt number OKW500071511 regarding 1 Complaint. (em) (Entered: 12/27/2018) |
| 04/26/2019 | 5 | | SUMMONS Returned Executed by John Tompkins. Kristopher Wade Vlosich served on 2/23/2019. (Shadid, Danny) (Entered: 04/26/2019) |
| 04/26/2019 | 6 | | SUMMONS Returned Executed by John Tompkins. Ralph T Gigliotti served on 3/7/2019. (Shadid, Danny) (Entered: 04/26/2019) |
| 04/26/2019 | 7 | | SUMMONS Returned Executed by John Tompkins. Richard A Stone served on 3/11/2019. (Shadid, Danny) (Entered: 04/26/2019) |
| 04/26/2019 | 8 | | SUMMONS Returned Executed by John Tompkins. Robert Wilkie served on 3/11/2019. (Shadid, Danny) (Entered: 04/26/2019) |
| 04/26/2019 | 9 | | SUMMONS Returned Executed by John Tompkins. Steve Young served on 3/11/2019. (Shadid, Danny) (Entered: 04/26/2019) |
| 04/26/2019 | 10 | | SUMMONS RETURNED EXECUTED by John Tompkins. Department of Veterans Affairs served on 3/11/2019. (Shadid, Danny) (Entered: 04/26/2019) |

| 04/29/2019 | 11 | CERTIFICATE of Counsel *Certificate of Compliance* by Danny K Shadid on behalf of John Tompkins (Attachments: # 1 Exhibit Letter of March 4, 2019, to William Barr, # 2 Exhibit U.S. Mail certified receipt and return card, # 3 Exhibit Letter of March 5, 2019, to Robert J. Troester)(Shadid, Danny) (Entered: 04/29/2019) |
| --- | --- | --- |
| 05/03/2019 | 12 | ENTRY of Appearance by Rebecca A Frazier on behalf of All Defendants (Frazier, Rebecca) (Entered: 05/03/2019) |
| 05/03/2019 | 13 | UNOPPOSED MOTION for Extension of Time by All Defendants. (Frazier, Rebecca) (Entered: 05/03/2019) |
| 05/06/2019 | 14 | ORDER granting 13 Motion for Extension of Time to File an Answer. Defendants to file an answer/response by 6/5/19. Signed by Honorable Robin J. Cauthron on 05/06/19. (wh) (Entered: 05/06/2019) |
| 06/04/2019 | 15 | SECOND MOTION for Extension of Time by All Defendants. (Frazier, Rebecca) (Entered: 06/04/2019) |
| 06/05/2019 | 16 | ORDER granting 15 Motion for Extension of Time to File. Answer or response due by 7/5/19. Signed by Honorable Robin J. Cauthron on 06/05/19. (wh) (Entered: 06/05/2019) |
| 06/05/2019 | 17 | ENTRY of Appearance by Tom Majors on behalf of All Defendants (Majors, Tom) (Entered: 06/05/2019) |
| 07/05/2019 | 18 | MOTION to Dismiss *or in the Alternative Motion for Summary Judgement* by Department of Veterans Affairs, Ralph T Gigliotti, Richard A Stone, Kristopher Wade Vlosich, Robert Wilkie, Steve Young. (Attachments: # 1 Exhibit 1 – Davidson Declaration with Attachments A SF–50 and 52 and Attachment B 5021 Part IV)(Frazier, Rebecca) (Entered: 07/05/2019) |
| 07/26/2019 | 19 | MOTION for Extension of Time *Plaintiff's Motion for Extension of Time* by John Tompkins. (Shadid, Danny) (Entered: 07/26/2019) |
| 07/26/2019 | 20 | RESPONSE to Motion re 19 MOTION for Extension of Time *Plaintiff's Motion for Extension of Time (Conditional "No Objection" Response to Motion with Reservation as suggestion of discovery)* filed by All Defendants. (Majors, Tom) (Entered: 07/26/2019) |
| 07/29/2019 | 21 | ORDER granting 19 Motion for Extension of Time to File Response. Response due 10/25/19. Signed by Honorable Robin J. Cauthron on 07/29/19. (wh) (Entered: 07/29/2019) |
| 10/25/2019 | 22 | MOTION for Extension of Time *Plaintiff's Second Motion for Extension of Time* by John Tompkins. (Attachments: # 1 Exhibit E–mail of 08/09/2019 from Danny Shadid to Tom Majors, # 2 Exhibit E–mail of 08/14/2019 from Danny Shadid to Tom Majors, # 3 Exhibit Plaintiff's First Request for Production to the Defendants, # 4 Exhibit Defendants' Response to Req. for Prod., dated 10/18/2019, # 5 Exhibit Defendants' Response to Req. for Prod., dated 10/22/2019, # 6 Exhibit E–mail of 09/12/2019 from Danny Shadid to Tom Majors, # 7 Exhibit E–mail of 09/12/2019 from Tom Majors to Danny Shadid, # 8 Exhibit E–mail of 10/16/2019 from Danny Shadid to Tom Majors, # 9 Exhibit E–mail of 10/16/2019 from Rebecca Frazier to Danny Shadid)(Shadid, Danny) (Entered: 10/25/2019) |

| | | | |
|---|---|---|---|
| 10/29/2019 | 23 | | ORDER granting 22 Plaintiff's Second Motion for Extension of Time to File. Plaintiff's response or Motion for Summary Judgment due by December 26, 2019. Signed by Honorable Robin J. Cauthron on 10/29/19. (wh) (Entered: 10/29/2019) |
| 11/20/2019 | 24 | 6 | AMENDED COMPLAINT against All Defendants filed by John Tompkins. (Attachments: # 1 Appendix VA Handbook, Part IV, Chapter 3, # 2 Exhibit Letter, Vlosich to Tompkins, 07/13/2017, # 3 Exhibit Letters from reviewing physicians, # 4 Exhibit Letter, Bray–Hall to Tompkins, 08/24/2017, # 5 Exhibit Proposed Separation and Revocation letter, 10/30/2017, # 6 Exhibit Letter, Shadid to Vlosich, 11/14/2017, # 7 Exhibit Response letter, Tompkins to Vlosich, 11/14/2017, # 8 Exhibit Letter, Shadid to Vlosich, 11/20/2017, # 9 Exhibit Memorandum, Vlosich, 08/17/2017, # 10 Exhibit Letter, Vlosich to Tompkins, 11/20/2017, # 11 Exhibit Discharge Letter, Vlosich to Tompkins, 11/21/2017, # 12 Exhibit Letter, Shadid to Gigliotti, 12/06/2017, # 13 Exhibit Memorandum, Gigliotti, 08/17/2017, # 14 Exhibit Decision of Grievance Examiner, Roger Tatum, M.D., 07/31/2018, # 15 Exhibit Decision letter, Gigliotti, 08/17/2018)(Shadid, Danny) (Entered: 11/20/2019) |
| 11/25/2019 | 25 | | THIRD MOTION for Extension of Time by Department of Veterans Affairs, Ralph T Gigliotti, Kristopher Wade Vlosich, Robert Wilkie. (Frazier, Rebecca) (Entered: 11/25/2019) |
| 11/26/2019 | 26 | | ORDER granting 25 Motion for Extension of Time to File Answer. Defendant's answer or response is due by 12/29/19. Signed by Honorable Robin J. Cauthron on 11/26/19. (wh) (Entered: 11/26/2019) |
| 12/12/2019 | 27 | | ENTRY of Appearance by Danny K Shadid on behalf of John Tompkins (Shadid, Danny) (Entered: 12/12/2019) |
| 12/20/2019 | 28 | 81 | MOTION to Dismiss by Department of Veterans Affairs, Ralph T Gigliotti, Kristopher Wade Vlosich, Robert Wilkie. (Frazier, Rebecca) (Entered: 12/20/2019) |
| 01/03/2020 | 29 | | ORDER REASSIGNING CASE. Case reassigned to Honorable Bernard Jones for all further proceedings. Honorable Robin J. Cauthron no longer assigned to case. Entered at the direction of the Honorable Robin J. Cauthron on 01/03/20. (wh) (Entered: 01/03/2020) |
| 01/06/2020 | 30 | | MOTION for Extension of Time *Plaintiff's Third Motion for Extension of Time* by John Tompkins. (Shadid, Danny) (Entered: 01/06/2020) |
| 01/07/2020 | 31 | | ORDER ~ Granting 30 Motion for Extension of Time to File. Plaintiff shall respond to the dispositive motion on or before January 31, 2020. Signed by Honorable Bernard Jones on 1/7/2020. (dwl) (Entered: 01/07/2020) |
| 01/29/2020 | 32 | 116 | MOTION for Leave to File Excess Pages *Plaintiff's Motion for Leave to File Response in Excess of 25 Pages* by All Plaintiffs. (Shadid, Danny) (Entered: 01/29/2020) |
| 01/30/2020 | 33 | 118 | **ORDER** ~ Granting 32 Motion for Leave to File Excess Pages. The motion is GRANTED and Plaintiff is permitted leave to file a response brief up to and including thirty–pages. Signed by Honorable Bernard Jones on 1/30/2020. (dwl) (Entered: 01/30/2020) |
| 01/31/2020 | 34 | 119 | |

| | | | |
|---|---|---|---|
| | | | RESPONSE in Opposition re 28 MOTION to Dismiss *Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint* filed by All Plaintiffs. (Shadid, Danny) (Entered: 01/31/2020) |
| 02/04/2020 | 35 | 154 | AMENDED DOCUMENT by John Tompkins. Amendment to 34 Response in Opposition to Motion *Correction to Plaintiffs Response to Defendants Motion to Dismiss Plaintiffs Amended Complaint and Substitution of Language.* (Shadid, Danny) (Entered: 02/04/2020) |
| 02/06/2020 | 36 | | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 34 Response in Opposition to Motion *to Dismiss* by Department of Veterans Affairs, Ralph T Gigliotti, Kristopher Wade Vlosich, Robert Wilkie. (Frazier, Rebecca) (Entered: 02/06/2020) |
| 02/06/2020 | 37 | | **ORDER** ~ Granting 36 Motion for Extension of Time to File Response/Reply. Defendants' deadline is extended to February 14, 2020. Signed by Honorable Bernard Jones on 2/6/2020. (dwl) (Entered: 02/06/2020) |
| 02/14/2020 | 38 | 158 | REPLY to Response to Motion re 28 MOTION to Dismiss filed by Department of Veterans Affairs, Ralph T Gigliotti, Kristopher Wade Vlosich, Robert Wilkie. (Attachments: # 1 Exhibit 1 – Excerpts from OIG Report)(Frazier, Rebecca) (Entered: 02/14/2020) |
| 04/03/2020 | 39 | 175 | **ORDER** ~ Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Brief in Support 28 is GRANTED and Plaintiff's claims are DISMISSED without prejudice. Defendants' dispositive motion addressing Plaintiff's original Complaint 18 became moot when Plaintiff filed the Amended Complaint and it is DENIED as such. Signed by Honorable Bernard Jones on 4/3/2020. (dwl) (Entered: 04/03/2020) |
| 04/03/2020 | 40 | 182 | **JUDGMENT** ~ Defendants' motion to dismiss 28 is GRANTED and Plaintiff's claims are DISMISSED without prejudice. Judgment is granted against Plaintiff and in favor of Defendants. Signed by Honorable Bernard Jones on 4/3/2020. (dwl) (Entered: 04/03/2020) |
| 04/30/2020 | 41 | 183 | NOTICE OF APPEAL as to 39 Order on Motion to Dismiss,,, 40 Judgment, by John Tompkins. (Shadid, Danny) (Entered: 04/30/2020) |
| 05/01/2020 | 42 | | PRELIMINARY RECORD LETTER – Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 41 Notice of Appeal. (Attachments: # 1 Attachment 1 – Preliminary ROA)(ank) (Entered: 05/01/2020) |
| 05/01/2020 | 43 | | Tenth Circuit USCA Case Number 20–6060 for 41 Notice of Appeal. Civil case docketed. Preliminary record filed. DATE RECEIVED: 05/01/2020 Fee, Docketing statement, Transcript order forma and Notice of appearance are due by 05/15/2020 for John Tompkins. Notice of appearance due on 05/15/2020 for Ralph T. Gigliotti, United States Department of Veterans Affairs, Kristopher Wade Vlosich and Robert Wilkie [20–6060](ank) (Entered: 05/01/2020) |
| 05/01/2020 | 44 | | USCA Appeal Fee received in the amount of $ 505.00, receipt number OKW500079819, re 41 Notice of Appeal filed by John Tompkins (knt) (Entered: 05/01/2020) |
| 05/13/2020 | 45 | | TRANSCRIPT Order Form by John Tompkins that transcripts are not necessary. See order form for dates and proceedings. (Shadid, Danny) (Entered: |

| | | | |
|---|---|---|---|
| | | | 05/13/2020) |
| 05/14/2020 | <u>46</u> | | TRANSCRIPT LETTER advising no transcripts are necessary re <u>41</u> Notice of Appeal filed by John Tompkins. The record is ready for appeal purposes. (ank) (Entered: 05/14/2020) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

JOHN TOMPKINS, M.D.,                           )
                                               )
           Plaintiff,                          )
                                               )        Case No. CIV-18-1251-C
v.                                             )        Western District
                                               )
1. UNITED STATES DEPARTMENT                    )
OF VETERANS AFFAIRS,                           )
                                               )
2. ROBERT WILKIE, in his Official Capacity,    )
                                               )
3. RALPH T. GIGLIOTTI, in his Official         )
Capacity, and,                                 )
                                               )
4. KRISTOPHER WADE VLOSICH, in his             )
 Official Capacity.                            )
                                               )
           Defendants.                         )

## AMENDED COMPLAINT

COMES NOW the plaintiff, John Tompkins, M.D., ***with the written consent of the defendants to file this Amended Complaint***, and for his Amended Complaint against defendants United States Department of Veterans Affairs ("VA"), Robert Wilkie, in his official capacity, Ralph T. Gigliotti, in his official capacity, and Kristopher Wade Vlosich, in his official capacity, alleges and states as follows:

## PARTIES, JURISDICTION AND VENUE

1.      The plaintiff is a citizen of the State of Oklahoma, residing in Oklahoma County, Oklahoma, within the Western District of Oklahoma.

2.      The United States Department of Veterans Affairs (VA) is a duly constituted,

cabinet level department of the executive branch of the United States Government, and is an "authority" of the government of the United States.

3.      Robert Wilkie is the duly appointed and Senate-confirmed Secretary of the United States Department of Veterans Affairs.  Defendant Wilkie became Secretary of the VA on or about July 30, 2018.  Defendant Wilkie also served as "acting" Secretary of the VA from March 28 through May 29, 2018.  Defendant Wilkie is sued in his official capacity as Secretary of the VA.

4.      The VA divides its administrative offices into multiple regions or "networks" known as a "Veterans Integrated Services Network" (VISN), which are located throughout the United States and United States territories.  There are two (2) VA health care systems in Oklahoma.  One is the VA Medical Center in Muskogee, Oklahoma, and the other, which is the site of the events involved in this action, is the Oklahoma City VA Medical Center. They are both part of "VISN 19" which is headquartered in Denver, Colorado.

5.      Ralph T. Gigliotti is, and was at all pertinent times, employed by the VA and is the "Network Director" of "VISN 19."  Defendant Gigliotti is sued in his official capacity as Network Director of VISN 19.

6.      Kristopher Wade Vlosich is, and was at all pertinent times, the Oklahoma City "System Director," i.e., the Director of the Oklahoma City VA Health Care System ("Oklahoma City VA").  Defendant Vlosich is sued in his official capacity as System Director of the Oklahoma City VA.

7.     Defendant Vlosich is, and was at all pertinent times, under the direct supervision of and reports to defendant Gigliotti.

8.     This action is brought for violation of the plaintiff's rights under the due process clause of the Fifth Amendment to the United States Constitution and for violation of federally granted rights under the VA Policies and Procedures pertaining to grievance hearings arising out of involuntary termination of employment and, more specifically, for violation of the administrative grievance procedures mandated by VA Policies and Procedures set forth in VA Handbook 5021/21, Part IV, Chapter 3, as contained in VA Handbook 5021/21, at Pages IV-17-through IV-29, attached hereto as Appendix A, and which is incorporated herein.

9.     As a cabinet level Department of the executive branch of the United States government, the VA is an "authority" of the government of the United States and, as such, is an "agency" within the purview of the federal Administrative Procedures Act, 5 USC §§551 et seq. The plaintiff has no further administrative remedies available beyond the hearing and appeal process set forth in the below-mentioned VA Policies and Procedures, and, therefore, has exhausted all administrative remedies available.

10.     The below-referenced decision of defendant Gigliotti, constitutes an adverse action taken by the defendants against the plaintiff.

11.     Subject matter jurisdiction is predicated upon this Court's federal question jurisdiction under 28 U.S.C. §1331, and upon this Court's authority to review actions of

administrative agencies of the government of the United States, 5 U.S.C. §§702-706, and to grant injunctive relief against officials of federal agencies under 5 U.S.C. §§702-706. This Court has personal jurisdiction over the parties in that all parties either reside within and/or conduct the business of the VA within the Western District of Oklahoma.

12.    Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. §1391(b) and (e), as (1) defendant Vlosich is a resident of the Western District of Oklahoma, (2) a substantial part of the events giving rise to this action occurred in the Western District of Oklahoma (the underlying events pertaining to the termination of the plaintiff from his service as an Orthopedic Surgeon for the VA all arose within the Western District of Oklahoma) and (3) the plaintiff is a resident of the Western District of Oklahoma and this action is brought against an agency of the United States and real property is not involved in this action. Venue is further proper as this Court is a "court of competent jurisdiction" within the purview of 5 U.S.C. §703.

## BACKGROUND

13.    Plaintiff, John Tompkins, M.D., was heretofore employed as an Orthopedic Surgeon at the Oklahoma City VA from 1987 through November 26, 2017.

14.    Dr. Tompkins had occupied the position of "Interim" Chief of Surgery commencing in September, 2010, and was later Chief of Surgery from January, 2012, through mid-October, 2016.

15.    Dr. Tompkins, voluntarily and without compulsion, resigned his position as

Chief of Surgery in mid-September, 2016, but remained in that position until a replacement was determined in mid-October 2016.

16.     Although Dr. Tompkins resigned his position as Chief of Surgery, he remained employed by the VA as an Orthopedic surgeon at the Oklahoma City VA, just as he had since 1987, and remained employed by the VA as an Orthopedic surgeon at the Oklahoma City VA until the time of being involuntarily discharged on November 21, 2017, effective November 26, 2016.

17.     At all pertinent times, Dr. Tompkins possessed and had a reasonable expectation of continued employment as an Orthopedic surgeon working for the VA.

18.     Defendant Vlosich was transferred from a VA Medical Center outside of Oklahoma and named the System Director of the Oklahoma City VA in or about May, 2016.

19.     Prior to Dr. Tompkins being discharged for alleged administrative deficiencies, defendant Vlosich had attempted to discharge Dr. Tompkins for alleged medical deficiencies.

20.     On July 13, 2017, defendant Vlosich summarily suspended Dr. Tompkins' privileges to perform knee and hip replacement procedures, effective July 14, 2017, citing a recommendation from the then-new Chief of Staff, Susan Bray-Hall, M.D. (a geriatric medicine specialist).  A copy of defendant Vlosich's letter of July 13, 2017, to Dr. Tompkins is attached hereto as Exhibit 1.

21.     Upon outside review of approximately 50 patient charts by three (3) separate VA Orthopedic Surgeons (reviewing approximately one-third (1/3) of the subject charts

each), the reviewers separately reported that Dr. Tompkins' medical practice was extremely good and well within the accepted standard of medical care.  Copies of the three (3) reports or responding letters of the three (3) VA reviewers are collectively attached hereto to as Exhibit 2.

22.     Shortly following receipt of the aforesaid letters/reports from the VA reviewers, Dr. Tompkins was reinstated to full surgical privileges on August 24, 2017.  A copy of the said reinstatement letter is attached hereto as Exhibit 3.

## COUNT I

23.     The plaintiff hereby adopts and realleges each and every allegation set forth in Paragraph Nos. 1-22, above.

24.     Following defendant Vlosich's failed attempt to oust Dr. Tompkins for alleged medical deficiencies, defendant Vlosich and then-new Chief of Staff Bray-Hall took steps to discharge Dr. Tompkins on the bases of alleged administrative deficiencies occurring in 2015-2016.

25.     On October 30, 2017, Susan Bray-Hall, M.D., issued a letter of "Proposed Separation & Revocation of Clinical Privileges," citing three (3) specifications of alleged administrative deficiencies occurring in 2015 and 2016 and two (2) purported aggravating factors.  A copy of the said letter is attached hereto as Exhibit 4.

26.     On November 14, 2017, Dr. Tompkins, through undersigned counsel, submitted Dr. Tompkins' formal response to the letter of Proposed Separation & Revocation

of Clinical Privileges to defendant Vlosich, a copy of which is attached hereto as Exhibit 5. Additionally, Dr. Tompkins, himself, sent a corresponding response to defendant Vlosich, a copy of which is attached hereto as Exhibit 6.

27.     On November 20, 2017, undersigned counsel, on behalf of Dr. Tompkins, sent correspondence to defendant Vlosich requesting that defendant Vlosich recuse himself from acting as the decision-maker regarding the Proposed Separation & Revocation of Clinical Privileges.  The said correspondence is attached hereto as Exhibit 7 and is incorporated herein by reference.

28.     The request for defendant Vlosich to recuse was due to defendant Vlosich having previously reviewed and agreeing with the draft report of the Office of Inspector General (OIG), upon which Dr. Bray-Hall was purportedly relying to support the letter of Proposed Separation & Revocation of Clinical Privileges.  Defendant Vlosich had signed off on a letter, dated August 17, 2017, stating that he had reviewed the OIG draft report and agreed with the findings therein.  A copy of that letter is attached hereto as Exhibit 8.

29.     On November 20, 2017, Mr. C. Trent Castleberry, who was an "Employee/Labor Relations Specialist, Human Resource Service, Oklahoma City VA Health Care System," sent via e-mail a letter signed by defendant Vlosich directly to Dr. Tompkins (breaching norms of communicating only with the attorney known to represent a party), with a copy to undersigned counsel, advising that defendant Vlosich refused to recuse himself. A copy of that letter is attached hereto as Exhibit 9.

30.     On November 21, 2017, Mr. Castleberry delivered to Dr. Tompkins a formal letter of discharge issued and signed by defendant Vlosich.  The discharge was to be effective November 26, 2017.  A copy of the said discharge letter is attached hereto as Exhibit 10.

31.     Thereafter, on December 6, 2017, Dr. Tompkins, through undersigned counsel, submitted his written formal grievance and demand for an evidentiary hearing to defendant Gigliotti, pursuant to VA grievance procedures and in accordance with the notice of right to seek further relief via grievance procedure as mentioned in the aforesaid discharge letter.  A copy of the formal grievance of December 6, 2017, is attached hereto as Exhibit 11.

32.     Within the formal grievance letter submitted to defendant Gigliotti was a corresponding request that neither defendant Gigliotti nor any of his subordinates within VISN 19 participate in any part of the decision-making process.  This request was made due to defendant Gigliotti having previously reviewed and approved the draft report of the OIG, just as defendant Vlosich had done.  A copy of the letter of August 17, 2017, reflecting his review and agreement with the content of the report is attached hereto as Exhibit 12.

33.     Defendant Gigliotti did not reply to the request for recusal.

34.     Subsequent to filing a formal grievance, the matter was set for an evidentiary hearing.

35.     Roger Tatum, M.D., Chief of Surgery at the VA Puget Sound Health Care System (VISN 20) was designated by defendant Gigliotti to be the Grievance Examiner.

36.     Dr. Tatum conducted approximately 12.25 hours of evidentiary hearing, with

opening and closing arguments. The hearing commenced on May 2, 2018, and was thereafter resumed on June 18, 2018, and concluded on June 19, 2018.

37.     Dr. Tatum wrote an extremely detailed report setting forth the evidence as to the alleged administrative deficiencies (which he found to exist in part, but which did not rise to the level of a termination from employment), the alleged aggravating factors (which Dr. Tatum found did not exist at all) and Dr. Tatum's rationale and recommendation for reinstatement of Dr. Tompkins.  Dr. Tatum's report is attached hereto as Exhibit 13.

38.     Thereafter, defendant Gigliotti issued a decision concurring in the termination of Dr. Tompkins,  contrary to Dr. Tatum's report  and recommendation.

39.     Defendant Gigliotti's decision is dated August 17, 2018, and was ostensibly signed on August 21, 2018, but was not sent to the parties until September 4, 2018. A copy of defendant Gigliotti's decision is attached hereto as Exhibit 14.

40.     Defendant Gigliotti, in his official capacity, is charged with the duty of enforcing and following the policies and procedures of the VA, including those set forth in VA Handbook 5021/21, Part IV, Chapter 3 (Appendix A, hereto).

41.     Defendant Gigliotti, in the present case, affirmatively failed and refused to follow the policies and procedures of the VA, including those set forth in VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13 (Contained within Appendix A, hereto).

42.     Defendant Gigliotti, as VISN 19 Network Director, refused to follow the Grievance Examiner's report and recommendation of reinstatement, and at the same time did

not follow express, mandatory VA requirements to be followed if and when a decision-maker refuses to follow a Grievance Examiner's report and recommendation, as set forth in VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, (within Appendix A hereto).

43.     Defendant Gigliotti's rejection of Dr. Tatum's report and recommendation was done in a manner contrary to the mandatory provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, as set forth within Appendix A hereto, both procedurally and substantively.

44.     The applicable portions of the VA Handbook are found at VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, ( contained within Appendix A hereto) which provides pertinent part:

> "(1)     If the decision official modifies or rejects the examiners recommendation(s), the written decision will include a ***specific statements*** of the reasons for the modification or rejection. Modification or rejection of recommendations of the grievance examiner ***will be limited*** to the following grounds:
>
> (a)     The recommendation(s) are contrary to law, regulation, or published Department Policy: and/or
>
> (b)     The recommendation(s) are not supported by the preponderance of the evidence." (Emphasis added.)

45.     Substantively, defendant Gigliotti, as Network Director of VISN 19, could reject the Grievance Examiner's recommendations only on the basis of one (1) or more of the two (2) expressly specified grounds listed in VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13 , *i.e.*,

"(a)     The recommendation(s) are contrary to law, regulation, or published department  policy; and/or

 (b)     The  recommendation(s)  are  not  supported by the preponderance of the evidence. or,

46.     In his decision to affirm defendant Vlosich's termination of Dr. Tompkins, defendant Gigliotti, procedurally and substantively, did not  state any specific  reasons for rejection of the Grievance Examiner's recommendations. Defendant Gigliotti did not base his rejection of Dr. Tatum's report and recommendation  on any of the limited, above-listed bases as expressly required by VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13.

47.     Defendant Gigliotti failed to follow the mandatory procedural and substantive provisions of  VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13.

48.     Defendant  Gigliotti  failed  to  afford  Dr.  Tompkins  his  procedural  and substantive administrative and due process rights to a specific statement that Dr. Tatum's recommendations were contrary to law, regulation or published department policy and, if so, specifically how Dr. Tatum's recommendations were contrary to law, regulation or published department  policy,  or  that  Dr.  Tatum's  recommendations  were  not  supported  by  the preponderance of the evidence  and how Dr. Tatum's recommendations were not supported by the preponderance of the evidence.

49.     Not  only  did  defendant  Gigliotti  fail  to  specify  how  Dr.  Tatum's recommendations were contrary to law, regulation, or published department policy, he also failed  to  specify  how  Dr.  Tatum's  recommendations  were  not  supported  by  the

preponderance of the evidence, but defendant Gigliotti actually inserted into his decision

letter a  purported statement attributed to the office of the Inspector General, which was

outside of any evidence presented to Dr. Tatum and was, in fact, never part of the OIG

Report.

      50.    More specifically, in his decision letter of August 17, 2018, Exhibit 14 hereto,

defendant Gigliotti stated in Paragraph 6 of his decision letter:

> "The findings from the investigation conducted by OIG
> indicated the severe impact Dr. Tompkins' lack of oversight had
> on Surgery Service as well as the facility. It is noted that the
> leadership of the facility took administrative action once they
> received the required clearance from OIG officials."

      51.    The content of the overall OIG report was not part if the evidence presented

to Dr. Tatum. Excerpts of the OIG report which may have been presented to Dr. Tatum

contained no language or findings whatsoever regarding any "impact," much less any "severe

impact" on the surgery service or the Oklahoma City VA facility. No where in the entire

report are there any such findings of the OIG. Defendant Gigliotti's aforesaid statement in

his decision letter evidences the fact that defendant Gigliotti had prejudged the matter and

was arbitrary and capricious in his decision, as such evidence was never before Dr. Tatum

and such a statement was never even contained within the OIG report. Defendant Gigliotti

attempted to justify his decision in a manner beyond the express limitations of VA Handbook

5021/21, Part IV, Chapter 3, Paragraph 13.

      52.    The above-quoted portion of defendant Gigliotti's decision making letter also

reveals the predetermined decision of defendant Vlosich to terminate Dr. Tompkins, prior to issuance of the OIG report, and the arbitrariness and capriciousness of defendant Vlosich's actions in this regard. Specifically, defendant Gigliotti, in his decision letter, establishes that the "leadership at the facility," of which defendant Vlosich was the head, took action once he received "required clearance" from OIG officials. There is no "required clearance" from OIG officials to terminate a permanent employee at the VA. Defendant Gigliotti's statement reveals that the termination of Dr. Tompkins was already in the works at the Oklahoma City VA and officials there were simply waiting for the issuance of the OIG report, the preliminary draft of which defendant Vlosich had expressly approved on August 17, 2017. (Exhibit 12, hereto.)

53.    Yet, contrary to the aforementioned statement in defendant Gigliotti's decision letter, defendant Dr. Bray-Hall's "Proposed Separation and Revocation of Clinical Privileges" letter (Exhibit 4 hereto) was issued on October 30, 2017, three (3) days prior to the issuance of the OIG final report. There was no waiting for OIG "required clearance." Defendant Gigliotti, in his decision letter, simply wrote an untruth, while ignoring the mandate of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13 for a statement of specifics as to how Dr. Tatum's recommendations were contrary to law, regulations or Department policy, or were not supported by a preponderance of the evidence.

54.    Defendant Wilkie, in his official capacity, is charged with the duty of enforcing the policies and procedures of the VA, including those set forth in VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13.

55.     The defendants' joint and several violations of mandatory administrative procedures pertaining to the determination of an administrative grievance procedure constitute deprivations of Dr. Tompkins' procedural and substantive due process rights under the Fifth Amendment to the United States Constitution, as well as deprivations of the aforementioned federally-created procedural and substantive administrative rights, themselves.

56.     Dr. Tompkins has been denied his procedural and substantive due process rights afforded him by the VA rules and grievance procedures as per VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, and by the Fifth Amendment to the United States Constitution.

57.     As a result of the defendants' joint and several violations of Dr. Tompkins' procedural and substantive due process rights, as well as the underlying procedural and substantive administrative rights, has caused Dr. Tompkins to suffer severe damages.

58.     The only relief available to Dr. Tompkins is that of injunctive relief, both under federal common law and under 5 U.S.C. §§702 et seq.

59.     Dr. Tompkins is entitled, as a matter of law, to the benefit of the Grievance Examiner's report and recommendations.

60.     Dr. Tompkins is entitled, as a matter of law, to the substantive due process right of the benefits set forth in the Grievance Examiner's report and recommendations, absent specific findings of one of the three (3) above-listed bases for rejection.

61.     Dr. Tompkins has suffered a legal wrong because of the actions of defendant VA and all of the acts and omissions of the individually named defendants, in their official capacities and under color of legal authority. 5 U.S.C. §702. As such, Dr. Tompkins is entitled to a mandatory decree compelling the individually named defendants to comply with the mandates of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13.

62.     Defendant Gigliotti's   acts and omissions in rejecting the Grievance Examiner's recommendations, in failing to comply with the mandatory requirements of 5 U.S.C. §§702-706, and in upholding defendant Vlosich's discharge of Dr. Tompkins were arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to Dr. Tompkins' constitutional right of due process, in excess of his authority and were without observance of procedure required by law. 5 U.S.C. §706.

63.     Upon the existence of any of the items set forth in Paragraph 62, above, this Court is mandated to compel the defendant VA and the individually names defendants, in their official capacities, to withhold the unlawful act of discharging Dr. Tompkins from VA employment, and must hold as unlawful and must set aside the VA's and the individual defendants' actions discharging Dr. Tompkins from VA employment.  5 U.S.C. §706.

64.     In reviewing the VA's agency action against Dr. Tompkins, the Court must review the entire record. 5 U.S.C. §706.  In this regard, a complete record of the evidentiary hearing conducted by Dr. Tatum does exist. Transcripts of the entire evidentiary hearing and copies of all exhibits admitted, and/or offered but not admitted, are available for the Court to review.

65.     Dr. Tompkins has no adequate remedy at law.  Dr. Tompkins has suffered extreme harm as a result of the defendants' joint and several denial of procedural and substantive administrative rights expressly mandated by VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13.  Dr. Tompkins will continue to suffer such extreme harm, which said harm is irreparable absent mandatory injunctive relief from this Court.

66.     The only lawful and valid determination made upon conclusion of the aforesaid evidentiary hearing is that of Dr. Tatum. The recommendation of Dr. Tatum, absent valid, mandatory procedures and substance, must be given its full force and effect.

67.     The only remedy available to redress the denial of Dr. Tompkins' administrative procedural and substantive rights is that of mandatory injunctive relief, commanding the defendants, and all of them, to reinstate Dr. Tompkins in accordance with the findings and recommendations of the Grievance Examiner, and to pay to the plaintiff all back salary and corresponding benefits, together with interest thereon, from and after November 26, 2017, through the date of reinstatement.

WHEREFORE, the plaintiff respectfully prays the Court enter Judgment on Count I for the plaintiff and against the defendants, jointly and severally, and enter a permanent, mandatory injunction commanding the defendants, and all of them, to reinstate the plaintiff in accordance with the findings and recommendations of the Grievance Examiner, with all back pay and corresponding benefits, together with interest thereon, from and after November 26, 2017, through the date of reinstatement.  The plaintiff further prays the Court award the plaintiff his court costs and attorneys fees.

## COUNT II

68.     The plaintiff hereby adopts and realleges each and every allegation set forth in Paragraph Nos. 1-67, above.

69.     Dr. Tompkins was entitled to an unbiased decision-maker to review Dr. Bray-Hall's Proposed Separation & Revocation of Clinical Privileges and Dr. Tompkins' Response and exhibits attached thereto.

70.     Long prior to the rendering of his official "Decision," defendant Vlosich had prejudged the issues.  On August 17, 2017, defendant Vlosich had reviewed and approved the OIG's draft Report (see Exhibit 8, hereto) which ultimately became a final Report, dated November 2, 2017, and from which Dr. Bray-Hall took snippets to create the Proposed Separation & Revocation of Clinical Privileges.

71.     Evidence will now show that defendant Vlosich and/or his subordinates had actually identified and engaged a successor to Dr. Tompkins' position several weeks before the letter of Proposed Separation & Revocation of Clinical Privileges was even issued.

72.     During the evidentiary hearing before Dr. Tatum, when asked if she told Dr. Aimee Levy (Chief of Surgery) during August, 2017, or thereabouts, that defendant Vlosich had planned to fire Dr. Tompkins, Dr. Bray-Hall testified under oath, "You know, I don't remember specifically." (Tr. of Testimony of Susan Bray-Hall, of June 18, 2018, at Page 66, Lines 19-23).  In her testimony, Dr. Bray-Hall did not deny that defendant Vlosich had previously stated to Dr. Levy, in August, 2017, or thereabouts, that defendant Vlosich planned on firing Dr. Tompkins.

73. Additional evidence will show that during August, 2017, or thereabouts, defendant Vlosich did, in fact, state to Dr. Levy that defendant Vlosich planned on terminating the employment of Dr. Tompkins.

74. Defendant Vlosich had, in fact, pre-determined to terminate the employment of Dr. Tompkins before the issuance of the  letter of Proposed Separation & Revocation of Clinical Privileges and long before defendant Vlosich's purported review of materials and purportedly entering into and conducting the decision-making process leading to the formal "Decision" of November 21, 2018, to terminate the employment of Dr. Tompkins.

75. Defendant Vlosich was not and could not have been a fair and unbiased decision-maker.

76. Defendant Vlosich's refusal to recuse himself as the initial decision-maker regarding the discharge of Dr. Tompkins was violative of Dr. Tompkins' right of due process under the Fifth Amendment to the United States Constitution.

77. Similarly, Defendant Gigliotti's refusal to recuse himself as a decision-maker following the aforesaid evidentiary hearing was also violative of Dr. Tompkins' right of due process under the Fifth Amendment to the United States Constitution.

78. Defendant Gigliotti, on August 17, 2017, had also reviewed and approved the OIG's draft Report long before the official discharge of Dr. Tompkins was implemented by defendant Vlosich, long before the hearing conducted by Dr. Tatum, and long before purportedly entering into and purportedly conducting the decision-making process leading

to his formal "decision" of August 17, 2018, to uphold the termination of the employment of Dr. Tompkins.  See Exhibit 12.

79.    Dr. Tompkins was denied the due process right to have a fair and unbiased decision-maker at the Network level upon conclusion of the evidentiary hearing and receipt of Dr. Tatum's report and recommendation for reinstatement.

80.    Dr. Tompkins' was denied his right of due process under the Fifth Amendment to the United States Constitution.

81.    The fact that defendant Gigliotti had prejudged and predetermined his upholding of defendant Vlosich's discharge of Dr. Tompkins' employment from the VA is further borne out by defendant Gigliotti's blatant failure to follow the express, mandated procedural and substantive provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, and by the fact that defendant Gigliotti went outside of the record to include false statements of fact in his decision letter.

82.    Defendant Gigliotti's failures to adhere to the procedural and substantive provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, as detailed in Count I, above, and adopted in this Count II, violated Dr. Tompkins' rights of procedural and substantive due process under the Fifth Amendment to the United States Constitution.

83.    Defendant Stone's failures to adhere to and to enforce the express and mandatory procedural and substantive provisions of  VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, as detailed in Count I, above, and adopted in this Count II, violated

Dr. Tompkins' rights of procedural and substantive due process under the Fifth Amendment to the United States Constitution.

84.     Defendant Wilkie and defendant VA are charged with the duty to enforce the express and mandatory procedural and substantive provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13, and they were so charged with the said duty in relation to the proceedings to discharge Dr. Tompkins from VA employment.

85.     Defendant Wilkie and defendant VA have not fulfilled their aforesaid respective duties to enforce the express and mandatory procedural and substantive provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13  in relation to the proceedings to discharge Dr. Tompkins from VA employment.

86.     Defendant Wilkie's and defendant VA's failure to fulfill their aforesaid respective duties to enforce the express and mandatory procedural and substantive provisions of VA Handbook 5021/21, Part IV, Chapter 3, Paragraph 13  in relation to the proceedings to discharge Dr. Tompkins from VA employment, constitutes a denial of due process and a violation of Dr. Tompkins' rights of due process under the Fifth Amendment to the United States Constitution.

87.     Dr. Tompkins has no adequate remedy at law to redress the denial of his rights of due process under the Fifth Amendment to the United States Constitution.  Dr. Tompkins has suffered extreme harm as a result of the defendants' joint and several denial of procedural and substantive due process rights expressly mandated by VA Handbook 5021/21,

Part IV, Chapter 3, Paragraph 13.  Dr. Tompkins will continue to suffer such extreme harm, which said harm is irreparable absent mandatory injunctive relief from this Court.

WHEREFORE, the plaintiff respectfully prays the Court enter Judgment on Count II for the plaintiff and against the defendants, jointly and severally, and enter a permanent, mandatory injunction commanding the defendants, and all of them, to reinstate the plaintiff in accordance with the findings and recommendations of the Grievance Examiner, with all back pay and corresponding benefits, together with interest thereon, from and after November 26, 2017, through the date of reinstatement.  The plaintiff further prays the Court award the plaintiff his court costs and attorneys fees.

**JURY TRIAL DEMANDED**

Respectfully submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail:dshadid@riggsabney.com
Attorney for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Thomas Majors
Rebecca A. Frazier
Assistant U.S. Attorney
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Tom.Majors@usdoj.gov
Rebecca.Frazier@usdoj.gov

Case 5:18-cv-01251-J Document 24-1 Filed 11/20/19 Page 1 of 14
Appellate Case: 20-6050 Document 010110395454 Date Filed: 09/03/2020 Page: 31
Case 5:18-cv-01251-C Document 18-1 Filed 07/05/19 Page 24 of 38

NOVEMBER 8, 2012

VA HANDBOOK 5021/10
PART IV
CHAPTER 3

## CHAPTER 3. TITLE 38 GRIEVANCES

### 1. SCOPE AND AUTHORITY

a. **General.** This chapter governs employee grievances under the VA grievance procedure.

b. **Employee Coverage**

(1) This chapter applies to all permanent and probationary physicians, dentists, podiatrists, chiropractors, optometrists, nurses, nurse anesthetists, physician assistants, and expanded-function dental auxiliaries [appointed under 38 U.S.C. 7401(1) and part-time registered nurses, including those with an intermittent duty basis, appointed under 38 U.S.C. 7405(a)(1)(A)].

(2) A bargaining unit employee may elect to use the VA grievance procedure described in this chapter or the negotiated grievance procedure, but not both, in the case of a disciplinary or adverse action covered under part II of this handbook which does not involve a question of professional conduct or competence.

c. **Disciplinary and Adverse Actions Covered.** Disciplinary and major adverse actions [issued to full-time permanent employees] (as defined in Part II, Chapter 1 of this handbook), other than title 38 major adverse actions which involve questions of professional conduct or competence, are covered by the grievance procedures described in this chapter. [These procedures also cover disciplinary and major adverse actions (as defined in Part II) issued to permanent and probationary part-time registered nurses appointed under 38 U.S.C. 7405(a)(1)(A). Part-time includes those registered nurses with an intermittent duty basis.]

### 2. REFERENCES

a. Section 203 of the Department of Veterans Affairs Health-Care Personnel Act of 1991 (Pub. L. 102-40).

b. Section 302 of the Veterans Healthcare, Capital Asset and Business Improvement Act of 2003 (Pub. L. 108-170).

c. Section 3 of the Department of Veterans Affairs Health Care Personnel Act of 2004 Public Law (Pub. L.) 108-445.

d. [Section 601 of the Caregivers and Veterans Omnibus Health Services Act of 2010 Public Law (Pub. L.) 111-163.

e.] 38 U.S.C. 501(a), 512(a), 7421, 38 U.S.C. 7461-7464.

### 3. OFFICIALS AUTHORIZED TO SETTLE GRIEVANCES

a. **Informal Grievance Procedure.** The official who will make a decision on grievances filed at the informal stage will be the immediate supervisor, or lowest level official with authority to settle the issue.



IV-17

b. **Formal Grievance Procedure.**  Authority to make a decision when the formal stage of the grievance procedure is reached will be exercised as follows:

(1) **Grievances of Facility Employees.**  The facility Director will be the decision official on a grievance from an employee under the facility Director's jurisdiction provided the matter to be resolved is one which is under the Director's authority.  In grievances where one of the exceptions identified in subparagraph (3) of this paragraph exist, the grievance will be decided by the next higher level official with the authority to resolve the issue.

**IV-17a**

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 3 of 14
Appellate Case: 23-6050 60Document: 01059Domunt111 0395 4Date: Fibn5 1168/02/202020age: Page: 33
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 26 of 38

VA HANDBOOK 5021/4                                       **SEPTEMBER 21, 2006**
PART IV
CHAPTER 3

(2) **Grievances of VA Central Office Employees.** The Under Secretary for Health, or designee, will decide the formal grievance of VA Central Office employees unless one of the exceptions in subparagraph (3) of this paragraph applies. (VA Central Office employees include those individuals whose names appear on VA Central Office employment listings, but may be physically located in a different geographic location.)  In those cases, where exceptions exist, the Secretary is responsible for designating an appropriate official who may decide the formal grievance.

(3) **Exceptions.** The normal decision official, as designated in paragraph 3b, will not decide the grievance when that official:

(a) Is the official with whom the employee would take up the initial grievance at the informal stage;

(b) Does not have the authority to make a determination on the grievance issues; or

(c) Made the decision or took the action on which the employee's grievance is based.

## 4. REPRESENTATION

a. **Election of Representation.**  An employee may present a grievance with or without representation.

b. **Designation of a Representative.**  An employee has the right to be accompanied, represented, and advised by a representative of choice at any stage of the procedure.  If a grievance is presented under the formal grievance procedure, designation of a representative will be in writing and will be submitted to the decision official.  Any change of representative will be in writing.

c. **Disallowance of a Designated Representative**

(1) **Conflict of Position or Conflict of Interest.**  An employee's representative who is employed by VA may be disallowed by the decision official because of conflict of position or conflict of interest.  The disallowance of a representative will be in writing, and will be issued within 5 days of receipt of the employee's written designation of representative.  The notice of disallowance will inform the employee of the basis on which the determination to disallow is made, and the right of the employee to challenge the determination.

(2) **Challenge of Disallowance of Designated Representative.**  If informed that a designated representative has been disallowed, an employee may, within 5 days, challenge the disallowance in writing to the decision official.  A challenge should state the reason for disagreeing with the disallowance, and whether the employee wishes to proceed with the grievance or wait for a decision on the challenge.  The grievance decision official will make a final decision on a challenge of disallowance of a representative no later than 10 days after receipt of the challenge.

d. **Change of Designated Representative.**  In the event that an employee changes representatives during the proceeding, any disallowance of representative or challenge regarding a disallowance will be resolved in the manner identified in paragraph 4c.

IV-18

Case 5:18-cv-01251-J Document 24-1 Filed 11/20/19 Page 4 of 14
Appellate Case: 20-6080 Document: 010110395423 Date Filed: 08/28/2020 Page: 34
Case 5:18-cv-01251-C Document 18-1 Filed 07/05/19 Page 27 of 38

## 5. TIME LIMITS FOR PROCESSING A GRIEVANCE

a. **Time Limits.** A decision on a grievance will be issued within the shortest time frame possible. To ensure timely and orderly processing, the following time limits are established for each stage of the grievance procedure:

(1) **Informal Procedure**

(a) 15 days from the date of the incident or action on which the grievance is based for employee to initiate grievance. When an employee is informed of a final decision that has not yet been effected, the period to present a grievance is counted from the date of notification of the action.

(b) 10 days for the supervisor to complete the action under the informal procedure.

(2) **Formal Procedure**

(a) 10 days for employee to file a written grievance under the formal procedure after completion of the informal procedure, or 15 days from the date of service of a decision where a grievance originates at the formal process (see par. 8, this chapter).

(b) 10 days for deciding official to adjust, reject, or refer grievance for inquiry by examiner or for technical review after employee files formal grievance.

(c) 30 days for completion of the inquiry and submission of report when the examiner is appointed locally.

(d) 45 days for completion of the inquiry and submission of report when an examiner from outside the facility is appointed.

(e) 30 days for Central Office to issue technical reviews when requested to do so by the decision official.

(f) 15 days for issuance of the decision after the decision official receives the examiner's report of findings and recommendations or the Central office technical review.

b. **Grievance on Continuing Condition or Practices.** An employee may present a grievance concerning a continuing practice or condition at any time. Situations caused by actions which were taken or occurred on a specific date (e.g., admonishments, reprimands, or shift assignments) are not considered continuing conditions for these purposes despite any continuing effects they may have.

c. **Delays in Processing Grievances.** Management officials will ensure that grievances are processed promptly. Management delays in any stage of the grievance procedure beyond the prescribed time limits will be explained to the employee and the employee's representative. Such delays should be rare. If the employee delays in any stage of the grievance procedure, management will determine whether there was good cause and whether the grievance should continue to be processed. Such delays,

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 5 of 14
Appellate Case: 23-6060  Document: 010110305942  Date Filed: 08/28/2023   Page: 35
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 28 of 38

**VA HANDBOOK 5021**                                                    **APRIL 15, 2002**
**PART IV**
**CHAPTER 3**

explanations, and determinations will be documented for the record.  This includes any delay created by the denial of an employee's representative or by challenge to the denial.

## 6. INFORMAL GRIEVANCE PROCEDURE

a. **Presenting a Grievance Under Informal Procedure.**  An employee desiring consideration of a grievance must first seek informal adjustment of the matter through supervisory channels.  This informal procedure will not be utilized when grieving disciplinary and adverse actions, where grievances will be initiated at the formal step of the grievance procedure.  The employee's request for informal adjustment of a grievance should be made as soon as possible, but not later than 15 days after the date of the incident or action upon which the grievance is based, or the date upon which the employee became aware of, or should have become aware of, the incident or action upon which the grievance is based.  The initial presentation at the informal level may be oral or written and is normally made to the immediate supervisor.  If the grievance is presented orally, the employee must make clear that a grievance is being presented, in order to distinguish grievances from mere inquiries.  Supervisors who receive oral grievances will prepare a written summary of the oral presentation.

b. **Resolving a Grievance.**  The supervisor to whom a grievance has been presented for informal adjustment will attempt to resolve it as expeditiously as possible, seeking the advice and assistance of others where necessary, and will give the employee a written decision on the matter within 10 days from the date of the request for informal consideration.  If the relief sought is not granted, the employee shall be advised of the right to present the grievance under the formal procedure.

c. **Mandatory Use of the Informal Procedure.**  Normally, the employee must complete processing under the informal procedure before a grievance will be accepted for processing under the formal procedure.  However, when the authority to resolve the matter is reserved to the Secretary, the informal procedure will not be used.  This informal procedure will not be utilized when grieving disciplinary and adverse actions, where grievances will be initiated at the formal step of the grievance procedure (see par. 8 of this chapter).

d. **Mandatory Acceptance of an Informal Grievance.**  A grievance may not be rejected in the informal stage for any reason.  If the grievance is not timely or does not meet criteria for processing under the grievance procedure, the employee should be so advised.  However, the employee will still be permitted to submit the grievance under the formal procedure.  Reasons for rejection of a grievance during the formal procedure are discussed in paragraph 10.

## 7. FORMAL GRIEVANCE PROCEDURE

a. **Presenting Grievance Under Formal Procedure.**  If the employee is not satisfied with the decision at the informal stage, or is grieving a disciplinary or adverse action (see par. 8 of this chapter), the employee may present the grievance under the formal procedure.  The formal grievance must be submitted in writing through the employee's immediate supervisor, within 10 days after completion of the informal procedure, or 15 days from the date of service of a decision where a grievance originates at the formal process (see par. 8, this chapter).  The immediate supervisor or other official receiving the employee's formal grievance will refer it promptly through channels to the appropriate decision official.  The time limit may be extended by management when good cause is shown by the employee.

**IV-20**

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 6 of 14
Appellate Case: 20-6080   Document: 010110395420   Date Filed: 08/28/2020   Page: 36
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 29 of 38

APRIL 15, 2002

VA HANDBOOK 5021
PART IV
CHAPTER 3

b. **Contents of Formal Grievance**

(1) A formal grievance will be submitted in writing, will contain sufficient detail to identify and clarify the basis for the grievance, and will specify the personal relief requested by the employee. It will contain the following information:

(a) The specific action or incident on which the grievance is based, the date the action or incident occurred (if known), and the date the employee first learned of the action or incident (if appropriate).

(b) The reason(s) for which the employee believes that the action was unjustified or that the employee was treated unfairly; and/or the specific policy (department, facility, etc.), written agreement, or regulation violated and how it affected the employee.

(c) The corrective action desired by the employee.

(2) If the formal grievance does not contain a statement of the grievance giving essentially the information specified above, the decision official will return the grievance to the employee so that the necessary information may be furnished. If the employee fails to provide the necessary information after being provided with an opportunity to do so, the decision official should cancel the grievance following procedures contained in paragraph 10 of this chapter.

c. **Group Grievances.** When a group of employees has an identical formal grievance, it will be considered in the same manner as an individual complaint and the decision will be binding on all members of the group. The group will select one individual case for processing under the provisions of the formal grievance procedure.

d. **Decision Official.** The normal decision official will not decide the grievance when that official made the decision or took the action on which the employee's grievance is based. The grievance examiner and grievance decision official will be from outside the facility. See further guidance in paragraph 3, this chapter.

e. **Adjustment or Referral of Grievance by Decision Official.** Unless the decision official rejects or returns the grievance for additional information, that official will review the employee's grievance and the grievance file and explore the possibility of adjusting the grievance to the employee's satisfaction. If the decision official is unable to resolve the grievance in a manner acceptable to the employee, the grievance will be referred for inquiry by an examiner (see par. 12, of this chapter) or for technical review by an appropriate official (see par. 11 of this chapter) within 10 days of the decision official's receipt of the formal grievance.

8. **GRIEVANCES OVER DISCIPLINARY AND ADVERSE ACTIONS**

a. Grievances over disciplinary and adverse actions will be filed at the formal stage described in paragraph 7 of this chapter without first filing under the informal procedure. In cases of an adverse action, the employee is entitled to a hearing before a grievance examiner, if requested.

IV-21

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 7 of 14
Appellate Case: 20-6080   Document: 010110395485   Date Filed: 08/28/2020   Page: 37
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 36 of 38

VA HANDBOOK 5021                                                      APRIL 15, 2002
PART IV
CHAPTER 3

b. Grievances initiated under the formal stage must be filed within 15 days from the date of service of the decision letter as indicated by paragraph 5a of this chapter.

c. Except as provided in subparagraphs a and b above, all other provisions of this chapter apply.

## 9. GRIEVANCE FILE

a. When a formal grievance is submitted, Human Resources Management Service will be promptly notified by the appropriate decision official.

(1) Human Resources Management Service will establish a grievance file separate from the employee's personnel folder, which will contain:

(a) The employee's grievance and designation of representative (if applicable);

(b) Notices;

(c) Written replies;

(d) Material or evidence used to support administrative action (e.g., if the grievance is based on a disciplinary or other administrative action);

(e) Copies of relevant policies; and

(f) Any other information considered appropriate for review in making a decision on the grievance.

(2) The grievance file will be expanded as more information is developed. If an examiner is appointed to inquire into a grievance, the examiner will add appropriate information to the file based on any inquiry made.

(3) The examiner will ensure that the grievance file contains all documents related to the grievance, including evidence collected, statements of witnesses, notices and replies pertinent to the case, and the report of hearing when a hearing is held.

b. The grievance file must not contain any document that may not be reviewed by the employee or the employee's representative. Information added to the file by the examiner must be included in a form which the employee can review or such information cannot be used.

(1) Any use or disclosure of a record or information must comply with legal requirements for disclosure.

(2) A complete copy of the grievance file will be provided to the employee, upon request.

IV-22

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 8 of 14
Appellate Case: 20-6060   Document: 010110395486   Date Filed: 08/20/2020   Page: 38
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 31 of 38

APRIL 15, 2002

VA HANDBOOK 5021
PART IV
CHAPTER 3

## 10. REJECTION, RETURN, OR CANCELLATION OF A GRIEVANCE

   **a. Reasons for Rejection of a Grievance.**  The decision official may reject a grievance only for one or more of the following reasons:

   (1) The relief sought is not personal to the grievant.  Relief in the form of a request to discipline another employee will not be considered appropriate;

   (2) The matter(s) is(are) not covered by the VA grievance procedure (see par 16 of this chapter);

   (3) The grievance was not filed in a timely manner (see par. 5, this chapter, for specific time limits). A grievance may be rejected under the formal procedure based on a failure to timely file at either the formal or informal stage.

   **b. Written Notification of Rejection of Formal Grievance.**  The grievant and the grievant's representative will be notified in writing when a formal grievance is rejected, and provided with the specific reason(s) for the rejection.

   **c. Reasons for Return**

   (1) Insufficient detail was furnished to clearly identify the matter being grieved;

   (2) The personal relief sought is not specified.

   **d. Written Notification of Return of Grievance.**  The grievant and the grievant's representative will be notified in writing when a grievance is returned, and provided with the specific reason(s) for the return.  A reasonable time will be identified for resubmission of the grievance.

   **e. Reasons for Cancellation of Grievance.**  A grievance may be canceled, either wholly or partially as appropriate, by the decision official under any of the following conditions:

   (1) At the employee's request;

   (2) Termination of the employee's employment, unless the personal relief sought by the employee involves monetary issue(s) and can be granted after termination of employment;

   (3) Death of the employee, unless the grievance involves a matter which would have entitled the employee to pay or benefits;

   (4) Failure of the employee to furnish required information after being notified in accordance with the procedures contained in paragraph 10d. of this chapter; or

   (5) Failure of the employee to duly proceed with advancement of the grievance.

IV-23

Case 5:18-cv-01251-J  Document 24-1  Filed 11/20/19  Page 9 of 14
Appellate Case: 20-6060  Document: 010110354 Date filed: 08/28/2020  Page: 39
Case 5:18-cv-01251-C  Document 18-1  Filed 07/05/19  Page 32 of 38

VA HANDBOOK 5021                                              APRIL 15, 2002
PART IV
CHAPTER 3

   f. **Written Notification Of Cancellation of Formal Grievance.** The grievant and the grievant's representative will be notified in writing when a grievance is canceled, and provided with the specific reason(s) for the cancellation.

## 11. TECHNICAL REVIEW

   a. In cases where the facts are not in dispute and the primary issue involves only the interpretation of regulation or policy, instead of appointing an examiner, the decision official may forward the grievance for technical review and recommendations through appropriate channels to the Office of Human Resources Management [and Labor Relations] (051) in VA Central Office. Situations where "the facts are not in dispute" are those instances where management essentially agrees with the grievant's statement of facts in the formal grievance and the primary issue in dispute is regulatory or policy interpretation. The grievant and the grievant's representative will be provided with a copy of the decision official's referral letter to VA Central Office. Upon receipt of the request, the grievance will be forwarded to the appropriate organizational element in VA Central Office which has technical program responsibility in the matter(s) disputed. A technical review will be conducted and the resulting recommendations transmitted by an appropriate VA line official to the decision official, who will resolve the grievance as indicated in paragraph 13 of this chapter. Since the technical review is part of the grievance file, the employee is entitled to a copy, if requested.

   b. Matters covered under part II of this handbook which are subject to review under the grievance procedure, may only be resolved through a technical review if the employee waives the right to a formal review by a grievance examiner. Such waivers shall be in writing.

## 12. REVIEW BY GRIEVANCE EXAMINER

   a. **Appointment of Grievance Examiner**

   (1) In cases where an examiner is required, the decision official may appoint a subordinate employee to act as the grievance examiner or request an examiner be appointed from outside the local area.

   (2) Decision officials should make every effort to appoint a local examiner to investigate an employee grievance. There may be instances where this is not practicable due to the nature of the grievance and/or the unavailability of an appropriate individual to act as the grievance examiner.

   (a) Such grievances will be forwarded to the Network Director for assignment of a grievance examiner.

   (b) Referral of grievances to the Network Director should be minimized and must provide an explanation as to why the grievance could not be handled by a grievance examiner appointed at the local level.

   (c) Two copies of the grievance file will be included with the grievance. A copy of the grievance file will be retained by the decision official.

IV-24

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 10 of 14
Appellate Case: 20-6060   Document: 010110354249   Date Filed: 03/20/2020   Page: 40
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 33 of 38

APRIL 15, 2002

VA HANDBOOK 5021
PART IV
CHAPTER 3

(d) The grievant and the grievant's representative will be given a copy of the letter to the Network Director requesting appointment of a grievance examiner.

(e) An examiner will be appointed within 5 days after the request and required files are received.

(f) Grievance examiners appointed by the Network Director will be authorized to visit the grievant's facility, if appropriate.

(3) The grievance examiner will be fair, impartial, and objective, with demonstrated analytical and fact-finding skills. The grievance examiner will not be assigned cases in his or her work unit or service, and must be an employee who has not been involved in the matter being grieved and who does not occupy a position subordinate to any official who recommended, advised, made a decision, or who otherwise is or was involved in the matter being grieved. The grievant and any designated representative will be informed of the assignment. The examiner assigned will promptly review the case and determine the nature and scope of the inquiry appropriate to the issue(s) involved in the grievance.

(4) In cases arising from disciplinary actions involving professional conduct or competence as covered under part II of this handbook the grievance examiner will be selected from the panel of employees designated to serve on Disciplinary Appeals Boards. Notice of the grievance examiner's name on the panel list must have been provided at least 30 days prior to his or her selection as an examiner.

(5) The normal decision official will not decide the grievance when that official made the decision or took the action on which the employee's grievance is based. The grievance examiner and grievance decision official will be from outside the facility. See guidance in paragraph 3, this chapter.

b. **Formal Review.** At the examiner's discretion, the grievance inquiry may consist of:

(1) The securing of documentary evidence, including the solicitation of such technical advice as may be needed, or compelling expert VA testimony;

(2) Personal or telephone interviews (statements of witnesses obtained by the examiner should be under oath or affirmation, without a pledge of confidentiality);

(3) A group meeting;

(4) A hearing; or

(5) Any combination of the preceding.

c. **Hearings**

(1) Formal hearings should be limited to grievances involving complex matters or where important factual matters are in dispute. The decision to schedule a hearing is the prerogative of the examiner, except in grievances over adverse actions where the employee has the right to a hearing, if requested.

IV-25

Case 5:18-cv-01251-J Document 24-1 Filed 11/20/19 Page 11 of 14
Appellate Case: 21-6081 Document: 010110542882 Date Filed: 08/04/2021 Page: 41
Case 5:18-cv-01251-C Document 18-1 Filed 07/05/19 Page 34 of 36

VA HANDBOOK 5021/21                                    **February 19, 2016**
PART IV
CHAPTER 3

(2) If a hearing is held, the examiner will determine how the hearing will be recorded, and will have a verbatim transcript or written summary of the hearing prepared. The record will include all pertinent documents submitted and accepted by the examiner. The examiner will make the transcript a part of the record of the proceedings. When a verbatim transcript was not made, a summary of pertinent portions of the testimony will be made by the examiner. The summary will constitute the report of the hearing and is made a part of the record of the proceedings.

(3) The examiner's authority includes but is not limited to taking proper steps to expedite the hearing of evidence and ruling on all questions arising during the proceeding, such as admissibility of evidence and calling of witnesses.

(4) When the examiner determines that a verbatim transcript is required, the facility Director where the hearing is being held will provide the hearing room and services for preparing the transcript and will ensure that the transcript reaches the examiner within 10 days after the hearing is held.

(5) In cases where the examiner travels to a different facility, the examiner may use the services of the grievant's facility, the examiner's own facility, or both to prepare the summary, whichever the examiner deems appropriate.

d. **Administering Oaths or Affirmations.** For purposes of this part, examiners are authorized to administer oaths or affirmations to those individuals providing testimony relative to the grievance. (See [the Office of Human Resources Management, Employee Relations Web site for sample letters].)

e. **Preparation of Examiner's Report.** The examiner will prepare a report of findings and recommendations and submit that report with the grievance file to the decision official. The examiner will also furnish a copy of the report to the employee and the employee's representative. The examiner's report should include the rationale for the findings and recommendations.

f. **Time Limits for Examiner's Report.** Except in unusual cases, the time limit for submission of the report and the grievance file to the decision official is 30 days for local grievance examiners or 45 days for grievance examiners from outside the facility, after receipt of written notification of appointment as the grievance examiner.

## 13. DECISION ON A GRIEVANCE

a. **Action by Decision Official - Technical Review.** VA Central office technical reviews (paragraph 11a of this chapter) and the resulting recommendations will be forwarded to the formal grievance decision official, and will serve as the basis for the final decision. The decision official will issue the decision to the employee within 15 days after the technical review is received from VA Central office.

b. **Action by Decision Official - Examiner's Report.** Upon receipt of the grievance examiner's report of findings and recommendations, the decision official will accept, modify, or reject the examiner's recommendation(s) and issue a written decision to the employee within 15 days after the recommendation is received. The employee's representative will also receive a copy of the decision.

**IV-26**

Case 5:18-cv-01251-J  Document 24-1  Filed 11/20/19  Page 12 of 14
Appellate Case: 23-6030  Document: 010110395428  Date Filed: 06/20/2023  Page: 42
Case 5:18-cv-01251-C  Document 18-1  Filed 07/05/19  Page 35 of 38

NOVEMBER 8, 2012

VA HANDBOOK 5021/10
PART IV
CHAPTER 3

(1) If the decision official modifies or rejects the examiner's recommendation(s), the written decision will include a specific statement of the reason(s) for the modification or rejection. Modification or rejection of recommendations of the grievance examiner will be limited to the following grounds:

(a) The recommendation(s) are contrary to law, regulation, or published Department policy; and/or

(b) The recommendation(s) are not supported by the preponderance of the evidence.

(2) The decision official may elect to grant the relief sought by the employee without regard to the examiner's recommendation(s).

**14. TRAVEL EXPENSES.** Authorized travel expenses for grievance examiners will be borne by the VA facility employing the grievant in accordance with Government travel regulations. Travel expenses of grievants and witnesses will be paid by VA where it is determined by a VA official or the grievance examiner that travel in connection with a grievance is necessary.

**15. INFORMING EMPLOYEES.** The information contained in this chapter will be brought to the attention of all employees. The text of this chapter is available electronically to all employees or hard copies may be reviewed in the Human Resources Management office.

**16. MATTERS EXCLUDED FROM COVERAGE UNDER THE AGENCY GRIEVANCE PROCEDURE.** The following actions and complaints are excluded from coverage under the grievance procedure:

a. Adverse actions taken under part II of this handbook which involve a question of professional conduct or competence [unless issued to a part-time registered nurse under 38 U.S.C. 7405(a)(1)(A)].

b. Disputes over whether a matter or question concerns, or arises out of, professional conduct or competence.

c. Separation during probationary period.

d. Complaints arising from failure to receive special advancement.

e. Complaints arising from failure to receive a promotion or reassignment.

f. Complaints arising from dissatisfaction with grade or pay on initial appointment.

g. Complaints arising from actions taken due to the individual's physical or mental condition.

h. Complaints arising from dissatisfaction with proficiency rating.

i. An action which terminates a temporary promotion within a maximum period of 2 years and returns the employee to the position from which the employee was temporarily promoted, or reassigns the employee to a different position that is not at a lower grade or pay than the position from which the employee was temporarily promoted.

IV-27

Case 5:18-cv-01251-J  Document 24-1  Filed 11/20/19  Page 13 of 14
Appellate Case: 23-5010  Document: 010549542919  Date Filed: 03/20/2023  Page: 43
Case 5:18-cv-01251-C  Document 18-1  Filed 07/05/19  Page 36 of 38

VA HANDBOOK 5021                                                      APRIL 15, 2002
PART IV
CHAPTER 3

j. The content of published VA or VHA regulations and policies. An employee's allegation that locally established policy is in conflict with existing Department policy or regulation may be handled as indicated in paragraph 11a of this chapter.

k. A decision which is subject to final administrative review by the Federal Labor Relations Authority (FLRA), or the Office of Workers' Compensation Programs (OWCP), under law or regulations of the FLRA or the OWCP; or any other matter for which final administrative authority lies outside VA.

l. Allegations of discrimination on the basis of race, color, religion, sex, national origin, age (over 40) and/or disability, in connection with any decision or action. Such allegations may only be pursued as complaints of discrimination, pursuant to regulations of the Equal Employment Opportunity Commission. Complaints of discrimination are excluded from the grievance procedure. However, other disputes related to the case are not precluded from review under the grievance procedures. Accordingly, a grievance concerning a matter or matters about which the employee has filed a complaint of discrimination must be rejected, either wholly or partially, as appropriate.

m. A preliminary warning notice of an action which, if effected, would be covered under a grievance or appeal system or excluded from coverage by other paragraphs of this chapter.

n. Disapproval of a suggestion, disapproval of a discretionary award or disagreement with the amount of an award.

o. A matter which includes specified relief that is not personal to the grievant or is not subject to the control of management.

p. A matter covered by a negotiated grievance procedure. However, an employee may elect to use the VA grievance procedure described in this part or the negotiated grievance procedure in the case of a disciplinary or adverse action covered under part II of this handbook which does not involve a question of professional conduct or competence.

q. A grievance of an individual from outside VA, except as provided in paragraph 2b of chapter 2 of this part.

r. Grievances concerning the number of positions to be filled, or the grade level at which positions are filled.

s. An action taken in accordance with the terms of a formal agreement voluntarily entered into by an employee.

t. Matters that are not directly related to the employee's conditions of employment.

u. Matters involving the methods, means or technology of performing work.

IV-28

Case 5:18-cv-01251-J   Document 24-1   Filed 11/20/19   Page 14 of 14
Appellate Case: 18-6050   Document: 010110295427   Date Filed: 08/28/2019   Page: 44
Case 5:18-cv-01251-C   Document 18-1   Filed 07/05/19   Page 37 of 38

SEPTEMBER 21, 2006

VA HANDBOOK 5021/4
PART IV
CHAPTER 3

v. [Determinations and authorizations, including those delegated by the Secretary, regarding the approval, disapproval, or amount of market or performance pay granted to a physician or dentist in the Veterans Health Administration. Refer to VA Handbook 5007, part IX, paragraph 11 for information regarding the right to request reconsideration of a tier determination].

w. [Determinations and authorizations, including those delegated by the Secretary, regarding the approval, disapproval, or amount of special pay granted to a nurse executive in the Veterans Health Administration]

x. [Designations of employees to serve on the panel from which members of Disciplinary Appeals Boards are selected and the selection of employees to serve on Disciplinary Appeal Boards, professional standards boards, compensation panels, or the appointment of a grievance examiner].

y. [All matters for which review procedures are already established in VA policy].

[z.]. A decision not to remove an admonishment or reprimand from an employee's personnel folder prior to the expiration date.

IV-29



**DEPARTMENT OF VETERANS AFFAIRS**
**Oklahoma City VA Health Care System**
**921 NE 13th Street**
**Oklahoma City, OK 73104-5028**

July 13, 2017                                    In Reply Refer To:  635/00

John Tompkins, M.D.
Surgery Service
921 NE 13th Street
Oklahoma City, OK 73104

SUBJECT: Summary Suspension

Dear Dr. Tompkins:

This is to notify you that your privileges to perform joint replacement surgery are summarily suspended effective July 14, 2017. This action is being taken upon the recommendation of the Chief of Staff since concerns have been raised to suggest that aspects of your clinical practice do not meet the accepted standards of practice and potentially constitute an imminent threat to patient welfare. A preliminary review demonstrated significantly higher than expected morbidity for total knee and total joint arthroplasties performed by you. This suspension is in effect pending a comprehensive review of these allegations.

You have the opportunity to provide any information you desire to provide regarding these concerns. Correspondence needs to be sent within 14 calendar days from your receipt of this notice, and be addressed to:

Susan Bray-Hall, MD
Chief of Staff
VA Oklahoma City Health Care System
921 NE 13th St
Oklahoma City, OK 73104

The comprehensive review of the reasons(s) for the summary suspension should be accomplished within 30 calendar days of the suspension, with recommendations to proceed with formal procedures for reduction or revocation of clinical privileges forwarded to me for consideration and action. Within 5 working days of receipt of the recommendations, I will make a decision either to restore your privileges to an active status or that the evidence warrants proceeding with a reduction or revocation process. Since you cannot perform joint arthroplasties during the review, you are will continue doing clinics and smaller procedures.

Should the comprehensive review result in a tentative decision by me to restrict or revoke your privileges, and if appropriate, to take an adverse personnel action, you will be notified at that time of your rights as per VHA Handbook 1100.19 and VA Directive and Handbook 5021. You have a right to be represented by an attorney or other representative of your choice throughout the proceedings.

**EXHIBIT**
tabbies
1

Summary suspension pending comprehensive review and due process is not reportable to the National Practitioner Data Bank (NPDB). However, if a final action against your clinical privileges is taken for professional incompetence or improper professional conduct, both the summary suspension and the final action, if greater than 30 days, will be reported to the NPDB, and a copy of the report must be sent to the State licensing boards in all states in which you hold a license.

If you surrender or voluntarily accept a restriction of your clinical privileges, including by resignation or retirement, while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, VA is required to file a report to the NPDB, with a copy to the appropriate State licensing board(s), pursuant to VA regulations in title 38 Code of Federal Regulations (CFR) Part 46 and VHA Handbook 1100.17, National Practitioner Data Bank Reports.
It is the policy of VA to report to State Licensing Boards those licensed health care professionals, whether currently employed or separated (voluntarily or otherwise), whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients (see 38 CFR Part 47). In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Board(s) pursuant to the provisions of VHA Handbook 1100.18, Reporting and Responding to State Licensing Boards.

Should you have any questions or wish to discuss this issue, please feel free to contact Susan Bray-Hall, M.D. OKC VA Health Care System Chief of Staff, 405-456-3306.

Sincerely,

Wade Vlosich
Health Care System Director

43



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
(b) (6), (b) (7)(C)

Dr. Aimee D. Levy, Pharm D, MD, FACS

Chief of Surgery Services OKC VAMC

921 NE 13th Street        Oklahoma City, OK

Regarding Chart Review for Dr. John F. Tompkins:

Dear Dr Levy,

Having performed chart review of Dr. Tompkin's surgical cases including operative notes,  pre and post-operative notes, Physical Therapy and clinical notes I feel all cases underwent appropriate surgical procedures for their underlying pathology and all surgical case radiographs reveal good alignment of the implanted prosthesis.

There were only two postoperative complications from these 18 reviewed cases. One DVT and one deep hematoma.  Both of these postoperative complications were rapidly diagnosed and treated appropriately. These sited complications are not an unexpected outcome of surgery and well within the range of standard of care.

Physical Therapy discharge notes revealed good postoperative outcomes with improvement in their preoperative symptoms, range of motion and joint stability.  Clinical postoperative notes reveal good patient satisfaction with their post surgical care and improvement in their preoperative symptoms.

I feel confident in Dr. Tompkin's surgical judgement, appropriateness of the procedures, surgical outcomes and postoperative care of these assigned cases.

Sincerely,



Staff Orthopedic Surgeon



EXHIBIT

tebbler

2



(b) (6), (b) (7)(C);  Right hip
                      Left knee
(b) (6), (b) (7)(C)   Left hip
                      Left knee
                      Right knee
                      Left knee
                       Right knee
                      Left hip
                      Left hip
(b) (6), (b) (7)(C)   Right knee

Aimee D. Levy, PharmD, MD, FACS
Chief of Surgery Services OKC VAMC
(b) (6), (b) (7)(C)                    aimee.levy@va.gov (b) (6), (b) (7)(C)
405-456-3409
(b) (6), (b) (7)(C)



From:
Sent: Thursday, August 17, 2017 8:09 AM
To: Levy, Aimee D. <Aimee.Levy@va.gov>
Subject: ortho review

Dr. Levy
I have now reviewed 20 of the 35 cases sent for my review. I have found one postop complication - that of a periprosthetic fracture on a total hip. The rest seem to be nearly textbook perfect.
Non responsive                          If the focus of this review is the periprosthetic fracture I would be happy to look in more detail at hospital daily notes etc. If there are other specific cases with postop complications to review let me know. Non responsive

Non responsive

Please let me know how to proceed.

(b) (6), (b) (7)(C)

(b) (6), (b) (7)(C)

**Subject:**                    FW: Ortho Total Joint Review


Aimee:

I have reviewed all of these cases. The provider in question has provided very appropriate quality care to the veterans in these cases. There were very few complications in this list and the vast majority of post-operative Xrays looked excellent. The one significant complication occurred in patient (b) (6), (b) (7)(C) This was a periprosthetic femoral fracture and apparent cup loosening in the early post-operative period. Periprosthetic fractures do occur in a small percentage of total hip cases and it seemed that the provider attempted to promptly follow-up with the patient to deal with this complication, but the patient was not very reliable in terms of follow-up.

Overall, I have no concerns about the provider in question. Let me know if this needs to be sent in a more formal response or if this email response is adequate.

Thanks,
(b) (6), (b) (7)(C)
Chief of Orthopaedic Surgery
Adult Reconstruction Surgeon
(b) (6), (b) (7)(C)

-----Original Message-----
From: Levy, Aimee D.
Sent: Friday, July 28, 2017 3:23 PM
To: (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)                                        Bray-Hall, Susan <Susan.Bray-Hall@va.gov>; Vlosich, Kristopher
W. <Kristopher.Vlosich@va.gov>
Subject: Ortho Total Joint Review

(b) (6), (b) (7)(C)

Thank you for agreeing to help OKC VAHCS in a quality of care review of one of our orthopedic providers total joint cases. Please see the attached memo for your records and please review both the pre-operative, operative and post-operative care of the following list of patients. Please provide detailed explanations of any concerns in quality of care provided to these patients. As of today, you should have CPRS access to these charts. The target date for completion of this review is 8/15/17. If you have any
question please do not hesitate to contact me.



| (b) (6), (b) (7)(C) | Left knee |
| (b) (6), (b) (7)(C) | Left hip |
| | Left knee |
| (b) (6), (b) (7)(C) | Right knee |
| | Left knee |
| (b) (6), (b) (7)(C) | Left knee |
| (b) (6), (b) (7)(C) | Left hip |
| (b) (6), (b) (7)(C) | Right knee |
| (b) (6), (b) (7)(C) | Right knee |

1



DEPARTMENT OF VETERANS AFFAIRS
Oklahoma City VA Health Care System
921 NE 13th Street
Oklahoma City, OK 73104-5028

August 24, 2017

In Reply Refer To:  635/00

Dr. John Tompkins
921 NE 13th Street (112)
Oklahoma City, OK 73104

Dear Dr. Tompkins:

This serves as notification that effective August 24, 2017 your joint replacement privileges have been reinstated by the Oklahoma City VA Health Care System (OKC·VA HCS) Professional Standards Board (PSB).  The Chief of Surgery presented results of an external focused review of 50 of your cases, and concluded appropriate standard of care was met. Based on an assessment of this review, the PSB recommended and Director approved full restoration of your privileges.

.Please sign and date the acknowledgment of this advisement of restoration of clinical privileges on the next page, and return it to the Office of the Chief of Staff within 5 days of receipt of this notification. If you have any questions, please contact Dr. Susan Bray-Hall, OKC VA HCS, Chief of Staff, 405-456-3306.

Sincerely,

Susan Bray-Hall, MD, FACP
Chief of Staff

cc: Wade Vlosich, Health Care System Director

Page 2.

Dr. ___John·Tompkins_

**EXHIBIT**

**3**



**DEPARTMENT OF VETERANS AFFAIRS**
Oklahoma City VA Health Care System
921 NE 13ᵗʰ Street
Oklahoma City, OK 73104

October 30, 2017                                                                        635/11

John Tompkins, MD
Surgery Service (112)
921 NE 13ᵗʰ Street
Oklahoma City, OK 73104

SUBJ: Proposed Separation & Revocation of Clinical Privileges

1. It is proposed to remove you from federal service and revoke your clinical privileges for the following reasons:

**BACKGROUND:** You were employed as Chief of Surgery at the Oklahoma City VA Health Care System beginning January 1, 2012, and ending October 16, 2016, when you voluntarily stepped down from that position. The following specifications of Failure to Provide Adequate Oversight are related to your duties as Chief of Surgery during the aforementioned timeframe.

**Failure to Provide Adequate Oversight**

**Specification 1:** You were informed by former Deputy Chief of Staff, Dr. Graca Dores, as early as August 23, 2015, that an attending physician had inappropriately documented in a patient's electronic health record (EHR) by utilizing a resident's credentials. When questioned on this topic, you admitted to having knowledge of providers, including residents, who entered information into patients' EHR on behalf of another provider who did not have access to the Computerized Patient Record System (CPRS). With knowledge of this improper access and/or inappropriate documentation, you should have taken sufficient steps to ensure the practice discontinued. You failed to provide adequate oversight by your inaction to stop improper access and/or inappropriate documentation.

**Specification 2:** As the Chief of Surgery, you were administratively responsible for the operation of the Surgical Service, to include timekeeping. It was reported that there were multiple part-time and resident physicians receiving compensation for services while they were absent from duty and not in an approved leave status. In an audit of clinic cancellations for Fiscal Year 2016, 381 clinic cancellations in Surgical Service were reviewed. Of those 381 cancellations, 119 (31%) were found to have been cancelled due to unauthorized absences of either part-time physicians



EXHIBIT
4

49

or residents. These 119 cancellations led to the potential improper payment of approximately $3,303. As the Chief of Surgery, you failed to provide adequate oversight of the time and attendance of part-time and resident physicians.

**Specification 3:** Center Memorandum 11-65 "Resident Supervision" states that facility monitoring of resident supervision occurs in a variety of patient care settings. The policy additionally states that monitoring resident supervision should also include residents' comments about their rotations at VA; opportunities for improvement in resident supervision and creation of action plans; and completion of an annual report on residency training programs.

The agency became aware that the sole documentation Surgical Service maintained concerning the supervision of residents was labeled "Medical Record Focused Review Surgical Services" and contained data specific to inpatient admissions to Surgical Service. Monthly compliance rates ranged from 70 to 93 percent between June 2014 and March 2016. These reviews were stopped following the Surgical Quality Improvement Coordinator's retirement in May 2016. Surgical Service failed to document routine ongoing monitoring of resident supervision in other Surgical Service patient care settings. As Chief of Surgery, you failed to provide adequate oversight of resident supervision.

2. **RIGHT TO REPLY:** You have the right to reply to this notice orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charges are unfounded and any other reasons why your removal should not be effected and your clinical privilege(s) should not be revoked. You will be given 7 business days to reply to these reasons orally or in writing, or both orally and in writing, and to submit any affidavits or other documentary evidence. Your written reply should be submitted to the health care system director, Wade Vlosich. Mr. Vlosich will receive your oral reply or will designate an official or officials to receive it. You may make arrangements for your oral reply by calling C. Trent Castleberry, Human Resources Specialist, at (405) 456-3263.

3. **RIGHT TO REVIEW EVIDENCE:** The evidence on which this notice of proposed action is based is enclosed. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply. Arrangements for the use of official time or requests for additional time should be made with me.

4. **AGGRAVATING FACTORS**:

- As the Chief of Surgery, you were in a position of leadership, expected to serve as an example of exemplary conduct and to ensure our Veterans received quality and timely care by employees and residents under your purview. Due to the actions, or lack thereof, outlined above, you damaged the credibility and integrity of Surgical Service and the agency.
- Notoriety of the offense: To date, notoriety outside the agency has not yet been gained; however, the specifications mentioned above will be included in the Office of Inspector General "Healthcare Inspection" report which will be made available to the public. The anticipated negative impact of this report is to such a degree that the agency Public Relations team and leadership have developed an advanced communication plan.

These factors will be considered in determining the appropriate level of discipline, if one or more of the above reasons are sustained. You may reply orally or in writing, or both orally and in writing, with respect to these factors and you may submit supporting evidence, including affidavits. In this regard, you may make a statement expressing your views as to the consideration to be given such factors in determining proper action.

5. **RIGHT TO REPRESENTATION**: You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision. Any representative must be designated in writing.

6. **DECISION**: The final decision to effect the actions proposed has not been made. Wade Vlosich, Health Care System Director, who will make the final decision, will give full and impartial consideration to your reply(ies), if submitted. You will be given a written decision within 15 business days of the date you receive the notice of proposed action. If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

7. **DUTY STATUS**: You will be retained in a pay and duty status during the period of advance notice.

8. **IMPACT OF DECISION REGARDING CLINICAL PRIVILEGES**: If a decision is made to remove you from federal service and revoke your clinical privileges for reasons of professional incompetence or professional misconduct, the medical center will file a report with the National Practitioner Data Bank (NPDB) regarding the revocation of your clinical privileges (and the summary suspension of your privileges, if applicable) with a copy to the State Licensing Board (SLB) of Oklahoma and other SLBs in all states in which you are licensed.

9. **IMPACT OF VOLUNTARY SURRENDERING REVOCATION OF PRIVILEGES**: Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the Department of Veterans Affairs while your professional competence or conduct is under investigation during these proceedings or to avoid investigation, your fair hearing and appeal rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care.

10. **REPORTING TO STATE LICENSING BOARDS**:  It is the policy of VA to report to State Licensing Boards those licensed health care professionals, whether currently employed or separated, voluntarily or otherwise, whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients.  In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Board(s).

11. If you have any questions about the reasons why your discharge is proposed, contact me or C. Trent Castleberry, Human Resources Specialist, at (405) 456-3263 for further explanation.

Susan T. Bray-Hall, MD
Chief of Staff

Enclosure

**ACKNOWLEDGEMENT: Your signature below only acknowledges receipt of two copies of this letter as well as all evidence used to support this action.  It does not indicate agreement or disagreement with the contents of this letter.  Refusal to sign will not void the contents of this letter.**

Signature                          Date

# R I G G S ⊛ A B N E Y

### NEAL  TURPEN  ORBISON  LEWIS

Danny K. Shadid                                          DShadid@RiggsAbney.com
Of Counsel                                                      Fax: (405) 842-2913

November 14, 2017

## VIA HAND-DELIVERED AND E-MAILED
(caleb.castleberry@VA.gov)

Mr. Wade Vlosich,
Health Care System Director
Department of Veteran Affairs
OKC VA Health Care System
921 N.E. 13th Street
Oklahoma City, OK 73104

RE: John Tompkins, M.D.

Dear Mr. Vlosich:

I am writing on behalf of John Tompkins, M.D., in response to the letter of October 30, 2017, from
Dr. Susan T. Bray-Hall to Dr. Tompkins, advising him of the VA's intent to terminate his
employment and clinical privileges with the VA on the basis of three (3) general alleged
Specifications and two (2) alleged aggravating factors. By addressing this Response to you, as
System Director, Dr. Tompkins does not waive, but specifically reserves, his right to address your
position as decision-maker in this matter. I will address that subject by separate letter.

## BACKGROUND
Before responding to the individual Specifications and alleged aggravating factors, there are certain
factual and legal matters which must be addressed. First, the VA initiated an attack upon Dr.
Tompkins from two (2) separate axes. The VA initially attempted to terminate Dr. Tompkins by
alleging that his medical care was substandard. The medical panel evaluating those claims of
substandard medical care found them to be unsubstantiated. Shortly thereafter, the VA initiated the
present attempt to terminate Dr. Tompkins from employment with the VA by setting forth spurious
allegations, relying upon excerpts of the recent report from the Office of Inspector General. A review
of the OIG Report reveals that the majority of deficiencies cited therein are aimed at prior "System
Directors" and the prior Chiefs of Staff.

Next, and importantly, Dr. Tompkins resigned his administrative position as Chief of Surgery in
September, 2016. The current allegations deal with *administrative matters only* and have nothing
to do with Dr. Tompkins' performance as an Orthopaedic Surgeon or his care for patients. Rather,
the current set of allegations were initiated 13 months after Dr. Tompkins removed himself from all



**EXHIBIT**

**5**

53

Mr. Wade Vlosich
November 14, 2017
Page 2

administrative duties. The current set of allegations are substantively moot, inasmuch as Dr.
Tompkins performs no administrative duties. To suggest that Dr. Tompkins be terminated from all
VA employment, and specifically *as a physician*, for alleged administrative/procedural deficiencies
occurring in 2015 (or in any event more than 13 months ago), calls into question (1) the legitimacy
of the current claims, (2) the legitimacy of the current administrative action, (3) a targeted
discriminatory action against Dr. Tompkins, and (4) violations of Dr. Tompkins' substantive and
procedural rights of due process.

The fact that the VA's attempt to terminate Dr. Tompkins from employment for alleged deficiencies
as a physician totally failed, and the fact that Dr. Tompkins resigned all administrative duties and
positions in September, 2016, leads only to the conclusion that the current attempt to terminate Dr.
Tompkins' employment with the VA on the basis of administrative deficiencies (which, if true,
occurred more than a year prior to issuance of the aforementioned Notice letter) that the VA was and
is targeting Dr. Tompkins in a discriminatory and harassing manner.

The proposed separation and revocation of clinical privileges set forth in Dr. Bray-Hall's letter of
October 30, 2017, has only the net effect of removing a Dr. Tompkins from clinical duties when his
medical care has already been upheld by a separate panel of medical professionals operating under
the auspices of the VA. To effect a separation, after Dr. Tompkins' medical proficiency has been
upheld, is to deprive the Oklahoma City VA and its many Oklahoma patients from the benefits of
a qualified and talented Orthopaedic Surgeon. That Dr. Tompkins is, in fact, a talented and qualified
Orthopaedic Surgeon is bolstered by the fact that in March, 2016, he was presented with the
Hammarsten Award for medical excellence at the Oklahoma City VA. Dr. Tompkins has an
exemplary record of medical performance at the VA. Not only are all of these mitigating factors
regarding any possible sanction against him, but also emphasize the true nature of the current
allegations, i.e., a targeted attempt to dismiss Dr. Tompkins. It must be recognized that Dr.
Tompkins has no history of discipline against him during the 26 years of service to the VA and its
member patients.

## SPECIFICATION 1

This Specification deals with alleged knowledge of a third-party attending physician
"inappropriately" documenting a patient's EHR by using a resident's credentials. It is alleged that
Dr. Tompkins "admitted" to having knowledge of such practices and that Dr. Tompkins should have
taken sufficient steps to insure that the practice was discontinued. Of course, there is nothing
mentioned in the Notice letter as to what "steps" should have been taken. It is alleged that Dr.
Tompkins "failed to provide adequate oversight" by his "inaction" to stop the aforementioned
alleged improper access to or alleged inappropriate documentation in patient EHR. There is only one
(1) instance identified in the Notice letter dealing with the situation on August 23, 2015, where Dr.
Graca Dores sent an e-mail, dated August 23, 2015, to Dr. Tompkins and numerous other VA
physicians, including the former Chief of Staff, pertaining to Dr. Craig Rabb and, a resident, Dr.

Mr. Wade Vlosich
November 14, 2017
Page 3

Chad Glenn. According to the e-mail, Dr. Rabb used Dr. Glenn's means of accessing the EHR to put a note into the patient's chart. Dr. Rabb and Dr. Glenn both appear on the note. Dr. Dores, in his e-mail, suggested that Dr. Rabb and Dr. Glenn retake computer/privacy training. That, on its face, would seem to have addressed the situation, at that time, without the need of any further action. Dr. Dores, on the face his e-mail, expressly indicated that retaking computer/privacy training classes would be a sufficient remedy.

On the face of the document, contained under Tab 4 of the packet presented to Dr. Tompkins with the Notice letter, the e-mail in question was sent to Mr. Vlosich on September 27, 2016, approximately 13 months after the situation was first noted by Dr. Dores. This, on its face, indicates that the situation noted by Dr. Dores on August 23, 2015, was something which Dr. Dores thought had been put to rest and needed no further review. The fact that this was forwarded to the System Director over 13 months after the event is also indicative of a relatively minor deficiency in procedure, if at all. I say, "if at all," because the practice of a physician putting notes into a patients' chart through a resident's access to the chart is not only common practice in the medical community throughout the United States, but is virtually mandated by EHR systems. A patients' chart can usually only be accessed by one physician at a time. When an attending and a resident are both dealing with a same patient at the same time, only one (1) can access the chart. It is customary in the practice of medicine throughout the United States for a resident to access an EHR and to either place the note into the chart and also comment upon the attending being present, or the attending putting the note into the chart with the resident being noted as present or signing off in addition to the attending. Most critically, even the OIG stated at Page 25 of its Report, "we acknowledge these 'interior' work-arounds' existed to ensure continuity of patient care."

The fact is that, at that time, the Oklahoma City VA computer systems and the procedures to obtain a PIV card were extremely slow and archaic. Doug Rowles, M.D., Chief of Orthopaedic Surgery, has openly stated to Dr. Tompkins and others that Dr. Rowles did not want attendings spending time putting notes into the medical records; he requested that mid-level providers, such as residents and PA's, put the notes into the records and openly stated that the attendings needed to be spending their time directly caring for the patients. However, in 2015 and prior thereto, obtaining a PIV card was a three (3) step process that covered many weeks. The PIV cards could also expire. Following receipt of the e-mail of August 23, 2015, Dr. Tompkins repeatedly told attendings and residents to get their PIV cards. He reminded the part-time attendings and the residents to make sure that they logged on at least within every 30 days to avoid their PIV cards expiring. Importantly, the OIG, in its Report, and Dr. Bray-Hall in her letter, cite no VA guidelines, whatsoever, prohibiting an attending from accessing a patient's chart through a resident's PIV. The OIG and Dr. Bray-Hall cite no VA regulation requiring an attending physician to access a patient chart exclusively through the attending's own PIV card. Dr. Tompkins did, in fact, discuss with the former Chief of Staff the need for updated computer systems and a much faster means of obtaining VIP cards. Dr. Tompkins, as Chief of Surgery, had no authority to obtain more advanced computers or to change the process to obtain PIV cards.

Mr. Wade Vlosich
November 14, 2017
Page 4

Further, in the OIG Report, Recommendations 11 and 12 do not include termination of any personnel whatsoever. The Recommendations deal with requiring service chiefs to ensure that the providers secure and maintain appropriate computer access. In this regard, Dr, Tompkins did everything within his purview by advising all attendings,part-time atttendings and residents make sure they get their PIV cards and to use their PIV Cards within every 30 days to make sure that there would be no expiration. Further, the OIG, in Recommendation 12, recommends that the "System Director," not service chiefs such as Dr. Tompkins, insure "availability of functional equipment, adequate staffing, and enhanced access for Personal Identity Verification card completion." Only the System Director and the VA itself had authority to provide the equipment and to enhance the process for access of PIV cards. This is clearly recognized by the OIG.

## SPECIFICATION 2

Specification 2 deals with inaccurate time keeping of part-time and resident physicians. The claim is that 119 canceled appointments were due to unauthorized absences of part-time or resident physicians. It is claimed that the 119 cancellations may have lead to a *"potential"* improper payment of $3,303.00. It is important to note from the outset, that the allegations in Specification 2 are speculative as to *"potential"* overpayments. The OIG, in its Report, also refers to *"potential"* improper payments (*See* OIG Report at Page 25.) The OIG, in Table 6 of its Report, points only to *"potential"* improper payments and not actual improper payments. It is reasonable to believe that had the OIG identified specific improper payments, it would have stated as such. However, it did not.

Specification 2 does not actually encompass the entirety of that portion of the OIG Report dealing with Clinic Cancellations. Yet, review of the OIG's discussion of SC Clinic Cancellations reveals that the OIG expressly stated, "[W]e did not find evidence that the clinic cancellations contributed to clinically significant adverse outcomes." OIG report, Page34. The OIG also found that the clinic cancellation rate of the Oklahoma City VA System for fascial year 2016 was "comparible to other VHA facilities with the same complexity level (1a) and quality ranking (3-star). The alleged failure to keep time of part-time and resident physicians, even if true, as a matter of fact and a matter of law, do not and did not rise to the level of any significant harm.

Critically, it must be recognized that physician check-in and check-out by time clocks or other similar check-in or check-out method is forbidden. The VA Department of Surgery maintains a staff of approximately 45 full time and part-time physicians and approximately 75 residents per month. It is unrealistic to charge Dr. Tompkins or any other department chief with a failure to keep track of the attendance of approximately 120 physicians. The issue is systemic in nature and not one of departmental monitoring. If the VA is, by policy or agreement with the physician union, prohibited from making use of check-in or check-out methods, it would be a travesty of justice to claim foul on Dr. Tompkins or any other department chief for failing to keep track of a physicians attendance.

Mr. Wade Vlosich
November 14, 2017
Page 5

**SPECIFICATION 3**
In Specification 3, Dr. Bray-Hall generally charges some type of inadequate oversight of residents. The Specification is specific in only one respect. i.e., that "the agency" was aware of only the "Medical Record Focused Review Surgical Services" (MRFRSS) as the "sole documentation" which the surgical service maintained regarding the supervision of residents. Initially, it should be pointed out that this allegation is untrue. Dr. Bray-Hall and, apparently, the OIG, failed to review data from the VA Surgical Quality Improvement Program (VASQIP). The VASQIP coordinator, Deborah Hovarter, R.N., provides quarterly reports regarding attending surgeons supervision of residents in the operating room. Inquiry reveals that Deborah Hovarter was never interviewed by the OIG or anyone else regarding this subject matter.

As with other subjects discussed above, the OIG did not find any patients who actually suffered harm from any alleged lack of resident supervision or lack of documentation regarding resident supervision. *See* OIG Report, Page 26. As the OIG put it, "despite finding deficiencies in the documentation of resident supervision, we could not substantiate an actual lack of resident supervision." *Id.*

Within Specification 3, Dr. Bray-Hall states that reviews of residents as part of the MRFRSS ceased in May, 2016, upon the retirement of Surgical Quality Improvement Coordinator.(S.Q.I.C.) Dr. Bray-Hall, as Chief of Staff, should be aware that there existed within the VA a de facto policy of attrition, i.e., a policy of not replacing a persons who resign or retire due to lack of funding. Dr. Tompkins did in fact make inquiry of the Chief of Staff as to the possibility of replacing the former S.Q.I.C., Marge Terosian, but was advised that funding was not available to do so.

## AGGRAVATING CIRCUMSTANCES

I.     The first purported "aggravating factor" alleged in the Notice letter, is that Dr. Tompkins allegedly "damaged the credibility and integrity of surgical service and the agency." This, in and of itself, is what is often referred to as a "bald allegation" without any factual support. Dr. Bray-Hall, in her Notice letter, states that as Chief of Surgery, Dr. Tompkins was expected to display "exemplary conduct" and to insure that Veterans receive quality and timely care by the VA attendings and residents. Dr. Bray-Hall's suggestion is that *"exemplary conduct"* somehow means *perfect conduct.* The mere fact that the VA bestowed the Hammarsten Award upon Dr. Tompkins in 2016 is, in and of itself, evidence of outstanding and exemplary conduct and exemplary medical care. Twenty-six years of service without a blemish on his VA record is also evidence of exemplary conduct and medical care. The second portion of the above-quoted statement is clearly overlooked, i.e., insuring that Veterans receive quality and timely care by VA employees and residents. That is specifically what cannot be overlooked. At no time does the OIG cite any specific case of actual harm to a patient as a result of any of the alleged procedural deficiencies contained within Specifications 1, 2 or 3. To the contrary, the OIG affirmatively stated, from time to time, that it understood that certain things were done to provide continuity of care for patients and that no patients were actually harmed.

57

Mr. Wade Vlosich
November 14, 2017
Page 6

II.     Dr. Bray-Hall alleges as an additional aggravating factor the "Notoriety of the Offense." There is no specific identified "offense" on the part of Dr. Tompkins, which has led to adverse notoriety. The allegation is wrought with speculation and conjecture. Dr. Bray-Hall, at the time of the Notice letter, admits that notoriety outside of the VA "has not yet been gained." Dr. Bray-Hall refers to the "anticipated negative impact" of the OIG report. The OIG report is over 90 pages in length and involves far more than any activity or inaction on the part of Dr. Tompkins. The OIG report deals far more with the former chief of staff and the previous System Directors. It deals with the overall Oklahoma City VA System.  It does not focus on "an offense" perpetrated by Dr. Tompkins.  It cannot be said that Dr. Tompkins personally created any adverse notoriety.  Since the issuance of the Notice letter, there has been one (1) newspaper article and an editorial piece. Dr. Tompkins did not cause those articles to exist.

Inasmuch as together Dr. Tompkins has not been involved with any administrative functions for well over a year, and, inasmuch as Dr. Tompkins is an excellent and award-recognized surgeon, it is unjust to terminate his position as a physician with the Oklahoma City VA.

Respectfully,

Danny K. Shadid
/ak

cc: John Tompkins, M.D.
    Susan T. Bray-Hall, M.D.,
    Chief of Staff



---

---

DEPARTMENT OF VETERANS AFFAIRS
Medical Center
921 Northeast 13th Street
Oklahoma City, OK 73104-5028

To:   K. Wade Vlosich
      Director

From: John Tompkins, M.D.
      Staff orthopedic surgeon

Date: November 14, 2017

Subj: Proposal for removal from federal service

In the wake of the report from the Office of Inspector General that was released on November 2, 2017 Susan Bray-Hall, M.D., the current Chief of Staff, has proposed that I be removed from federal service. Her proposal is based almost entirely on the OIG report and is without merit.

The following are my responses to the three specifications in the proposal.

**Specification #1:**

**"You were informed by the former Deputy Chief of Staff, Dr. Graca Dores, as early as August 23, 2015, that an attending physician had inappropriately documented in a patient's electronic health record (EHR) by utilizing a resident's credentials. When questioned on this topic, you admitted to having knowledge of providers, including residents, who entered information into patients' EHR on behalf of another provider who did not have access to the Computerized Patient Record System (CPRS). With knowledge of this improper access and/or inappropriate documentation, you should have taken sufficient steps to ensure the practice discontinued. You failed to provide adequate oversight by your inaction to stop improper access and/or inappropriate documentation."**

It is inaccurate to state that I had knowledge of "this improper access (to the electronic health record) and/or inappropriate documentation..." The only case in the evidence file in which someone "inappropriately documented in a patient's EHR" is the neurosurgery attending who on August 22, 2015 wrote a note after his resident apparently logged onto CPRS. As far as I am aware, the practice discontinued after that incident.

Furthermore, I disagree with the assertion that I had knowledge of "inappropriate documentation" by residents (or mid-level providers). I specially recall telling the OIG team that it is a standard practice for residents (and mid-level providers) to enter notes and orders into CPRS for attending physicians. For example, most operative notes are dictated by residents.



EXHIBIT
6
59

**Specification #2:**

**"As the Chief of Surgery, you were administratively responsible for the operation of the Surgical Service, to include timekeeping. It was reported that there were multiple part-time (attending physicians) and resident physicians receiving compensation for services while they were absent from duty and not in an approved leave status. In an audit of clinic cancellations for Fiscal Year 2016, 381 clinic cancellations in Surgical Service were reviewed. Of those 381 cancellations, 119 (31%) were found to have been cancelled due to unauthorized absences of either part-time physicians or residents. These 119 cancellations led to the potential improper payment of approximately $3,303. As the Chief of Surgery, you failed to provide adequate oversight of the time and attendance of part-time and resident physicians."**

Monitoring the attendance of scores of employees of Surgery Service is extremely difficult, because the locations in which they work are scattered throughout the hospital and because the use of time-clocks is prohibited. Although there may have been some unaccounted absences from duty of attending surgeons and residents during Fiscal Year 2016 the total "potential improper payment" for Surgery Service was only $3,303 (the sum of $326 for the ENT part-time attending staff members and $2,977 for the ophthalmology residents). This is a paltry amount of money compared with the VAMC's medical care budget of $509,594,802 for Fiscal Year 2016.

**Specification #3:**

**"Center Memorandum 11-65 'Resident Supervision' states that facility monitoring of resident supervision occurs in a variety of patient care settings. The policy additionally states that monitoring resident supervision should also include residents' comments about their rotations at VA; opportunities for improvement in resident supervision and creation of action plans; and completion of an annual report on residency training programs.**

**"The agency became aware that the sole documentation Surgical Service maintained concerning the supervision of residents was labeled 'Medical Record Focused Review Surgical Services' and contained data specific to inpatient admissions to Surgical Service. Monthly compliance rates ranged from 70 to 93 percent between June 2014 and March 2016. These reviews were stopped following the Surgical Quality Improvement Coordinator's retirement in May 2016. Surgical Service failed to document routine ongoing monitoring of resident supervision in other Surgical Service patient care settings. As Chief of Surgery, you failed to provide adequate oversight of resident supervision."**

It should be emphasized that page 2 of the OIG report states, **"VA policy assigns responsibility for oversight of physician trainees working in a VHA facility to the**

**Chief of Staff (COS) and to the Designated Education Officer (DEO), sometimes referred to as the Associate Chief of Staff for Education. The COS is responsible for assessing the quality of residency training programs, as well as the quality of the care provided by the residents and faculty in those programs. The DEO is responsible for ensuring that facility monitoring and reporting requirements regarding resident supervision are met, and for ensuring that a facility resident supervision policy is in place."**

Most of the responsibility for monitoring resident oversight is obviously borne by the Chief of Staff and the Associate Chief of Staff for Education. To what degree the Chief of Surgery bears responsibility for monitoring resident oversight is not clearly defined.

The method of assessing supervision of residents for in-patient admissions was to monitor notes entered into CPRS by the attending surgeon within 24 hours of a patient's admission. Such monitoring was performed by the Surgical Quality Improvement Coordinator, who was Marge Torossian, R.N.

The proposal for my removal from federal service states, **"Monthly compliance rates ranged from 70 to 93 percent between June 2014 and March 2016."** During the many months that Ms. Torossian monitored the medical records, the compliance of attending surgeons in documenting their supervision of residents improved. However, the proposal for my removal from federal service does not define an acceptable rate of compliance.

When the Surgical Quality Improvement Coordinator announced her plan to retire a request was made to the Chief of Staff to not only replace her but to do so two weeks prior to her final day of service. The two weeks of overlapping service was requested to allow her replacement to receive appropriate on-the-job training. Unfortunately, because of budgetary constraints the coordinator was not replaced until long after I stepped down from the position of Chief of Surgery. Because of a severe manpower shortage in Surgery Service the monitoring of attending surgeons' documentation stopped when Ms. Torossian retired in May 2016. The decision to not assign this task to one of the administrative staff members of Surgery Service was made by the Chief of Staff.

The OIG reviewed 212 patient visits by a combination of the cardiology, orthopedic, neurosurgery, and ENT teams for 185 patients to **"determine whether the supervising physician saw the patient within 24 hours of admission or consultation."** The OIG report does not provide data to allow assessment of the individual performance of these four teams. However, for 200 of the 212 visits **"the supervising (attending) physician saw the patient within 24 hours of admission or consultation."** This is a rate of slightly more than 94 percent compliance with hospital policy. The proposal for my removal from federal service does not define an acceptable rate of compliance.

Beyond the 200 visits in which the attending physician or surgeon documented his or her supervision of the residents within 24 hours of consultation or admission of a patient the OIG report states, **"Eight additional EHRs contained evidence of resident supervision, but not within 24 hours of the consultation or admission."**

In only four of the 212 visits was there **"no documentation of resident supervision."** The OIG report states, **"While the EHRs for these (four) patient did not contain required documentation of resident supervision, we did not find evidence that patient harm occurred during these episodes of care."** Furthermore, the report states, **"Despite finding deficiencies in the documentation of resident supervision, we could not substantiate an actual lack of resident supervision."** The OIG team interviewed 31 resident physicians. The report states, **"None of them reported any deficiencies in supervision."**

In her proposal for my removal from federal service Dr. Bray-Hall stated, **"The agency became aware that the sole documentation Surgical Service maintained concerning the supervision of residents was labeled 'Medical Record Focused Review Surgical Services' and contained data specific to inpatient admissions to Surgical Service... Surgical Service failed to document routine ongoing monitoring of resident supervision in other Surgical Service patient care settings. As Chief of Surgery, you failed to provide adequate oversight of resident supervision."**

It appears that neither the OIG team nor Dr. Bray-Hall reviewed the appropriate data from the VA Surgical Quality Improvement Program (VASQIP). The VASQIP coordinator is Debra Hovarter, R.N. She provides quarterly VASQIP reports that document attending surgeons' supervision of residents in the operating room. It should be noted that more than 99 percent of surgical cases done at the Oklahoma City VAMC are done at the A, B, or C levels of supervision (as defined in the VASQIP guidelines). In its report the OIG should have included the VASQIP data regarding the monitoring of resident supervision in the operating room.

In her proposal for my removal from federal service Dr. Bray-Hall states that I **"failed to provide adequate oversight of resident supervision."** The proposal for my removal from federal employment does not define what would constitute adequate oversight of resident supervision.


**Mitigating factors:**

- The specifications outlined in the proposal to remove me from federal service all relate to administrative issues. I voluntarily stepped down as the Chief of Surgery in September 2016. Since then I have been a staff orthopedic surgeon with no administrative duties.

- I have been employed by the VA Medical Center since 1991 with no history of any disciplinary actions taken against me. In honor of my exemplary record of service to the medical center I received the James F. Hammarsten Physician of Excellence Award in March 2016.

# RIGGS ⓡ ABNEY
### NEAL TURPEN ORBISON LEWIS

Danny K. Shadid
Of Counsel

DShadid@RiggsAbney.com
Fax: (405) 842-2913

November 20, 2017

**VIA HAND- DELIVERY**

K. Wade Vlosich
Health Care System Director
Department of Veteran Affairs
OKC VA Health Care System
921 N.E. 13th Street
Oklahoma City, OK 73104

RE: John Tompkins, M.D.

Mr. Vlosich:

I am writing separately from the Response letter of November 14, 2017, which was delivered to your office regarding Dr. Tompkins. The purpose of this letter is to make inquiry into any and all prior involvement, prior communications and/or prior review of purported evidence, from the OIG Report or otherwise, which you may have had regarding the claims and/or purported evidence, regarding Dr. Tompkins. If you have had any communications with anyone regarding the Specifications set for in Dr. Bray-Hall's Notice letter of October 30, 2017, or any communications with anyone regarding the purported evidence regarding the allegations, then, on behalf of Dr. Tompkins, objection is made to you acting as the decision-maker on the merits of the Specifications and Aggravating Factors in the present matter.

Your Memorandum of August 17, 2017, addressed to "Director, VA Rocky Mountain Network," establishes that you reviewed the OIG Report and "agree[d] with the findings of the inspection," long before the Notice letter of October 30, 2017, much less the Response of November 14, 2017. This clearly suggests a predisposition on your part regarding the merits of the Specifications and/or Aggravating Factors. This further constitutes a denial of due process guaranteed by the Fourteenth Amendment to the United States Constitution.

Due process requires that this matter be assigned to an independent Administrative law Judge or, at the very least, an official with the VA, outside of the Rocky Mountain Network, totally free of any connection with this matter.

Respectfully,

Danny K. Shadid
/ak

cc: Dr. Bray-Hall, Joan Green, Dr. Tompkins

**EXHIBIT 7**

Appendix E

# System Director Comments

**Department of
Veterans Affairs** **Memorandum**

Date: August 17, 2017

From: Director, Oklahoma City VA Health Care System (635/00)

Subj: Healthcare Inspection—Evaluation of System-Wide Clinical,
Supervisory, and Administrative Practices, Oklahoma City VA Health
Care System, Oklahoma City, Oklahoma

To: Director, VA Rocky Mountain Network (10N19)

1. I have reviewed the findings within the report of the Healthcare
   Inspection—Evaluation of System-Wide Clinical, Supervisory, and
   Administrative Practices, Oklahoma City VA Health Care System,
   Oklahoma City, Oklahoma.  I agree with the findings of the inspection.

2. The plan for corrective actions has been established.

Wade Vlosich
Director, Oklahoma City VA Health Care System

EXHIBIT
8

64



**DEPARTMENT OF VETERANS AFFAIRS**
Oklahoma City VA Health Care System
921 NE 13th Street
Oklahoma City, OK  73104

November 20, 2017                                                                    635/00

John Tompkins, MD
Surgery Service (112)
THRU: Danny Shadid
528 Northwest 12th Street
Oklahoma City, OK 73103
Electronic Delivery: DShadid@RiggsAbney.com

RE: John Tompkins, M.D.

The purpose of this letter is to advise you of receipt and decision on your request for an
alternative deciding official made in letter dated November 20, 2017, entitled "RE: John
Tompkins, M.D." I have reviewed the claims and information contained in the letter,
have found them without merit, and established that no due-process violation will occur
by my remaining the deciding official in the matter of John Tompkins' proposed removal
and revocation of privileges. Therefore, your request for an alternative deciding official
has been denied.

Wade Vlosich
Health Care System Director

**EXHIBIT**

**9**

65



**DEPARTMENT OF VETERANS AFFAIRS**
**Oklahoma City VA Health Care System**
**921 NE 13ᵗʰ Street**
**Oklahoma City, OK 73104**

November 21, 2017                                                    635/00

John Tompkins, MD
Surgery Service (112)
921 NE 13ᵗʰ Street
Oklahoma City, OK 73104

SUBJ: Discharge

1.  In connection with the notice of proposed removal and revocation of privileges dated October 30, 2017, a decision has been made to discharge you from federal employment effective November 26, 2017, based on the following reasons: Failure to Provide Adequate Oversight.

2.  In reaching this decision, your written replies were carefully considered along with all the evidence developed.

3.  This decision also takes into consideration the aggravating factors cited in your notice of proposed removal: prominence of position and notoriety of the offense. These factors were considered in determining the appropriate level of discipline. I have also considered other factors including your years of service, your past work record, the seriousness of the offense(s) with which you have been charged, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty. I have concluded that the sustained charge(s) against you are of such gravity that mitigation of the proposed penalty is not warranted, and that the penalty of discharge is appropriate and within the range of reasonableness.

4.  You will be retained in a pay and duty status until the effective date of your discharge.

5.  Since the reason(s) for the action as stated in the notice of proposed removal and revocation of privileges do not involve a question of professional conduct or competence, you may appeal this action under the VA grievance procedure or the negotiated grievance procedure, but not both. You shall be deemed to have exercised your option to appeal this action at such time as you timely file a grievance under either procedure. Your grievance must be submitted to Mr. Ralph Gigliotti, VISN 19 Network Director within 10 business days after you receive this letter if you file under the negotiated grievance procedure, or 15 calendar days after you receive this letter if you file under the VA grievance procedure.

**EXHIBIT**

tabbies®

10

If you elect to file a grievance through the VA grievance procedure in connection with this action, you have the right to request a hearing. Any request for a hearing must be submitted in your grievance. For further information about the grievance procedure, you may consult C. Trent Castleberry at (405) 456-3263 or Caleb.Castleberry@VA.gov.

6. If you believe that this action is based on discrimination because of your race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination with VA in accordance with Office of Resolution Management (ORM) discrimination complaint procedures. Should you elect to do so, you may appeal this action by contacting ORM at 1-888-737-3361 within 45 calendar days of the effective date of this action.

7. **IMPACT OF DECISION REGARDING CLINICAL PRIVILEGES:** As noted above, the reasons for you discharge **ARE NOT** reasons of professional incompetence or professional misconduct. Accordingly, the medical center **WILL NOT** file a report with the National Practitioner Data Bank (NPDB) regarding the revocation of your clinical privileges with a copy to the State Licensing Board (SLB) of Oklahoma and other SLBs in all states in which you are licensed. The revocation of privileges will occur due to your loss of employment, not for cause.

Wade Vlosich
Health Care System Director

Enclosure

**ACKNOWLEDGEMENT: Your signature below only acknowledges receipt of two copies of this letter. It does not indicate agreement or disagreement with the contents of this letter. Refusal to sign will not void the contents of this letter.**

_John Tompkins, MD_                    _Nov 21, 2017_
Signature                              Date



**R I G G S** ⟨RA⟩ **A B N E Y**

NEAL  TURPEN  ORBISON  LEWIS

Danny K. Shadid                                    DShadid@RiggsAbney.com
Of Counsel                                         Fax: (405) 842-2913

December 6, 2017

**VIA HAND-DELIVERED AND E-MAILED**
**(caleb.castleberry@VA.gov)**

Ralph Gigliotti
Director, Veterans Intergrated Service Network 19
Denver, Colorado
C/O Mr. Trent Castleberry
Human Resources
Department of Veteran Affairs
OKC VA Health Care System
921 N.E. 13th Street
Oklahoma City, OK 73104

RE: John Tompkins, M.D.

Dear Mr. Gigliotti:

This, together with Exhibit 12 hereto, constitutes the formal grievance of John Tompkins, M.D., over a disciplinary action previously initiated within the Oklahoma City VA Health Care System, by letter of October 30, 2017, from Susan T. Bray-Hall, M.D., Chief of Staff, to Dr. Tompkins. A copy of that letter is attached hereto as Exhibit 1. Dr. Tompkins first learned of this specific action on October 30, 2017, the date on which he received Exhibit 1.

**BACKGROUND**

Dr. Tompkins has been an Orthopaedic surgeon at the Oklahoma City VA Hospital for approximately 26 years, without any blemish on his record. From approximately 2011 to mid-October, 2016, Dr. Tompkins served as Chief of Surgery at the Oklahoma City VA Hospital. He voluntarily resigned from that position in September, 2016, but stayed on for a few weeks until a replacement could be named.

The present disciplinary action is the System Director's second attempt to remove Dr. Tompkins from employment during 2017. The first attempt was unsuccessful. On July 13, 2017, Mr. Vlosich wrote to Dr. Tompkins advising that Dr. Tompkins' privileges to perform Joint Replacement Surgery, which is the most significant part of Dr. Tompkins' practice, were being summarily suspended. Mr. Vlosich stated that the suspension was based upon recommendations from Chief of Staff, Susan Bray-Hall, M.D., who alleged that Dr. Tompkins failed to meet accepted standards of medical practice and was a potential threat to patient welfare. A copy of Mr. Vlosich's letter of July

**EXHIBIT**
11 / 68

13, 2017, is attached hereto as Exhibit 2. Subsequent to a review of patient charts by the Oklahoma City VA Hospital's Professional Standards Board, the Board found that Dr. Tompkins *had indeed satisfied the standard of care*. Dr. Tompkins was *restored to full privileges* on August 24, 2017. See letter of August 24, 2017, from Susan Bray-Hall to Dr. Tompkins, attached hereto as Exhibit 3.

However, inasmuch as the System Director's first attempt to effectively remove Dr. Tompkins from being a VA surgeon, Mr. Vlosich proceeded on a second track to remove Dr. Tompkins, this time on the basis of alleged administrative deficiencies which were claimed to have occurred from 2014 to mid-2016. The grounds for removal in the present disciplinary action are set forth in the letter, dated October 30, 2017, from Dr. Bray-Hall to Dr. Tompkins, Exhibit 1 hereto.

Dr. Tompkins, through undersigned counsel, submitted a detailed response, dated November 14, 2017, a copy of which is attached hereto as Exhibit 4 and is fully incorporated herein by reference and made a part hereof. In addition to the aforementioned response, Dr. Tompkins prepared his own, personal response, dated November 14, 2017, which was submitted contemporaneously with the response submitted by undersigned counsel. A copy of Dr. Tompkins' additional, personal response is attached hereto as Exhibit 5, and incorporated herein by reference and made a part hereof. On November 21, 2017, Mr. Vlosich issued a written decision wherein he discharged Dr. Tompkins on the basis of administrative deficiencies, having nothing to do with Dr. Tompkins' medical skills. A copy of that letter is attached hereto as Exhibit 6.

In addition to this grievance, Dr. Tompkins, has, again prepared a separate, more personalized written grievance which is attached hereto as Exhibit 12, and which is fully incorporated herein by reference and made a part hereof.

## DEMAND FOR EVIDENTIARY HEARING

Demand is hereby made for a full, evidentiary hearing before an independent grievance examiner and independent decision official.

In this regard, and with all due respect to you, Dr. Tompkins requests that the grievance examiner be someone other than yourself, one of your subordinates, anyone within the Oklahoma City VA Healthcare System or anyone within VISN19.

Your letter of August 17, 2017, attached hereto as Exhibit 7 reflects that you had already reviewed the draft report of the VA Office of Inspector General and concurred with the findings therein. Therefore, and again respectfully, neither your nor any of your subordinates should be a decision-maker within this grievance process. To do so exceeds the bounds of propriety and does not satisfy the long-established standard that there not be even an "appearance of inpropriety" associated with the decision making process within any governmental action.

Respectfully, should this matter proceed before you or one of your subordinates, or anyone within VISN19, Dr. Tompkins' due process right to a fair hearing continues to be violated.

## GROUNDS FOR GRIEVANCE

I.       As part of the present grievance, Dr. Tompkins submits that the disciplinary action taken by the VA Oklahoma City Healthcare System Director, Mr. Wade Vlosich, was equally inappropriate and violative of due process. Dr. Tompkins, via counsel, formally requested Mr. Volisch remove himself as the decision-maker on the disciplinary matter, below. Mr. Vlosich was requested to assign the below disciplinary action to an independent Administrative Law Judge, or some other VA Official outside of the Rocky Mountain Network, totally free of any connection with the underlying disciplinary action. A copy of the correspondence, dated November 20, 2017, setting forth that request is attached hereto as Exhibit 8. As was noted in my letter of November 20, 2017, to Mr. Vlosich, he had also acknowledged, in writing, that he had previously reviewed the draft of the OIG Report and agreed with the "findings" of the OIG Report. Attached hereto as Exhibit 9, a copy of Mr. Vlosich's Memorandum of August 17, 2017, wherein he acknowledges having reviewed the OIG Report and agreed with it.

Due process, as guaranteed by the Fourteenth Amendment to the United States Constitution requires that any and all governmental decision-makers be free from bias or other influences prior to and during the fact-finding process and decision-making process. Mr. Vlosich refused to recuse himself as set forth in his letter of November 20, 2017, addressed to Dr. Tompkins, and which is attached hereto as Exhibit 10. Mr. Vlosich's refusal to assign this matter to an independent decision-maker is one of the basis of upon which the present grievance is submitted and one of the reasons reflecting that Dr. Tompkins has not been treated fairly.

II.      Regarding Specification 1, the evidence does not support a finding that Dr. Tompkins failed to provide adequate oversight by inaction. Summaries of the deficiencies within the Specification itself, the evidence, Dr. Tompkins' legal position and arguments are set forth in undersigned counsel's response letter of November 14, 2014, Exhibit 4 hereto, which is fully adopted and incorporated herein by reference.

III.     Regarding Specification 2, the evidence does not support a finding that Dr. Tompkins inaccurately kept time of part-time and resident physicians. Summaries of the deficiencies within the Specification itself, the evidence, Dr. Tompkins' legal position and arguments are set forth in undersigned counsel's response letter of November 14, 2014, Exhibit 4, hereto, which is fully adopted and incorporated herein by reference.

IV.      Regarding Specification Three, the evidence does not support a finding that Dr. Tompkins inadequately conducted oversight of residents. A summary of the deficiencies within the Specification within itself, the evidence, Dr. Tompkins' legal position and arguments are set forth in undersigned counsel's response letter of November 14, 2014, Exhibit 4, hereto, which is fully adopted and incorporated herein by reference.

V.       Regarding Aggravating Circumstances, the evidence does not support the existence of any of the alleged aggravating factors. A summary of the false assumptions and deficiencies within the alleged aggravating factors themselves, the evidence, Dr. Tompkins' legal position and arguments are set forth in undersigned counsel's response letter of November 14, 2014, Exhibit 4, hereto, which is fully adopted and incorporated herein by reference.

Mr. Ralph Gigliotti
December 6, 2017
Page 4

VI.      Upon full evidentiary hearing, written documentation will show that from 2013 through mid-2016, Dr. Tompkins sent multiple e-mail communications to staff members and to the former Chief of Staff addressing many of the issues of which Dr. Bray-Hall, in her letter of October 30, 2017, claims Dr. Tompkins to be deficient. The evidence will show that Dr. Tompkins did in fact address the issues which were the subject of Dr. Bray-Hall's charging letter. Copies of a sampling of e-mail communications from Dr. Tompkins to VA Surgeons and the former Chief of Staff are available for submission at the evidentiary hearing to be held in the present grievance proceeding.

VII.     The penalty of discharge/removal imposed by the System Director far exceeds the range of penalties set forth in Center Memorandum 05-32, January 26, 2015, for the types of offenses set forth in Dr. Bray-Hall's letter of October 30, 2017. A copy of the Center Memorandum 05-32 is attached hereto as Exhibit 11. Even assuming that the changes are supportable by evidence, a reprimand or minor suspension would be the greatest available sanction. Again assuming the allegations are supported by evidence and even if removal was appropriate, it would only be removal from the position of Chief of Surgery, not removal from employment as a surgeon.

**RELIEF REQUESTED**

Dr. Tompkins has not been part of the VA's administrative hierarchy since mid-October, 2016. He voluntarily resigned as Chief of Surgery at that time. He was the recipient of the VA's Hammarsten Award for Medical Excellence in March, 2016. Dr. Tompkins has not and does not seek to be restored to any administrative position. Rather, her seeks only to be reinstated as an employee of the VA in the capacity of an Orthopedic Surgeon at the Oklahoma City VA Healthcare System.

Respectfully,

Danny K. Shadid
/ak

cc: John Tompkins, M.D.
     Susan T. Bray-Hall, M.D.,
     Chief of Staff

Appendix D

# VISN Director Comments

**Department of Veterans Affairs**              **Memorandum**

**Date:** August 17, 2017

**From:** Director, VA Rocky Mountain Network (10N19)

**Subj:** Healthcare Inspection—Evaluation of System-Wide Clinical, Supervisory, and Administrative Practices, Oklahoma City VA Health Care System, Oklahoma City, Oklahoma

**To:** Director, Rapid Response (54RR)
Director, Management Review Service (VHA 10E1D MRS Action)

1. Thank you for the opportunity to review and comment on the draft report, Healthcare Inspection—Evaluation of System-Wide Clinical, Supervisory, and Administrative Practices, Oklahoma City VA Health Care System, Oklahoma City, Oklahoma.

2. I concur with the findings, provide the attached action plan to address recommendation 1 at the VISN level, and agree with the attached action plan submitted by Oklahoma City VA Health Care System to address the remaining recommendations.

*Ralph T. Gigliotti*

Ralph T. Gigliotti, FACHE
Director, VA Rocky Mountain Network (10N19)

**EXHIBIT**

**12**

# REPORT OF FINDINGS AND RECOMMENDATIONS (DECISION)
# IN THE GRIEVANCE OF
# DR. JOHN TOMPKINS vs. OKLAHOMA CITY VA HEALTH SYSTEM

## INTRODUCTION

This document details the summary and conclusion of the formal grievance examination performed by Dr. Roger Tatum, Chief of Surgery, VA Puget Sound Health Care System (VISN 20) at the request of the grievant, John Tompkins M.D., recently dismissed Staff Orthopedic Surgeon and formerly Chief of Surgery against his former employer, the Oklahoma City VA Health System (VISN 19). This grievance was officially filed on December 6, 2017, and Dr. Tatum was appointed as examiner on February 13, 2018, by Mr. Ralph Gigliotti, Network Director, VISN 19.

Dr. Tompkins' grievance concerns his dismissal and the circumstances of this action that are outlined in a letter from Susan Bray-Hall, M.D., Chief of Staff of the Oklahoma City VA Health System, dated October 30, 2017. This letter constitutes the proposal for Dr. Tompkins' removal and revocation of his clinical privileges, detailing a failure of oversight while in his role as Chief of Surgery, a position which the grievant had voluntarily relinquished in October of the preceding year. The failure of oversight that is cited by the proposal letter includes three specifications, including failure to correct improper documentation in the medical record by providers within the surgical service line, inadequacies in the oversight of time and attendance of part-time and resident physicians, and failure to appropriately monitor resident supervision. In addition, two aggregating factors were specified, including damage to the credibility and integrity of the Oklahoma City VA Surgical Service Line as well as the agency at large, and notoriety of the offense given negative media attention that had resulted from an Office of the Inspector General (OIG) report from 2017 which had included these findings, among others.

On November 14, 2017, Dr. Tompkins submitted a written reply to Mr. Wade Vlosich, Director of the Oklahoma City VA Health System, detailing his response to each of the three formal charges. Subsequently Dr. Tompkins' attorney, Mr. Danny Shadid, filed a letter with Mr. Vlosich claiming a due process violation whereby Mr. Vlosich, having previously reviewed the preliminary OIG report mentioned above, should not serve as the deciding official in the matter of Dr. Tompkins' termination. This claim was denied by Mr. Vlosich that same day, and on November 21, 2017 Dr. Tompkins was issued a final decision letter confirming his discharge from federal employment, effective November 26, 2017.

1

EXHIBIT

13

Thus the grievance presented on December 6, 2017 seeks a full evidentiary hearing before an independent grievance examiner outside of VISN 19, which has now been concluded and is the subject of this report.  The specific relief sought by Dr. Tompkins is for him to be reinstated as an orthopedic surgeon on staff at the Oklahoma City VA Health System.

PROCEDURAL REVIEW

Though there is a claim of due process violation in the grievance letter presented by Mr. Shadid, stating that the failure to appoint an independent deciding official in the matter of Dr. Tompkins' removal from VA service constitutes a violation of the Fourteenth Amendment to the United States Constitution, this grievance examiner did not perform a legal review of due process as that was not focus of the examination nor is the grievance examiner a legal expert.  It shall be stated however that customarily the Facility Director of a VA Medical Center is the deciding official in any such personnel action, and only under unusual circumstances would such a matter be assigned to another individual.

DISCUSSION AND ANALYSIS

In preparing this report, all evidence presented by both the grievant's representative and the agency were thoroughly reviewed prior to hearing testimony.  The grievant's attorney provided a list of three witnesses, including:  Dr. John Tompkins; Dr. Mark Huycke, who was the Oklahoma City VA Chief of Staff during Dr. Tompkins' time as Chief of Surgery; and Ms. Debra Hovarter R.N., VA Surgical Quality Improvement Program Coordinator.  On behalf of the agency three witness were also provided, including:  Dr. Bray-Hall; Mr. Vlosich; and Ms. Jindria Alvarado, Compliance and Business Integrity Officer for the Oklahoma City VA Health Care System.  Hearings were conducted over 3 days in May and June of 2018, with opportunities for the attorneys representing both parties to examine and cross-examine all witnesses.

By way of additional background, because of a variety of concerns that had been reported regarding operations at the Oklahoma City VA Health System, the Office of Inspector General conducted an in-depth investigation during 2016 which included aspects of the Surgery Service Line at the facility, among others.  The three specific allegations against Dr. Tompkins for failure of oversight are based on three areas cited in the OIG report of this investigation, entitled "Evaluation of System-Wide Clinical, Supervisory, and Administrative Practices, Oklahoma City VAHCS, Oklahoma City, Oklahoma," which was first released to Mr. Vlosich on August 17, 2017 (based on review of a memo of that date from Mr. Vlosich acknowledging receipt).  Dr. Tompkins had not been serving in the role of Chief of Surgery since November of the preceding year, and per Dr. Tompkins' testimony, his reasons for stepping down from the position

2

were based on a desire to leave behind administrative tasks and focus on purely clinical work as a staff orthopedic surgeon, rather than as a result of the OIG investigation. Up to that point, Dr. Tompkins had been Chief of Surgery for a period of approximately seven years. The circumstances and evidence surrounding the three allegations of failure to provide adequate oversight are each detailed separately below.

1. **Inappropriate documentation in the medical record by surgery attending providers:** this is based on the section of the OIG report entitled "Managing patient care without CPRS access," on page 25 of the OIG report, and cites a finding of several instances in which an attending physician had either used another provider's CPRS log on code to enter a note for patient care. As specific evidence of this, the agency provided an August 2015 email from the then-Deputy Chief of Staff to Dr. Tompkins about one specific incident involving a neurosurgery provider. In addition there is a list of Surgery providers from September of 2016 who were shown to have expired CPRS access codes, most of whom are WOC ("without compensation") or contract providers who were not actively or directly providing care, but including two part-time physicians. Notably, Dr. Tompkins did present evidence of his attempts to correct this in the form of emails to all surgical staff from 2014 to 2016 reminding them to maintain their CPRS and VHA computer system log on credentials and also emphasizing the importance of direct documentation. No evidence of specific disciplinary action for the providers in question was provided. The OIG report recommended that service chiefs assure all providers maintain appropriate computer access and that functional equipment and adequate HR staffing be readily available, issues that are regular concerns across the VA system at large.

2. **Improper timekeeping for part-time and resident physicians:** this allegation centers around the section in the OIG report detailed on pages 33-35, "SC Clinic Cancellations." The report presents data on numbers of clinic encounters that were cancelled due to absence of part time and/or resident physicians in several specialties, both in Medicine and Surgery, specifically listing 114 incidents involving ophthalmology residents and 5 incidents involving ENT part-time physicians, among others in medical subspecialties. These are tied to what the report refers to as "potential improper payments" of $3,303 for the services of the physicians in the surgical subspecialties, which would have been made to the Oklahoma City VA Health Care System's academic affiliate, Oklahoma University Medicine. There is no definitive evidence presented which confirms that such improper payments were made, though Mr. Vlosich indicated that a subsequent review had revealed a much larger sum of improper payments was likely. As a counter point, during testimony it was alleged by Dr. Tompkins that there had been many thousands of dollars of missing payments from the VA to Oklahoma University Medicine for services rendered, to illustrate that such payment discrepancies are commonplace in both directions. Again, no specific evidence of this latter claim was presented, thus it is not possible to make a judgment

3

based on these data.  As an additional note, the OIG report states that overall clinic cancellation rates at the Oklahoma City VA Health Care System are similar to those of other same-size and level VA medical facilities, and that there were no findings that such cancellations had resulted in any patient harm or adverse outcomes.  From the report it is also clear that this issue was not isolated to the Surgery Service Line, and the witnesses for the agency did not specify whether or not the Chief of Medicine, under whom the other subspecialty sections mentioned above fall, was disciplined in a manner similar to Dr. Tompkins.  A significant point of discussion that arose from this section of the allegations against Dr. Tompkins is the fact that use of a "check-in and check-out time clock" system for physician timekeeping is not permissible within the Oklahoma City VA system, which was verified by the witnesses for the agency.

3. **Inadequate resident supervision:**  the OIG report indicates, beginning on page 26, that "system managers did not monitor resident supervision as required under VHA policy."  Specifically, the report states that the only evidence for monitoring of surgery resident supervision was a "Medical Focused Record Review Surgical Services," which was subsequently discontinued with the retirement of Surgical Quality Improvement Coordinator, who compiled this document, in May of 2016.  Dr. Tompkins indicated that he did not have the personnel to take over this responsibility upon that individual's retirement, and that he was not authorized to fill this vacancy thereafter in his time as the Chief of Surgery.  Witnesses for the agency, including Mr. Vlosich, Dr. Bray-Hall, and Ms. Alvarado all indicated that this was an important enough function to warrant coverage of these duties regardless of the loss of personnel.  The OIG report did include a review of 212 inpatient admissions across both Medicine and Surgery finding that only 4 records were missing documentation of resident supervision, and concluded that the OIG "could not substantiate an actual lack of resident supervision."  Neither the OIG report nor the letter proposing Dr. Tompkins' removal from federal service mention the documentation of resident supervision that is included in the National Surgery Office Quarterly Report, formerly known as the VASQIP report, which specifically indicates the level of resident involvement and supervision in operative cases.  This report had continued without interruption throughout Dr. Tompkins' time as Chief of Surgery, as attested by Ms. Hovarter.  As a further point, thorough review of the Oklahoma City VA Health Care System Center Memorandum 11-65 (dated March 13, 2015) entitled "Resident Supervision," reveals that the responsibilities for monitoring and maintaining documentation of resident supervision are clearly stated in article 5.  The individuals specifically indicated include the medical center Director, followed by the facility Chief of Staff, the ACOS for Education, the Residency Program Director, and the VA Residency Program Coordinator.   The Chief of the Service Line is not even mentioned in this context.  Though the Service Chief has a general responsibility for all operations within his or her

4

service line, and thus has a vested interest in this aspect of oversight, the policies and procedures supplied as evidence on behalf of the facility do not indicate this as the direct purview of this position.

In addition to the three Specifications detailed in the proposed removal letter of October 30, 2017, two aggravating factors are cited, including damage to the "credibility and integrity of Surgical Service and the agency," and "notoriety of the offense." While both factors were discussed by witnesses for the grievant and for the agency, in particular concerning negative media reports at the time of the release of the OIG report, no actual evidence of this was presented for examination of this grievance. There is no indication that there has been damage to the Oklahoma City VA Health Care System Surgical Service, such as a decline in patient referrals or above average departures of staff during Dr. Tompkins' tenure, and again no evidence of these or other potential impacts was provided in either the written or testimonial material submitted. Therefore it is not possible to substantiate the claims made in either of these aggravating factors. Notably, removal of the Chief of Surgery is not recommended or suggested in the OIG report.

A final issue raised by the grievant concerns an event that occurred approximately three months prior to the issuance of the proposal for removal. On July 13, 2017, Dr. Tompkins' privileges for performing total joint replacement surgery were summarily suspended pending an investigation into the quality of his clinical care; per Mr. Vlosich's testimony this arose because of anonymous complaints from surgical staff as well as an incident in which Dr. Tompkins had begun to perform a joint injection on the wrong side shoulder of a patient (inaccurately characterized as a "wrong site surgery") before realizing the mistake and performing the correct injection. Subsequently an external review of 50 of Dr. Tompkins' surgical cases was completed with the finding that there were no deviations from the standard of care, and his privileges were restored on August 24, 2017. There does not appear to have been any internal review or process that preceded the summary suspension of privileges. Despite Dr. Bray-Hall's and Mr. Vlosich's assertion that this event was entirely unrelated to the subsequent decision to remove Dr. Tompkins from federal service, the timing of this suspension legitimately raises the question of whether or not this was utilized as an initial and alternative means of terminating Dr. Tompkins' appointment.


FINDINGS

Based upon the extensive review detailed above, it is concluded there were indeed several areas in which Dr. Tompkins should have provided closer oversight over administration of the Surgery Service Line during his time as Chief of Surgery at the Oklahoma City VA Health Care System. Such concerns could be used to justify requiring a Chief of Service to relinquish that position, although without giving the individual the opportunity to improve based upon feedback, it is unlikely that this would

5

be applied in similar circumstances within every VA facility. However, as noted above, Dr. Tompkins voluntarily stepped down as the Chief of Surgery in October of 2016, and had not served in that role for a full year at the time of his proposed removal from federal service. Terminating his employment as a staff physician for the causes specified in the removal letter is not appropriate and is highly inconsistent with any connection to his duties at the time of his termination.

## RECOMMENDATIONS

It is recommended that Dr. Tompkins be fully restored to his position as a staff physician in the practice of orthopedic surgery under the Surgery Service Line at the Oklahoma City VA Health Care System. The time between his removal from federal service on November 26, 2017 up to the time that he is reinstated should be considered as time served in the position of staff physician for the purposes of benefits and retirement.

Thank you for the opportunity to perform this review and serve as official grievance examiner in the matter of the removal from federal service of John Tompkins, MD.

Sincerely,

*Roger P. Tatum*

**Roger P. Tatum, M.D FACS**
Grievance Examiner
Chief of Surgery, VA Puget Sound Health Care System
Seattle, Washington
July 31, 2018

6



**DEPARTMENT OF VETERANS AFFAIRS**
**VA Rocky Mountain Network – VISN 19**
**Mountain Towers, Suite 1100**
**4100 East Mississippi Avenue**
**Glendale. CO   80246**

**Date:** August 17, 2018

**To:**  Danny K. Shadid, Counsel, Riggs Abney Law Firm

**From:**  Ralph T. Gigliotti, VISN 19 Network Director

**Subj:**  Administrative Grievance: Decision- John Tompkins, M.D.

1. This is in response to the Administrative Grievance received December 7, 2017 on behalf of the Grievant.

2. **Issue:** Oklahoma City VA Health Care System (OKCVAHCS) John Tompkins, M.D., Orthopedic Surgeon, was discharged from federal service, effective November 26, 2017, for Failure to Provide Adequate Oversight.  Dr. Tompkins, through representation from Danny K. Shadid, has a made a formal grievance regarding his discharge.

3. **Background:** Sustained charge was Failure to Provide Oversight (Findings from OIG Investigation revealed during his appointment, Chief of Surgery failed to provide oversight in the following aspects: (1) to stop improper access and inappropriate documentation in patient's electronic health record (EHR) by an attending physician, (2) time and attendance of part-time and resident physicians, and (3) documenting routine ongoing monitoring of resident supervision). Grievance submitted by Dr. Tompkins representative on 12/6/2017 due to discharge.

4. **Employee Position:**  Dr. Tompkins feels that he did take appropriate action to address the issues he was aware of.  It is also noted by Dr. Tompkins' representative, that it is their belief that the penalty of discharge exceeds the range of penalties in relation to the stated offense of Failure to Provide Adequate Oversight.

5. **Requested Remedy:**  Requesting to be reinstated as an employee of the VA in the capacity of an Orthopedic Surgeon at the OKCVAHCS.

6. **Final Decision:**  The Network Director reviewed the Grievance Examiner Report, along with the evidence file supporting the discharge.  He found the offense was serious enough in nature, to rise to the level of discharge given Dr. Tompkins' assignment as Chief of Surgery.  In this role, all administrative and clinical functions of the service were ultimately Dr. Tompkins' responsibility.  The findings from the investigation conducted by OIG, indicated the severe impact Dr. Tompkins' lack of oversight had on Surgery Service as well as the facility.  It is noted that the leadership at the facility took administrative action, once they received the required clearance from OIG officials.

**EXHIBIT**

14

tabbies®

79

Page 2
Grievance Decision-John Tompkins, M.D.

    7.  For the reasons stated above, the grievance and requested remedy is not granted.


*Ralph T. Gigliotti*      / 8/21/2018
_____    _____
Ralph T. Gigliotti, FACHE        Date
Network Director, VISN19


_____     / _____
John Tompkins, M.D.            Date

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN TOMPKINS, M.D.,** | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | **Case No. CIV-18-1251-C** |
| **OF VETERANS AFFAIRS,** *et al.* | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S AMENDED COMPLAINT
## WITH BRIEF IN SUPPORT

---

TIMOTHY J. DOWNING
United States Attorney

*/s/ Rebecca A. Frazier*
REBECCA A. FRAZIER
Assistant U.S. Attorney
Okla. Bar Number: 22285
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Rebecca.Frazier@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................

STATEMENT OF THE CASE ................................................................................... 1

STANDARD FOR DISMISSAL ............................................................................... 4

    Fed. R. Civ. P. 12(b)(1) ..................................................................................... 4

    Fed. R. Civ. P. 12(b)(6) ..................................................................................... 5

AUTHORITY AND ARGUMENT ............................................................................ 5

I.    THERE IS NO WAIVER OF THE GOVERNMENT'S SOVEREIGN
    IMMUNITY FOR ALLEGED VIOLATIONS OF THE ADMINISTRATIVE
    PROCEDURES ACT ("APA") ........................................................................... 5

    A.  Title 38 is Analogous to the CSRA Which Prohibits Judicial Review in
        Certain Instances ..................................................................................... 7

    B.  Judicial Review id Precluded by Title 38 as Reflected in Congressional
        Intent ....................................................................................................... 10

II.    PLAINTIFF'S APA CLAIMS FAIL UNDER RULE 12(b)(6) BECAUSE THE
    PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM FOR AN APA
    VIOLATION ..................................................................................................... 14

III.    PLAINTIFF'S CONSTITUTIONAL CLAIMS FAIL UNDER RULE
    12(b)(6) ............................................................................................................. 15

    A.  Plaintiff Fails to State a Plausible Due Process Claim .......................... 15

        1.  Plaintiff Fails to State a Plausible Substantive Due Process
            Claim ............................................................................................ 16

        2.  Plaintiff Fails to State a Plausible Procedural Due Process
            Claim ............................................................................................ 19

            i.  The VA Handbook Does Not Determine What Level of
                Process is Owed to Plaintiff and Cannot Formulate the
                Basis for Plaintiff's Property Interest in His
                Employment ................................................................... 20

ii.   Even if the Plaintiff Has a Property Interest in His Federal
Employment, He Fails to State a Plausible Claim of Due
Process Violations ........................................................... 21

a.   Plaintiff's Claims of Bias and Lack of Impartiality
or Any other Inadequate Process Are Not
Sufficiently Plead ................................................ 21

b.   Plaintiff Claims that Gigliotti Failed to Follow the
Grievance Examiner's Recommendation such that
it Violated His Due Process Rights are Not
Sufficiently Plead ................................................ 23

CONCLUSION ............................................................................... 26

CERTIFICATE OF SERVICE ........................................................ 27

ii

# **TABLE OF AUTHORITIES**

<u>Federal Cases</u>

*Abdi v. Wray*,
   942 F.3d 1019 (10th Cir. 2019) ....................................................... 16, 17, 20

*Amalgamated Sugar Co. v. Bergland*,
   664 F.2d 818 (10th Cir. 1981) ...................................................................... 6

*Arron v. United States*,
   113 F.3d 1245 (10th Cir. 1997) .................................................................... 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................... 5

*Beck v. Shinseki*,
   No. CV 113-126, 2015 WL 1202196 (S.D. Ga. Mar. 16, 2015) ................... 11

*Block v. Cmty Nutrition Inst.*,
   467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) ................................. 6

*Board of Regents v. Roth*,
   408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ............................ 19, 20

*Bonner v. Dep't of Veterans Affairs Pittsburgh Healthcare Sys.*,
   477 F.3d 1343 (Fed. Cir. 2007) .................................................................. 13

*Bottom v. City of Yukon, Oklahoma*,
   No. CV-17-152-SLP, 2018 WL 4839227 (W.D. Okla. Aug. 17, 2018) ........ 20

*Brown v. Montoya*,
   662 F.3d 1152 (10th Cir. 2011) .................................................................. 16

*Carlson v. Green*,
   446 U.S. 14 (1980) .................................................................................... 15

*City of Albuquerque v. United States Dep't of Interior*,
   379 F. 3d 901 (10th Cir. 2004) .................................................................... 4

*Coleman v. Utah State Charter Sch. Bd.*,
   673 F. App'x 822 (10th Cir. 2016) ............................................................. 20

*Coppedge v. Marsh*,
   532 F. Supp. 423 (D. Kan. 1982) ............................................................... 19

*Cruzan v. Director, Missouri Dept. of Health*,
   497 U.S. 261 (1990) .................................................................................. 18

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) .................................................................................. 16

*Darr v. Town of Telluride, Colo.*,
   495 F.3d 1243 (10th Cir. 2007) ............................................................ 18, 19

iii

*Davis v. Passman,*
    442 U.S. 228 (1979) .................................................................................. 15
*Eisenstadt v. Baird,*
    405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) .................................... 18
*El v. U.S. Dep't of Commerce*,
    No. 2:15CV532, 2016 WL 9113570 (E.D. Va. July 19, 2016) ..................... 10
*Farmer v. Perrill,*
    275 F.3d 958 (10th Cir. 2001) .................................................................... 16
*FDIC v. Meyer*,
    510 U.S. 471 (1994) ..................................................................................... 16
*Fligiel v. Samson*,
    440 F.3d 747 (6th Cir. 2006) .......................................................... 10, 12, 13
*Franks v. Nimmo,*
    796 F.2d 1230 (10th Cir. 1986) ............................................................. 9, 10
*Goh v. Dep't of Veterans Affairs*,
    No. 1:14-CV-00315 LJO, 2014 WL 5093279 (E.D. Cal. Oct. 9, 2014) ........... 14
*Griswold v. Connecticut,*
    381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) .................................... 18
*Halley v. Huckaby*,
    902 F.2d 1136 (10th Cir. 2018) .................................................................... 17
*Hardison v. Cohen*,
    375 F.3d 1262 (11th Cir. 2004) ............................................................ 20, 21
*Henry v. Office of Thrift Supervision,*
    43 F.3d 507 (10th Cir. 1994) ......................................................................... 4
*High Country Citizens All. v. Clarke*,
    454 F.3d 1177 (10th Cir. 2006) ..................................................................... 6
*Holt v. United States,*
    46 F.3d 1000 (10th Cir. 1995) ....................................................................... 4
*Jackson v. Shinseki,*
    526 F. App'x 814 (10th Cir. 2013) ................................................................. 9
*Jones v. Hunt,*
    410 F.3d 1221 (10th Cir. 2005) ..................................................................... 5
*Koessel v. Sublette Cty. Sheriff's Dep't,*
    717 F.3d 736 (10th Cir. 2013) ........................................................ 17, 18, 20
*Loving v. Virginia,*
    388 U.S. 1 (1967) ........................................................................................ 17
*Massachusetts Bd. of Ret. v. Murgia,*
    427 U.S. 307 (1976) ..................................................................................... 18

*Merida Delgado v. Gonzales*,
428 F.3d 916 (10th Cir. 2005) ................................................. 6
*Meyer v. Nebraska*,
262 U.S. 390 (1923) ................................................................ 18
*Miller v. City of Mission*,
705 F.2d 368 (10th Cir.1983) ................................................. 19
*Mount Evans Co. v. Madigan*,
14 F.3d 1444 (10th Cir. 1994) ................................................ 14
*Nat'l Ass'n of VA Physicians v. Derwinski*,
No. CIV. A. 87-2302, 1991 WL 120105 (D.D.C. June 19, 1991) ................. 21
*Neighbors for Rational Dev., Inc. v. Norton*,
379 F.3d 956 (10th Cir. 2004) ................................................ 6
*Pathak v. Department of Veterans Affairs*,
274 F.3d 28 (1st Cir. 2001) .......................................... 11, 12, 22
*Petrini v. Howard*,
918 F.2d 1482 (10th Cir. 1990) ............................................... 9
*Pierce v. Society of Sisters*,
268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ......................... 18
*Potts v. Davis County*,
551 F.3d 1188 (10th Cir.2009) ............................................... 18
*Preferred Risk Mut. Ins. Co. v. United States*,
86 F.3d 789 (8th Cir. 1996) ................................................ 15
*Reno v. Flores*,
507 U.S. 292 (1993) .......................................................... 17
*Robbins v. U.S. Bureau of Land Mgmt.*,
438 F.3d 1074 (10th Cir. 2006) .............................................. 10
*Rochin v. California*,
342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) .......................... 18
*Ruiz v. McDonnell*,
299 F. 3d 1173 (10th Cir. 2002) .............................................. 4
*S. Utah Wilderness All. v. United States Dep't of the Interior*,
No. 215CV00194JNPEJF, 2016 WL 1261064 (D. Utah Mar. 30, 2016) ........... 15
*Seegmiller v. LaVerkin City*,
528 F.3d 762 (10th Cir. 2008) .............................................. 17
*Simmat v. United States*,
*BOP*, 413 F.3d 1225 (10th Cir. 2005) ..................................... 16
*Skinner v. Oklahoma ex rel. Williamson*,
316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ....................... 17

*State of Utah v. Babbitt*,
   137 F.3d 1193 (10th Cir. 1998) ................................................................. 14
*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ..................................................................................... 4
*Sullivan v. Stark*,
   808 F.2d 737 (10th Cir. 1987) ................................................................. 21
*Sylvia v. Wisler*,
   875 F.3d 1307 (10th Cir. 2017) ................................................................. 5
*Teigen v. Renfrow*,
   511 F.3d 1072 (10th Cir. 2007) ............................................................... 20
*U.S. v. Mitchell*,
   445 U.S. 535 (1980) ................................................................................... 6
*United States ex rel. Reed v. KeyPoint Gov't Solutions*,
   923 F.3d 729 (10th Cir. 2019) ................................................................... 5
*United States v. Erika, Inc.,*
   456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) ............................... 7
*United States v. Fausto*,
   484 U.S. 439 (1998) ............................................................................... 7, 8
*Walker v. United States*,
   744 F.2d 67 (10th Cir. 1984) ..................................................... 19, 22, 24
*Washington v. Glucksberg*,
   521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ..................... 16, 17
*Weber v. Dep't of Veterans Affairs*,
   521 F.3d 1061 (9th Cir. 2008) ................................................................. 12
*Williams v. Fed. Deposit Ins. Corp.*,
   723 F. Supp. 612 (W.D. Okla. 1989) ................................................... 21, 22
*Wirshing v. Mansfield*,
   No. CV 07-6927 DSF, 2008 WL 11340379 (C.D. Cal. June 17, 2008) ............... 13, 14
*Wyoming v. United States*,
   279 F.3d 1214 (10th Cir. 2002) ................................................................. 6
*Yu v. U.S. Dep't of Veterans Affairs*,
   528 F. App'x 181 (3d Cir. 2013) ............................................................... 9
*Ziglar v. Abbasi*,
   137 S.Ct. 1843 (2017) ............................................................................. 15
*Zynger v. Dep't of Homeland Sec.*,
   615 F. Supp. 2d 50 (E.D.N.Y. 2009) ....................................................... 25

Federal Statutes

5 U.S.C. § 701(a) ........................................................................................... 6
5 U.S.C. § 702 ................................................................................................ 3
5 U.S.C. § 704 ................................................................................................ 6
5 U.S.C. § 706(2)(A) ...................................................................................... 15
5 U.S.C. § 5596 .............................................................................................. 7
5 U.S.C. § 7511(b)(10) ................................................................................... 11
28 U.S.C. § 1331 ............................................................................................ 6
38 U.S.C. § 4104 ............................................................................................ 10
38 U.S.C. § 7401(1) .............................................................................. 2, 11, 12, 13
38 U.S.C. § 7403 ............................................................................................ 12
38 U.S.C. § 7403(b)(2) ................................................................................... 12
38 U.S.C. § 7406 ............................................................................................ 20
38 U.S.C. § 7461(c)(2) ................................................................................... 11
38 U.S.C. § 7463 .................................................................................... 10, 11, 13
38 U.S.C. § 7463(c)(1) ................................................................................... 23
38 U.S.C. § 7463(d) ....................................................................................... 23
38 U.S.C. § 7463(d)(2) ................................................................................... 24
38 U.S.C. § 7463(d)(3) ................................................................................... 24
38 U.S.C. § 7461-7463 .............................................................................. 2, 11

<u>Federal Rules</u>

Fed. R. Civ. P. 8(a) ......................................................................................... 5
Fed. R. Civ. P. 12(b)(6) .................................................................................. 5
Fed. R. Civ. P. 12(b)(1) .......................................................................... 1, 3, 4

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA

JOHN TOMPKINS, M.D.,       )
    Plaintiff,              )
    v.                    )
                          )   **Case No. CIV-18-1251-C**
UNITED STATES DEPARTMENT  )
OF VETERANS AFFAIRS, *et al.*   )
    Defendants.            )
                          )

---

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT
WITH BRIEF IN SUPPORT**

---

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants U.S.

Department of Veteran Affairs ("VA"), Robert Wilkie ("Secretary"), Ralph Gigliotti, and

Kristopher Wade Vlosich respectfully move for dismissal of all claims for a lack of subject

matter jurisdiction and failure to state a claim. In support, the Defendants offer the

following brief.

<u>**STATEMENT OF THE CASE**</u>

Plaintiff John Tompkins, M.D., was an Orthopedic Surgeon employed by the U.S.

Department of Veterans Affairs at the Oklahoma City Veteran Affairs Medical Center

("OKC VA") as Chief of Surgery from September 2010 through October 2016. (Am.

Compl., Doc. 24, ¶14). Dr. Tompkins resigned as Chief of Surgery in September 2016,

effective in October 2016, but continued his employment at the OKC VA as an orthopedic

surgeon. Dr. Tompkins contends that he was involuntarily discharged in November 2017

from the OKC VA.  (*Id.* ¶¶15 & 16).  The OKC VA's termination was based on administrative deficiencies that occurred when Dr. Tompkins was Chief of Surgery from 2015 to 2016.  (*Id.* ¶¶24 & 25).

Because Dr. Tompkins was an OKC VA physician appointed by the Secretary pursuant to 38 U.S.C. § 7401(1), he was exempted from the Civil Service Reform Act ("CSRA") and had the option to contest adverse employment actions pursuant to VA statutory provisions and internal grievance procedures.  Pursuant to 38 U.S.C. §§ 7461-7463, the grievance process available to each employee differs if a "major adverse action" occurred or if the action arises out of a question of professional conduct or competence. To contest his termination, Plaintiff sought relief through the agency's internal grievance process in 2017.  And, contrary to his assertions, Dr. Tompkins received copious due process including a full administrative hearing, a neutral Grievance Examiner, a prompt report of the Grievance Examiner's findings and recommendations, and a prompt review of the Examiner's findings and recommendations by a higher-level official at the VA.

Plaintiff now alleges violations of his procedural and substantive due process rights under the Fifth Amendment of the Constitution and the "rights" afforded to him under the VA Handbook, which further delineates the agency's internal grievance process (Am. Compl. ¶¶80-81).  Specifically, Plaintiff alleges: (1) Gigliotti's decision to reject the Grievance Examiner's recommendations violated his substantive due process rights; (2) Gigliotti's explanation for his decision failed to adhere to the VA Handbook requirements

thereby violating Plaintiff's procedural due process rights; (3) Vlosich and Gigliotti's termination decisions were biased thereby violating Plaintiff's procedural due process rights, because they were "predetermined decisions" due to the fact that both defendants had previously reviewed the OIG report; and (4) the overall content of the OIG report was not part of the evidence presented to the Grievance Examiner, yet Gigliotti's decision letter references the report. (Am. Compl. ¶¶ 32, 51, 74, 81-82). The process owed to Plaintiff, if any, is determined based on the VA's statutory provisions, not its handbook. However, the VA adhered to both provisions and provided Plaintiff process more extensive than what was required under either provision. Plaintiff seeks injunctive relief under federal common law and the Administrative Procedures Act, 5 U.S.C. §§ 702 *et seq.* including reinstatement but also seeks money damages in the form of back pay. (*Id.* ¶¶58 & 67).

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully move for dismissal of all claims for lack of subject matter jurisdiction or failure to state a claim upon which relief may be granted. Specifically, Plaintiff's Administrative Procedures Act ("APA") claims fail, because the government has not waived its sovereign immunity for such claims, and because Plaintiff is not entitled to judicial review pursuant to the APA. Additionally, Plaintiff's constitutional claims fail to state a claim for relief.

Plaintiff focuses on semantics, taking issue with the terminology used by Mr. Gigliotti to formulate his termination letter, because he is dissatisfied with the outcome of an extensive administrative process which provided him with notice and opportunity for a

hearing before a neutral Grievance Examiner. Dismissal of his Amended Complaint is appropriate under Rules 12(b)(1) and (b)(6).

## STANDARD FOR DISMISSAL

### *Fed. R. Civ. P. 12(b)(1)*

Federal courts are courts of limited jurisdiction. *Henry v. Office of Thrift Supervision,* 43 F.3d 507, 511 (10th Cir. 1994). A plaintiff, as the party invoking the court's jurisdiction, must first establish the court has jurisdiction to consider the issues he presents to it. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103-104 (1998). Pursuant to Rule 12(b)(1), a motion to dismiss for lack of subject matter jurisdiction may take two forms – a facial or factual attack. *City of Albuquerque v. United States Dep't of Interior*, 379 F. 3d 901, 906 (10th Cir. 2004) (citing *Ruiz v. McDonnell*, 299 F. 3d 1173, 1180 (10th Cir. 2002)). A facial attack, such as the one lodged here regarding the Court's jurisdiction over Plaintiff's APA claim, challenges the "sufficiency of the complaint" on its face and requires the court to accept the allegations in the complaint as true. *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Continental Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005); *see Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).[1]

### *Fed. R. Civ. P. 12(b)(6)*

---

[1]A factual attack challenges, "the facts upon which subject matter jurisdiction depends" thereby permitting the moving party to attack the factual accuracy of the complaint. *Holt*, 46 F.3d at 1003.

When considering a motion to dismiss under Rule 12(b)(6), the court must determine whether the plaintiff has stated a claim upon which relief may be granted.  Fed. R. Civ. P. 8(a).  A claim may be dismissed under Fed. R. Civ. P. 12(b)(6) if a complaint "lacks enough facts to state a claim to relief that is plausible on its face."  *United States ex rel. Reed v. KeyPoint Gov't Solutions*, 923 F.3d 729, 764 (10th Cir. 2019).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).[2]  In deciding whether the plaintiff has adequately stated a claim for relief, we view "the totality of the circumstances as alleged in the complaint in the light most favorable to [the plaintiff]," *Jones v. Hunt*, 410 F.3d 1221, 1229 (10th Cir. 2005), accepting the plaintiff's well-pled facts as true and drawing all reasonable inferences in the non-moving party's favor, *Sylvia v. Wisler*, 875 F.3d 1307, 1313 (10th Cir. 2017).

## AUTHORITY AND ARGUMENT

## I.   THERE IS NO WAIVER OF THE GOVERNMENT'S SOVEREIGN IMMUNITY FOR ALLEGED VIOLATIONS OF THE ADMINISTRATIVE PROCEDURES ACT ("APA")

As a sovereign entity, "the United States may not be sued without its consent." *Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 823 (10th Cir. 1981).  The principle

---

[2] Here, Plaintiff references multiple agency documents in his amended complaint (Doc. 24), and attaches them as exhibits.  At this stage of the proceeding, Defendants do not contest the authenticity of these documents but contends that simply attaching these documents to his complaint does not relieve Plaintiff of his pleading duties to plead factually sufficient and legally cognizable claims.

shields not only the United States but also its agencies and officers acting in their official

capacity.  *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002). General federal

question jurisdiction may be established under 28 U.S.C. § 1331; however, this provision

is not a waiver of the United States' sovereign immunity. *Merida Delgado v. Gonzales*,

428 F.3d 916, 919 (10th Cir. 2005).  The terms of this waiver define the court's jurisdiction

to entertain a suit against the United States.  *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980).

The APA creates a limited waiver of the government's sovereign immunity but does

not confer subject matter jurisdiction. *High Country Citizens All. v. Clarke*, 454 F.3d 1177,

1181–82 (10th Cir. 2006)(citations omitted).  Additionally, this waiver does not apply

where "any other statute that grants consent to suit expressly or impliedly forbids the relief

which is sought." *Neighbors for Rational Dev., Inc. v. Norton,* 379 F.3d 956, 961 (10th Cir.

2004) (quoting 5 U.S.C. § 702(2)).  Therefore, this waiver is withdrawn in instances where

judicial review is precluded[3].  *Id*.; *see also* 5 U.S.C. § 701(a).

While there is a "presumption of reviewability" under the APA, it controls in instances

"where substantial doubt exists about congressional intent on the preclusion issue" and

may be overcome.  *High Country*, 454 F.3d at 1181–82 & n. 5 (citing *Block v. Cmty.*

*Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)(omission of

review procedures for consumers affected by milk market orders, coupled with the

---

[3] Further, under section 704 of the APA, only "[a]gency action made reviewable by statute
and final agency action for which there is no other adequate remedy in a court are subject
to judicial review." 5 U.S.C. § 704.  Here, Plaintiff also seeks review under the Fifth
Amendment for due process violations.

provision of such procedures for milk handlers so affected, was strong evidence that Congress intended to preclude consumers from obtaining judicial review)); *see also United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982)(a provision of the Medicare statute permitting judicial review in Part A, coupled with the omission of judicial review under Part B provided "persuasive evidence that Congress deliberately intended to foreclose further review of such claims").

Here, congressional intent regarding APA review for certain Title 38 employees is clear and substantial doubt does not exist.

## A. Title 38 is Analogous to the CSRA Which Prohibits Judicial Review in Certain Instances

The Civil Service Reform Act ("CSRA") is a comprehensive statutory scheme that Congress established relating to federal employment; it precludes district courts from exercising jurisdiction over employment-related actions not authorized under the Act. *United States v. Fausto*, 484 U.S. 439, 443-45 (1998)(holding CSRA preempts action under the Back Pay Act even though CSRA provided nonpreference excepted service employee no administrative or judicial review of agency's decision). In *Fausto*, an employee of the Department of the Interior Fish and Wildlife Service, sought back pay in the Claims Court under the Tucker Act, 5 U.S.C. § 5596, for a 30 day suspension for unauthorized use of a government vehicle. *Id.* Fausto, however, had no right under the CSRA to judicial review of the adverse personnel action taken against him, as "[n]o provision of the CSRA gives nonpreference members of the excepted service the right to administrative or judicial

review of suspension for misconduct." *Id.* at 443. Thus, the Court addressed whether the

withholding of a remedy was meant to preclude judicial review, and held that it was. *Id.* at

446. As explained in *Fausto*, Congress enacted the CSRA "to replace the haphazard

arrangements for administrative and judicial review of personnel action," and to put in its

place "an integrated scheme of administrative and judicial review, designed to balance the

legitimate interests of the various categories of federal employees with the needs of sound

and efficient administration." *Id.*

    The Supreme Court found that the CSRA preempted judicial review for

nonpreference members of the excepted service, because the CSRA "displays a clear

congressional intent to deny the excluded employees the protections of Chapter 75 --

including judicial review -- for personnel action covered by the chapter." *Id.* at 446-47. The

Court reasoned that the structure of the statutory scheme evidenced two purposes: to give

a preference for certain categories of employees and to facilitate a consistent Executive

Branch position on personnel matters. 484 U.S. at 449.  The Court concluded that allowing

federal employees to bring employment actions in federal court would frustrate the purpose

of the CSRA as it would give nonpreference employees greater rights than preferred

employees; it would undermine the consistency of interpretation; and it would provide a

second layer of judicial review, which Congress intended to eliminate. *Id.* at 450-51.

    Therefore, it is well settled the CSRA precludes judicial review in certain instances.

*See, e.g., Jackson v. Shinseki*, 526 F. App'x 814, 818 (10th Cir. 2013)(explaining that only

he Federal Circuit had jurisdiction to consider the plaintiff's wrongful discharge claim

the Federal Circuit had jurisdiction to consider the plaintiff's wrongful discharge claim

under the CSRA; also "to the extent [Jackson's] claim challenges the procedures or lack

thereof leading up to his termination under the [APA] or the due process clause, any such

claim is preempted by the CSRA") (citing *Petrini v. Howard,* 918 F.2d 1482, 1485 (10th

Cir. 1990)); *Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 184–86 (3d Cir.

2013)(explaining that the CSRA foreclosed Yu's damages claims because his allegations

against the VA challenging personnel decision would have been brought under the CSRA

which excludes the federal court's jurisdiction).

In *Arron v. United States*, 113 F.3d 1245 (10th Cir. 1997), the plaintiff challenged

personnel actions that were covered by the CSRA.   Specifically, Arron argued that the

Tenth Circuit should reexamine its jurisprudence regarding the "preemptive effect" of the

CSRA; that he had "a higher expectation and right to judicial protections than the 'mine

run' probationary employee"; and that he should be entitled to judicial review under the

APA.  *Id.*  The Tenth Circuit explained its weighty precedent surrounding the CSRA and

held that Arron's APA and constitutional claims including due process allegations were

preempted by the CSRA deeming any "judicially-created exception[s] to the CSRA's

exclusive remedies" as inappropriate.  *Id.*; *see also Franks v. Nimmo,* 796 F.2d 1230, 1240

(10th Cir. 1986)(examining the statutory predecessor to §7461 and explaining that congress

intended to provide a "summary process by which unqualified physicians previously protected by civil service could be expeditiously separated from service.").[4]

Here, Title 38 is analogous to the CSRA. *See Fligiel v. Samson*, 440 F.3d 747, 752 (6th Cir. 2006)(applying the holding in *Fausto* to the facts raised by *Fligel* as a Title 38 employee). Because the CSRA precludes judicial review pursuant to the APA in certain instances, Dr. Tompkins' allegations arising from personnel actions and procedures pursuant to 38 U.S.C. § 7463 should also be precluded from judicial review. *See, e.g.*, *El v. U.S. Dep't of Commerce*, No. 2:15CV532, 2016 WL 9113570, at *4–5 (E.D. Va. July 19, 2016), *aff'd*, 678 F. App'x 99 (4th Cir. 2017)(Fifth Amendment claim precluded by the CSRA); *Planas v. Lamoutte*, No. CA 14-1468-MML, 2015 WL 5568015, at *6–8 (D.P.R. Sept. 22, 2015)(no jurisdiction over termination or related due process claims where "deliberate exclusion[s] from the protections of the CSRA preclude...judicial review of [the plaintiff's] involuntary separation").

**B. Judicial Review is Precluded by Title 38 as Reflected in Congressional Intent**

The APA is typically read "in conjunction with other jurisdiction statutes waiving sovereign immunity in order to determine whether those statutes forbid the relief sought in the case at hand." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1080 (10th Cir.

---

[4] The Tenth Circuit noted that a probationary VA physician appointed pursuant to 38 U.S.C. § 4104 and separated from service under Section 4106(b) could obtain judicial review of his termination pursuant to the APA. *Id.* Since this decision, Congress enacted substantial amendments overhauling the statutory employment scheme applicable to most VA employees. The provisions applicable to Dr. Tompkins had not yet been passed by Congress when *Franks* was decided.

2006)(citations omitted).  Here, Dr. Tompkins is a permanent VA physician appointed pursuant to 38 U.S.C. § 7401(1).  Because of this, Dr. Tompkins is also exempted from the Civil Service Reform Act ("CSRA").  *See* 5 U.S.C. § 7511(b)(10).  Additionally, VA employees appointed pursuant § 7401(1) may contest "major adverse actions"[5] under various avenues depending upon whether the action involves a question of professional conduct or competence related to direct patient care or clinical competence. 38 U.S.C. § 7461.  Adverse actions implicating questions of professional conduct or competence allow the employee to appeal the adverse action to the VA's disciplinary appeals board ("DAB") and permits judicial review of these decisions in a manner that mirrors the APA. 38 U.S.C. §§ 7461, 7462; *see also Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *11 (S.D. Ga. Mar. 16, 2015) (court's review of the DAB's final action for VA employee appointed pursuant to 38 U.S.C. § 7401(1) was governed by 38 U.S.C. § 7462(f)(2) which permits judicial review similar to APA review).

However, § 7401(1) employees contesting adverse actions that are not "major" or did not arise out of a question involving professional conduct or competence are governed by 38 U.S.C. § 7463.  This provision does not permit an appeal to a DAB nor does it provide for judicial review.  In *Pathak v. Department of Veterans Affairs,* a VA physician appointed pursuant to § 7401(1) was suspended for seven days as discipline for sexual harassment. 274 F.3d 28, 31 (1st Cir. 2001).  Dr. Pathak contested this decision and also alleged that

---

[5] "Major adverse actions" include suspension, transfer, reduction in grade or basic pay, and discharge. 38 U.S.C. § 7461(c)(2).

the VA Center Director was biased. *Id.* The court explained that Dr. Pathak's appointment was an "excepted service," because he was appointed without regard to civil service requirements. *Id.* (citing 38 U.S.C. § 7403). The Court reasoned that "Congress's express provision of judicial review in § 7462, coupled with a complete omission of judicial review in § 7463—the provision governing Pathak—is 'persuasive evidence that Congress deliberately intended to foreclose further review of such claims.'" *Id.* at 32. The First Circuit remanded the case to the district for a dismissal for lack of subject matter jurisdiction. *Id.* at 31 ("*Fausto* stands for the general proposition that judicial review is unavailable to a federal employee who has suffered an adverse personnel action if CSRA does not provide judicial review."); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1068 (9th Cir. 2008)(employee appointed under 38 U.S.C. § 7401(1) seeking judicial review under 38 U.S.C. § 7403(b)(2); the court, concurring with the Sixth Circuit in *Fligiel*, held that Title 38 provides a comprehensive regulatory schedule for VA employees and it does not provided for judicial review under the APA or Back Pay Act for certain employees appointed under 38 U.S.C. § 7401(1)).

In *Fligiel v. Samson*, the court considered whether a VA physician covered under § 7463 could rely on the APA as a jurisdictional vehicle for contesting the agency's decision to reassign her. 440 F.3d 747, 754 (6th Cir. 2006). The court, applying the holding in *Fausto* to the facts presented in *Fligel*, reasoned that congressional intent was clearly demonstrated to limit the review of adverse actions governed by § 7463 determining that

Fligel could not "circumvent this limitation by invoking the judicial review provision of the APA." *Id.* Thus, the court held that the Veterans' Benefits Act precluded judicial review for Fligiel.[6] Finally, *Bonner* is also instructive explaining "[s]ince Mr. Bonner's removal was an adverse action not involving a question of professional conduct or competence, Mr. Bonner could have appealed through the Department grievance procedures provided by 38 U.S.C. § 7463 rather than filing a grievance pursuant to the negotiated grievance procedures...[s]ignificantly, under the Department grievance procedures of § 7463, an employee cannot obtain review by a Disciplinary Appeals Board...,nor can he obtain judicial review of the Department's final decision." *Bonner v. Dep't of Veterans Affairs Pittsburgh Healthcare Sys.*, 477 F.3d 1343, 1345–48 (Fed. Cir. 2007)(dismissing petition for lack of jurisdiction, because the court did not have jurisdiction to review the arbitrator's decision under 5 U.S.C. § 7121(f)); s*ee also, Wirshing v. Mansfield*, No. CV 07-6927 DSF, 2008 WL 11340379, at *5 (C.D. Cal. June 17, 2008)(holding that the plaintiff, appointed as a VA physician pursuant to 38 U.S.C. § 7401(1) was not entitled to judicial review under the APA of his Title 38 termination).

Here, it is clear that Dr. Tompkins was a VA physician appointed pursuant to § 7401. (Doc. 24-1, p. 1 §1(b)(1): "This chapter applies to all permanent...physicians...appointed under 38 U.S.C. § 7401(1)..."). Because Dr. Tompkins' termination was an adverse action that did not implicate his professional

---

[6] The Court only considered the issue of Fligiel's alleged denial of statutory due process. It did not reach the issue of her alleged denial of constitutional due process.

conduct or competency, and he was appointed pursuant to § 7401(1), § 7463 governs his termination process.  VA employees contesting adverse actions pursuant to this provision are not entitled to a DAB nor are they entitled to judicial review.  *Id.*; *Goh v. Dep't of Veterans Affairs*, No. 1:14-CV-00315 LJO, 2014 WL 5093279, at *3 (E.D. Cal. Oct. 9, 2014)(noting that Section 7463 does not provide for judicial review).  Had Congress intended to create an avenue for judicial relief for VA physicians such as Dr. Tompkins, it would have explicitly done so § 7463 as it did in § 7462.  It is axiomatic that Dr. Tompkins' adverse action is precluded from judicial review pursuant to the APA.  Finally, Dr. Tompkins makes no reference to § 7463 in his extensive 75-page Complaint.  Rather, Dr. Tompkins relies solely on the VA Handbook as creating the grounds for his relief under the APA and the Fifth Amendment.  As explained in detail below, Plaintiff's claims should be dismissed pursuant to Rule 12(b)(6), because they fail to state a claim.

## II.   PLAINTIFF'S APA CLAIMS FAIL UNDER RULE 12(b)(6) BECAUSE THE PLAINTIFF FAILS TO PLEAD A PLAUSIBLE CLAIM FOR AN APA VIOLATION

Statutory standing requirements of the APA require a plaintiff to show that his claims "fall within the zone of interests protected by the statute forming the basis of [his] claims." *State of Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998); *see also Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1452 (10th Cir. 1994)(same).

Section 706(2)(A) of the APA permits a reviewing court to set aside an agency's action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." 5 U.S.C. § 706(2)(A). However, this provision alone does not establish a plaintiff's independent substantive rights. There must also be some "relevant statute whose violation forms the basis for the complaint." *S. Utah Wilderness All. v. United States Dep't of the Interior*, No. 215CV00194JNPEJF, 2016 WL 1261064, at *5 (D. Utah Mar. 30, 2016)(quoting *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996)).

Here, Plaintiff fails to assert any statutory basis for his claims and fails to reference any additional statutory provisions other than the APA. Because of this, Plaintiff fails to sufficiently plead an APA violation and his claims should be dismissed pursuant to Rule 12(b)(6).

## III. PLAINTIFF'S CONSTITUTIONAL CLAIMS FAIL UNDER RULE 12(b)(6)

### A. Plaintiff Fails to State a Plausible Due Process Claim

In his Amended Complaint, Dr. Tompkins alleges Fifth Amendment due process violations against two federal employees in their official capacity, the Secretary, and the federal agency.[7] (Am. Compl. ¶¶ 74, 76, 81-82, & 86). If Plaintiff is entitled to any level

---

[7]To the extent Plaintiff raises a constitutional tort and seeks an implied *Bivens* remedy, no such remedy is available. The Supreme Court recently cautioned courts that providing such a remedy is a "disfavored judicial activity." *Ziglar v. Abbasi,* 137 S.Ct. 1843, 1857 (2017)(quoting *Iqbal* at 675)(explaining that other than *Bivens* itself (which involved a warrantless search in violation of the Fourth Amendment), this implied cause of action has only been found to exist by the Supreme Court on two occasions, *Davis v. Passman,* 442 U.S. 228 (1979)(*Bivens* remedy under the Fifth Amendment when an administrative assistant sued a Congressman for firing her because she was a woman) and *Carlson v. Green,* 446 U.S. 14 (1980)(*Bivens* remedy under the Eighth Amendment when federal jailers allegedly failed to treat a prisoner's asthma), neither of which exist here.

of process, it is delineated in the VA's statutory provisions, not its handbook.  However,

the VA adhered to both provisions and provided Plaintiff process more extensive than what

was required under either provision.

Fifth Amendment procedural due process guarantees a fair procedure in connection

with any deprivation of property or liberty interest, while substantive due process protects

an individual's liberty against certain government actions regardless of the fairness of the

procedures used to implement them.  *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir.

2011).

### 1.  *Plaintiff Fails to State a Plausible Substantive Due Process Claim*

For substantive due process analysis, the Supreme Court has found violations where

the government infringes on a "fundamental" right without a "compelling" government

purpose, *Abdi v. Wray*, 942 F.3d 1019, 1023 (10th Cir. 2019) (citing *Washington v.*

*Glucksberg*, 521 U.S. 702, 721–722, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)), or where

the government deprives an individual of life, liberty, or property in a manner so arbitrary

that it "shocks the conscience".  *Id.* (*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846

(1998)).  The Tenth Circuit has determined that it is appropriate to apply the "shocks-the-

conscience approach" when the plaintiff contests "tortious executive action", but applies

---

Additionally, such claims are not actionable against federal agencies or federal employees
in their official capacity.  *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 486 (1994); *Farmer v.*
*Perrill*, 275 F.3d 958, 963 (10th Cir. 2001); *Simmat v. United States BOP,* 413 F.3d 1225,
1231 (10th Cir. 2005).  Finally, Plaintiff raises only official capacity claims and does not
reference or imply that any of his allegations against the federal employees are in their
individual capacity.

the "fundamental-rights" approach when the plaintiff challenges legislative action.[8] *Id.* (quoting *Halley v. Huckaby*, 902 F.2d 1136, 1153 (10th Cir. 2018)). Importantly, a plaintiff must allege a plausible substantive due process claim. *Id.*

Under the *Glucksberg* analysis, the court must determine whether a fundamental right is implicated; whether "the claimed right – fundamental or not – has been infringed through... total prohibition or 'direct and substantial' interference"; and whether the government can show that the action interfering with that fundamental right "is narrowly tailored to achieve a compelling government purpose." *Abdi*, 942 F.3d at 1028. However, if the right it not fundamental, the court applies a rational basis review. *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 305 (1993)). Only the Supreme Court or the Tenth Circuit determine a fundamental right. *Id.* The Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) addressed fundamental rights and liberty interests:

> In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct.

---

[8] However, these two tests should not be used "inflexibly". *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008)("shocks the conscience" and "fundamental liberty" tests are two separate approaches but "are not mutually exclusive" and do not establish an "inflexible dichotomy"). Because Plaintiff does not allege tortious executive action, Defendants analyze his claims pursuant to the *Glucksberg* analysis. However, if Plaintiff fails to allege a plausible substantive due process claim under the fundamental rights analysis, his allegations certainly fail under a "shocks the conscience analysis". *See Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 750 (10th Cir. 2013)(listing multiple non-exhaustive factors to determine whether conduct shocks the conscience).

1678, 14 L.Ed.2d 510 (1965); to use contraception, *ibid.; Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); to bodily integrity, *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, *Casey, supra.* We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. *Cruzan,* 497 U.S., at 278–279, 110 S.Ct., at 2851–2852.

It has also addressed the right to government employment. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S. Ct. 2562, 2566–67, 49 L. Ed. 2d 520 (1976)("This Court's decisions give no support to the proposition that right of governmental employment per se is fundamental."). Finally, the Tenth Circuit has not determined whether a "public employment is a fundamental liberty interest protected by substantive due process." *Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 749–50 (10th Cir. 2013)(for Fourteenth Amendment analysis)(citing *Potts v. Davis County,* 551 F.3d 1188, 1193 n. 1 (10th Cir.2009)).[9]

Here, Plaintiff seems to contest Mr. Gigliotti's decision to reject the Grievance Examiner's recommendation as a violation of his substantive due process rights because it led to his ultimate termination. (Am. Compl. ¶¶79-82). However, Plaintiff fails to allege sufficient facts to implicate a fundamental rights violation. Because of this, his substantive

---

[9] But s*ee Darr v. Town of Telluride, Colo.,* 495 F.3d 1243, 1257 (10th Cir. 2007)("a public employee with a property interest in continued employment has a substantive due process right not to be terminated for arbitrary or capricious reasons" under a Fourteenth Amendment "shock the conscience" analysis ). Notably, none of these determinations have been applied to the federal government under the Fifth Amendment.

due process claims fail.  Next, Plaintiff takes issue with the process utilized by the OKC

VA and alleges procedural due process violations. (*Id.* At ¶¶84-86).

### 2. *Plaintiff Fails to State a Plausible Procedural Due Process Claim*

For procedural due process, the Constitution prohibits deprivation of liberty or

property without due process of law.  *Walker v. United States*, 744 F.2d 67, 68–71 (10th

Cir. 1984)(citing U.S. Const. amend. V).   If a property or liberty interest is implicated, the

court should then consider whether the procedures employed satisfied constitutional

standards.  *Id.*(determining that a probationary government employee did not have a

property interest in his continued employment).   The Tenth Circuit determined that

adequate procedural due process requires (1) an impartial tribunal; (2) notice of the

charges; and (3) a hearing that is held before a termination is effective. *Id.* (citing *Miller v.

City of Mission,* 705 F.2d 368 (10th Cir.1983)). Generally, there is not a property interest

in continued public employment unless a claimant can demonstrate a "legitimate claim of

entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d

548 (1972)*; Coppedge v. Marsh*, 532 F. Supp. 423, 427–29 (D. Kan. 1982)(no property

interest where, among other things, employee can be discharged at the secretary's

pleasure).

"Although due process protections derive from the Constitution, the property

interests to which those protections apply derive from an independent source such as state

law or terms of employment". *See, e.g., Bottom v. City of Yukon, Oklahoma*, No. CV-17-

152-SLP, 2018 WL 4839227, at *4 (W.D. Okla. Aug. 17, 2018)(citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577-78 (1972)); *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 827 (10th Cir. 2016); *Teigen v. Renfrow*, 511 F.3d 1072, 1079 (10th Cir. 2007). A plaintiff must allege a plausible procedural due process claim. *Abdi v. Wray*, 942 F.3d 1019, 1034 (10th Cir. 2019).   Here, Plaintiff's only basis for his claim is the VA Handbook.  This is impermissible.  *See Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 749–50 (10th Cir. 2013)(for Fourteenth Amendment procedural due process purposes, the parties did not dispute the plaintiff, a county sheriff's, protected property interest in continued public employment pursuant to a state statute).

   i.   **The VA Handbook Does Not Determine What Level of Process is Owed to Plaintiff and Cannot Formulate the Basis for Plaintiff's Property Interest in His Employment.**

   In *Hardison v. Cohen*, 375 F.3d 1262, 1267–69 (11th Cir. 2004), the plaintiff was a temporary VA employee appointed pursuant to 38 U.S.C. § 7406 who took issue with the agency's alleged failure to follow grievance policies.  The Court determined that Hardison was appointed without regard to civil service or classification laws, rules, or regulations and was denied appeal rights of adverse employment actions pursuant to statutory provisions. *Id.*  The court found "[b]ecause Hardison does not and cannot allege that the grievance policies established exclusive grounds upon which his discharge could be based nor that a podiatry resident could be discharged only for cause, the grievance policies did not create a property interest in Hardison's employment." *Id.*; *see also Sullivan v. Stark*,

808 F.2d 737, 740 (10th Cir. 1987)(explaining that a Park Service employee's employment status was "crucial" to determining whether he had a due process claim); *Nat'l Ass'n of VA Physicians v. Derwinski*, No. CIV. A. 87-2302, 1991 WL 120105, at *4 (D.D.C. June 19, 1991)(the"VA's grievance procedures do not give rise to a claim under the Fifth Amendment. The grievance procedures supply VA physicians with a vehicle for asserting dissatisfaction relating to their employment but do not provide the physicians with protected interest in grievance procedures."); *Williams v. Fed. Deposit Ins. Corp.*, 723 F. Supp. 612, 613–14 (W.D. Okla. 1989)(excepted service and appointed employees acquire no contracted rights and have no property interest in their employment).

Here, Plaintiff fails to reference any statutory provisions to support his due process assertions, relying solely of the VA Handbook.  However, the VA Handbook cannot create a property interest sufficient to form the basis for Plaintiff's constitutional relief.  Because of this, Dr. Tompkins fails to state a colorable constitutional claim, and his complaint should be dismissed pursuant to Rule 12(b)(6).

ii.    **Even if Plaintiff Has a Property Interest in His Federal Employment, He Fails to State a Plausible Claim of Due Process Violations**

a.    **Plaintiff's Claims of Bias and Lack of Impartiality or Any other Inadequate Process Are Not Sufficiently Plead**

During the administrative process, Dr. Tompkins sought Vlosich's recusal and later Mr. Gigliotti's.  (Am. Compl. ¶¶27 & 32).  He also sought the appointment of a "neutral" grievance examiner, an individual outside of VISN 19.  (*Id.* at ¶32).  Mr. Gigliotti appointed

Dr. Roger Tatum, a Chief of Surgery from VISN 20, to serve as Dr. Tompkins' grievance examiner. (*Id* at ¶35).  Dr. Tompkins asserts "bias" by Mr. Vlosich simply because he completed a memorandum related to the VA's OIG investigation and then also participated in Dr. Tompkins' termination. (*Id.* at ¶¶ 28 & 74).  Plaintiff contends that Mr. Vlosich was "pre-determined to terminate the employment of Dr. Tompkins before the issuance of the letter of Proposed Separation & Revocation of Clinical Privileges", (*Id.* at ¶74), and that both Mr. Vlosich and Mr. Gigliotti should have recused themselves as decision-makers in his termination.  (*Id.* at ¶¶75-77)     This overlap of investigating an employee and acting as a decision maker is not sufficient to plead a due process violation. *See Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 33 (1st Cir. 2001)(plaintiff failed to allege a colorable claim of bias against center director after review by an impartial grievance examiner).

Plaintiff alleges that the process afforded to him was constitutionally inadequate but identifies four different individuals involved in his termination decision (Dr. Bray-Hall, Mr. Vlosich, Dr. Tatum, and Mr. Gigliotti) who work at various divisions/departments within the VA and in various capacities. (Am. Compl. ¶¶20, 32, & 35).  *See Walker v. United States*, 744 F.2d 67, 68–71 (10th Cir. 1984)(determining that the tribunal was not impartial because the plaintiff was directed to respond to the same that office issued his termination notice).  Constitutional due process requires an *impartial tribunal*, which is what Plaintiff alleges he received.   Accordingly, Plaintiff's bias allegations should be dismissed.

b. **Plaintiff Claims that Gigliotti Failed to Follow the Grievance Examiner's Recommendation such that it Violated His Due Process Rights are Not Sufficiently Plead**

Pursuant to 38 U.S.C. § 7463(c)(1) an employee encountering a major adverse action that does not involve professional conduct or competence is "entitled to notice and an opportunity to answer with respect to those charges..."  Moreover, § 7463(d) provides for "a right to formal review by an impartial examiner within the Department of Veterans Affairs"; "a right to a prompt report of the **findings and recommendations** by the impartial examiner"; and "a right to a prompt review of the examiner's findings and recommendations by an official of a higher level...who may accept, modify, or reject the examiner's recommendations."

Here, Dr. Susan Bray-Hall was the initial official who proposed Dr. Tompkins' termination for alleged administrative deficiencies. (Am. Compl. ¶25).  Mr. Vlosich then terminated Dr. Tompkins effective November 26, 2017. (*Id.* ¶¶ 27-30).  Dr. Tompkins filed a formal grievance with Mr. Gigliotti in December 2017 demanding an evidentiary hearing and seeking appointment of neutral arbitrary.  (*Id.* ¶¶ 31-39).  Mr. Gigliotti's official action in this matter did not occur until August 2018, when he acted as a "higher level official" pursuant to 38 U.S.C. § 7463(d), rejecting the Grievance Examiner's recommendations. (*Id.* ¶¶ 43).  The agency's actions were consistent with § 7463(d) and the level of process required under this provision.

Plaintiff admits that Dr. Tatum "conducted approximately 12.25 hours of evidentiary hearing, with opening and closing arguments" and then wrote a detailed report setting forth his evidentiary findings and his recommendation for Dr. Tompkins' reinstatement. (Am. Compl. ¶¶ 36-37). Plaintiff admits he received a prompt report of Dr. Tatum's findings and recommendations as required by 38 U.S.C. § 7463(d)(2). (Am. Compl. ¶ 37). Finally, as a higher level official, Plaintiff admits that Mr. Gigliotti conducted a prompt review of Dr. Tatum's findings and recommendations. Mr. Gigliotti decided to reject these recommendations in accordance with 38 U.S.C. § 7463(d)(3). Most importantly, this provision does not require the agency to provide specific statements of reasons for the rejection. *Id.*

Plaintiff claims that the agency failed to adhere to VA Handbook provisions. However, Sections 13b(1)(a) & (b) of the VA Handbook 5021, Part IV, Chapter 3 state that a "decision official [who] modifies or rejects the examiners recommendation(s)" should "include a ***specific statement*** of the reasons for the modification or rejection." Additionally, the rejection is limited to certain ***grounds***. *Id.*

Here, Mr. Gigliotti issued a final decision on August 21, 2018[10]. Mr. Gigliotti provided specific statements for his rejection of the Grievance Examiner's

---

[10] In his final decision Gigliotti states:

> The Network Director reviewed the Grievance Examiner Report, along with the evidence file supporting the discharge. He found the offense was serious enough in nature, to rise to the level of discharge given Dr. Tompkins' assignment as Chief of Surgery. In this role, all administrative and clinical functions of the service were ultimately Dr. Tompkins' responsibility. The findings from the investigation

recommendation, as required by the VA Handbook. It is those specific statements that Plaintiff alleges are inadequate. However, even the VA Handbook does not delineate what **specific words** must be used to explain a rejection. Rather, it delineates **specific grounds** for said rejection. Plaintiff conflates these two separate and distinct provisions – one requiring "specific statements" for the rejection and the other limiting the grounds or basis for said rejection. Gigliotti adheres to both requirements. (Am. Compl. Doc. 24-15)

Contrary to his assertions of due process violations, the facts as plead by Plaintiff allege ample due process. Plaintiff received the notice, an opportunity to hear the evidence against him, and to respond to it, all within the framework of an adversarial proceeding. Dismissal is warranted pursuant to Rule 12(b)(6), because Plaintiff fails to allege sufficient facts to state a plausible claim for a due process violation. *See Zynger v. Dep't of Homeland Sec.*, 615 F. Supp. 2d 50, 61–62 (E.D.N.Y. 2009), *aff'd,* 370 F. App'x 253 (2d Cir. 2010)(TSA agent alleging that her termination violated procedural and substantive due process; the court held "[t]aken together, the complaint indicates that the decision [to terminate the plaintiff] was reviewed, that she had a chance to submit an appeal and that defendants were required to submit evidence in order to justify her firing," and granted the government's motion to dismiss).

---

conducted by OIG, indicated the severe impact Dr. Tompkins' lack of oversight had on Surgery Service as well as the facility. It is noted that the leadership at the facility took administrative action, once they received the required clearance from OIG officials. (Am. Compl. Doc. 24-15)

CONCLUSION

For the reasons stated above, Defendants are entitled to dismissal pursuant to Rules

12(b)(1) and (b)(6).

TIMOTHY J. DOWNING
United States Attorney

*/s/ Rebecca A. Frazier*
REBECCA A. FRAZIER
Assistant U.S. Attorney
Okla. Bar Number: 22285
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Rebecca.Frazier@usdoj.gov

# CERTIFICATE OF SERVICE

  X  I hereby certify that on December 20, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the electronic records currently on file, the Clerk of Court will transmit a notice of Electronic Filing to the following ECF registrant(s):

> Danny K. Shadid, OBA 8104
> Riggs, Abney, Neal, Turpen, Orbison & Lewis Law Firm
> 528 N.W. 12th Street
> Oklahoma City, OK 73103
> Phone: (405) 843-9909
> Fax: (405) 842-2913Email: dshadid@riggsabney.com
> *Attorney for Plaintiff*

_____   I hereby certify that on _____ I served the attached document by U.S. Mail on the following, who is not a registered participant of the ECF System

> */s/ Rebecca A. Frazier*
> REBECCA A. FRAZIER

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JOHN TOMPKINS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CIV-18-1251-J |
| v. | ) | |
| | ) | |
| 1. UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR LEAVE TO FILE RESPONSE IN EXCESS OF 25 PAGES

COMES NOW the plaintiff, John Tompkins, M.D., by and through his attorney Danny K. Shadid, and pursuant to Rule 7.1(e), respectfully moves the Court grant leave to the plaintiff to exceed the 25 page limit for his Response to the defendants' Motion to Dismiss Amended Complaint (Doc. No. 28), and to allow the plaintiff to file a Response of up to and including 30 pages. In support hereof, the plaintiff would show the Court as follows:

1.      The defendants' motion to dismiss was 25 pages in length and contained 73 case citations. In responding, while the plaintiff cannot necessarily use his allotted amount of pages to discuss all 73 cases, it is necessary to discuss or refer to many of those cases, as well as to place them in context with the factual matters of the present case, as set forth in the Amended Complaint (Doc. No. 24). The plaintiff has completed the vast majority of his Response and states to the Court that he is in need of additional space within which to complete his Response.

2. The plaintiff requests leave to exceed the 25 page limit and to file a Response of up to and including 30 pages.

3. Plaintiff's counsel has conferred with counsel for the defendants and is authorized to advise the Court that the ***defendants have no objection to the present Motion***.

WHEREFORE, the plaintiff respectfully prays the Court grant leave to exceed the 25 page limit and allow the plaintiff to file a Response of up to and including 30 pages.

Respectfully Submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail:dshadid@riggsabney.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Thomas Majors
Rebecca A. Frazier
Assistant U.S. Attorney
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Tom.Majors@usdoj.gov
Rebecca.Frazier@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

JOHN TOMPKINS, M.D.,        )
                            )
           Plaintiff,       )
                            )
v.                           )      Case No. CIV-18-1251-J
                            )
UNITED STATES DEPARTMENT OF,   )
VETERANS AFFAIRS, et al.       )
                            )
          Defendants.    )

## <u>ORDER</u>

Before the Court is Plaintiff's unopposed motion to file a response brief in excess of twenty-five pages.  [Doc. No. 32].  The motion is GRANTED and Plaintiff is permitted leave to file a response brief up to and including thirty-pages.

IT IS SO ORDERED this 30th day of January, 2020.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JOHN TOMPKINS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CIV-18-1251-J |
| v. | ) | |
| | ) | |
| 1. UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Danny K. Shadid, OBA #8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISION AND LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK  73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail: dshadid@riggsabney.com
*Attorney for Plaintiff*

<h1 style="text-align:center">I N D E X</h1>

**PREFATORY NOTE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE FACTS AND THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ARGUMENT AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**I. SOVEREIGN IMMUNITY IS NOT PRESUMED UNDER THE ADMINISTRATIVE PROCEDURES ACT, ESPECIALLY FOR A CLAIM NOT SEEKING MONEY DAMAGES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**A.    Defendants' CSRA Analogy Fails** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**B.    Title 38 Does Not Preclude Judicial Review for Major Adverse Actions** . . . . 15

**II. PLAINTIFF HAS PLEADED A PLAUSIBLE CLAIM FOR AN APA VIOLATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**III. PLAINTIFF ADEQUATELY PLEADS CONSTITUTIONAL CLAIMS** . . . . . 22

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<h2 style="text-align:center">TABLE OF AUTHORITIES</h2>

## CASES

*Anupama Bekkem v. Wilkie,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  915 F.3d 1258 (10th Cir. 2019)

*Beck v. Shinseki,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  No. CV 113-126, 2015 WL 1202196 (S.D.Ga. Mar. 16, 2015)

*Bennett v. Merit Sys. Prot. Bd.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  635 F.3d 1215 (Fed. Cir. 2011)

*Block v. Cmty Nutrition Inst.,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)

*Bonner v. Dep't of Veterans Affairs Pittsburgh Healthcare Sys.,* . . . . . . . . . . . . . . . 19
  477 F.3d 1343 (Fed. Cir. 2007)

i

*Bowen v. Michigan Acad. of Family Physicians*, ................................... **10**
     476 U.S. 667, 90 L. Ed. 2d 623, 106 S. Ct. 2133 (1986)

*Cerwonka v. Dep't of Veterans Affairs*, ..................................... **21**
     915 F.3d 1351 (Fed. Cir. 2019)

*Clark v. Library of Congress*, .............................................. **10**
     750 F.2d 89 (D.C. Cir. 1984).

*Columbian Fin. Corp. v. Stork*, ............................................ **27**
     702 Fed. Appx. 717, 722 (10th Cir. 2017).

*Darr v. Town of Telluride*, ................................................ **23**
     495 F.3d 1243 (10th Cir. 2007)

*Doe v. Purdue Univ.*, .............. .. ..................................... **27**
     928 F.3d 652, 663 (7th Cir. 2019).

*Dorman v. Wilkie*, ...................................................... **21, 27**
     768 Fed. App'x 340, 354 (6th Cir. 2019)

*Fligiel v. Samson*, ..................................................... **15, 19**
     440 F.3d 747 (6th Cir. 2006)

*Franks v. Nimmo*, ....................................................... **14**
     796 F.2d 1230 (10th Cir. 1986)

*Goh v. Dep't of Veterans Affairs*, .......................................... **19**
     No. 1:14-CV-00315 LJO, 2014 WL 5093279 (E.D. Cal. Oct. 9, 2014)

*Hardison v. Cohen*, ...................................................... **22**
     375 F.3d 1262 (11th Cir. 2004)

*High Country Citizens All. v. Clarke*, ....................................... **11**
     454 F.3d 1177 (10th Cir. 2006)

*Mount Evans Co. v. Madigan*, ............................................. **22**
     14 F.3d 1444 (10th Cir. 1994)

*Nat'l Ass'n of VA Physicians v. Derwinski*, ................................. **22**
     No CIV. A. 87-2302, 1991 WL 120105 (D.D.C. June 19, 1991)

ii

*Pathak v. Department of Veterans Affairs,* ..................................... **19**
    274 F.3d 28 (1st Cir. 2001)

*S. Utah Wilderness All. v. United States Dep't of the Interior,* .................. **21, 22**
    No. 215CV00194JNPEJF, 2016 WL 1260164 (D. Utah Mar. 30, 2016)

*State of Utah v. Babbitt,* ................................................... **.20**
    137 F.3d 1193, 1215-16 (10th Cir. 1998).

*Stone v. F.D.I.C.,* ....................................................... **22, 24**
    179 F.3d 1368, 1374 (Fed. Cir. 1999).

*United States v. Erika, Inc,* ................................................. **12**
    456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982)

*United States v. Fausto,* .................................................. **.13, 14**
    484 U.S. 439, 108 S. Ct. 668, 98 L. Ed. 2d 830 (1988)

*Webster v. Doe,* ....................................................... **.10, 28**
    486 U.S. 592, 603, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988).

*Wirshing v. Mansfield,* .................................................... **.19**
    No. CV 07-6927 DSF, 2008 WL 1130379 (C.C. Cal. June 17, 2008)

*Wyoming v. United States,* ............................................ **10, 18, 20**
    279 F.3d 1214 (10th Cir. 2002).

*Yu v. U.S. Dep't of Veterans Affairs,* ....................................... **.14**
    528 F. App'x 181 (3rd Cir. 2013)

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend V. ................................................ **9, 24, 26**

## STATUTES

5 U.S.C. §702 ......................................................... **9**

38 U.S.C. §7461 ...................................................... **17**

38 U.S.C. §7462 ...................................................... **12**

38 U.S.C. §7463 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

42 U.S.C. §405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

## **COURT RULES**

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

## **OTHER AUTHORITIES**

VA Handbook 5021/21, Part IV, Chapter 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8, 27**

iv

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

1. JOHN TOMPKINS, M.D.,      )
                                       )

        Plaintiff,          )
                                       )     Case No. CIV-18-1251-J

v.                                 )
                                       )

1. UNITED STATES DEPARTMENT  )
OF VETERANS AFFAIRS, et al.    )
                                       )

        Defendants.     )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

       The Plaintiff, John Tompkins, M.D. ("Dr. Tompkins") presents this Response to the Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 28). Based upon the arguments presented below, the Court should deny the Motion.

## PREFATORY NOTE

       A substantial portion of the defendants' Motion deals with Dr. Tompkins' employee status within the VA, as characterized by the defendants and not within the four (4) corners of the Amended Complaint.  It is fundamental that a Rule 12(b)(6) motion to dismiss motion to dismiss for failure to state a claim upon which relief can be granted must be judged upon the allegations within the complaint and not based upon alleged factual matters outside of the complaint.  Even that part of the defendants' Motion alleging lack of subject-matter jurisdiction goes beyond the allegations of the Amended Complaint and injects allegations of fact, better left for discovery and a determination upon evidence.

124

## STATEMENT OF THE FACTS AND THE CASE

Dr. Tompkins worked as an Orthopedic Surgeon at the Oklahoma City VA Health Care System ("OKC VA") for 30 years. Amend. Compl. ¶13. He served as "Interim" Chief of Surgery starting September, 2010, and served as Chief of Surgery from January 2012, through mid-October, 2016. Amend. Compl. ¶14. Dr. Tompkins voluntarily resigned as Chief of Surgery, but remained at the VA as a full-time Orthopedic Surgeon. Amend. Compl. ¶15.

Defendant Kristopher Wade Vlosich, was transferred from a VA Medical Center outside of Oklahoma and named the System Director of the OKC VA in or about May, 2016. Amend. Compl. ¶18.  Vlosich tried to fire Dr. Tompkins for medical deficiencies in July of 2017. Amend. Compl. ¶¶18-20. That effort failed when an outside review by three separate VA Orthopedic Surgeons concluded that Dr. Tompkins' medical practice was extremely good and well within the accepted standard of care. Amend. Compl. ¶21.  *See* the three (3) written communications to Dr. Aimee D. Levy, Exhibit 2 to Amend. Compl. Dr. Tompkins' surgical privileges were reinstated on August 24, 2017. Amend. Compl. ¶22.  See Letter of August 24, 2017, from Susan Bray-Hall, M.D., the then newly-appointed Chief of Staff, Exhibit 3 to Amend. Compl.

Shortly after Vlosich failed to terminate Dr. Tompkins' employment for medical deficiencies, Vlosich and Susan Bray-Hall, M.D., the then new Chief of Staff, came up with another reason to try to discharge Dr. Tompkins. Amend. Compl. ¶24. On October 30, 2017, sightly more than 60 days after Dr. Tompkins' surgical privileges were reinstated, Bray-Hall issued a letter of "Proposed Separation & Revocation of Clinical Privileges" on the basis of

alleged administrative deficiencies occurring in 2015-2016 while Dr. Tompkins was the Chief of Surgery. Amend. Compl. ¶¶ 22, 24, 25. The evidence will show that Vlosich and/or his subordinates had identified and engaged a replacement for Dr. Tompkins several weeks before the letter of Proposed Separation & Revocation was even issued. Amend. Compl. ¶71. Evidence will show that in August of 2017, Vlosich told another doctor that he intended to fire Dr. Tompkins. Amend. Compl. ¶¶ 72-73.

Counsel submitted a formal response on Dr. Tompkins' behalf, in addition to a response by Dr. Tompkins, Amend. Compl. ¶¶ 27, 28 and Exhibits 5, 6, to Amend. Compl. and requested that Vlosich recuse himself as a decision-maker, because Vlosich had demonstrated that he had a predisposition to find that Tompkins should be terminated, partly due to Vlosich's prior statement that he had reviewed the draft report of the Office of the Inspector General ("OIG") on or about August 17, 2017, and agreed with the findings of that report. Amend. Compl. ¶¶27-28, Exhibits 7 and 8 to Amend. Compl. Vlosich refused to recuse himself. Amend. Compl. ¶29, Exhibit 9 to Amend. Compl.

On November 21, 2017, the Human Resource Service of the OKC VA delivered to Dr. Tompkins a formal letter of discharge issued and signed by Vlosich. The discharge was to be effective November 26, 2017. The discharge letter advised Dr. Tompkins that he could appeal the action under the VA grievance process/procedure. Amend. Compl. ¶30, Exhibit 10 to Amend. Compl. On December 6, 2017, Dr. Tompkins, through counsel, submitted his written formal grievance and demand for an evidentiary hearing. Amend. Compl. ¶31, Exhibit 11 to Amend. Compl. Counsel, on behalf of Dr. Tompkins requested that neither

Page 3 of 30

defendant Ralph T. Gigliotti, the Network Director for Veterans Integrated Services Network

("VISN") 19, nor any of his subordinates within VISN 19 participate in any part of the

decision-making process, because Gigliotti had previously reviewed and approved the OIG

draft report. Amend. Compl. ¶32, Exhibit 12 to Amend. Compl. Gigliotti did not respond to

the request for recusal. Amend. Compl. ¶33.

The matter was set for an evidentiary hearing, and Gigliotti designated Roger Tatum,

M.D. to serve as Grievance Examiner. Amend. Compl. ¶¶34, 35. Dr. Tatum conducted

approximately 12.25 hours of evidentiary hearing on May 2 and June 18 and 19, 2018.

Amend. Compl. ¶¶35, 36. Dr. Tatum wrote a detailed report setting forth the evidence. His

report reveals that Vlosich served as a witness for the agency.

**Dr. Tatum's report made the following findings regarding the administrative**

**deficiencies alleged by the Agency:**

1.      The Agency alleged that Dr. Tompkins failed in supervising to avoid

inappropriate documentation in the medical record by surgery attending providers, based

upon a section of the OIG report which cited an email about one specific incident and a list

of surgery providers from September of 2016, who were shown to have expired computer

access codes. Most of those providers were not actively or directly providing care, but two

(2) part-time VA physicians were on the list. Dr. Tompkins presented evidence of attempts

to correct this in the form of emails to all surgical staff from 2014 to 2016, reminding them

to maintain their log on credentials and emphasizing the importance of direct documentation.

Dr. Tatum noted that the OIG recommendation was that service chiefs assure all providers

Page 4 of 30

maintain appropriate computer access and that functional equipment and adequate HR staffing be readily available in order to provide Personal Identity Verification ("PIV") card to allow physicians to log onto the electronic medical record system. Dr. Tatum noted that issues of PIV card not being produced in a timely manner are regular concerns across the VA system at large.

2.      The Agency alleged that Dr. Tompkins failed in supervising to prevent improper timekeeping for part-time physicians and resident physicians. The allegations related to canceled appointments. Dr. Tatum noted that the overall clinic cancellation rates at OKC VA are similar to those of other same-size and level VA facilities, that there were no findings that the cancellations resulted in patient harm or adverse outcomes, and that the issue was not isolated to the Surgery Service Line. Dr. Tatum noted that the witnesses for the agency did not specify whether the Chief of Medicine was disciplined like Dr. Tompkins for the cancellations under the Chief of Medicine's supervision. Moreover, Dr. Tatum noted that a "check in and check out time clock" for physicians was not permitted in OKC VA System, making it difficult for supervisors to ensure complete compliance for physicians duty hours. Tatum noted that the agency alleged that there were "potential improper payments" of $3,303, but also noted, "There is no definitive evidence presented which confirms that such improper payments were made."

3.      The Agency alleged that Dr. Tompkins failed to adequately document supervision of residents. Dr. Tompkins testified, without contravention and actually with concurring testimony, that he did not have the personnel to take over this responsibility after

Page 5 of 30

the Surgical Quality Improvement Coordinator retired in May of 2016, and that he was not authorized to fill this vacancy. Dr. Tatum noted that the OIG report included a review of 212 inpatient admissions across both Medicine and Surgery and found that only 4 records were missing documentation of resident supervision. Dr. Tatum also noted that the OIG report concluded that it "could not substantiate an actual lack of resident supervision." Dr. Tatum noted that there were other ways in which the supervision of residents was documented, including the National Surgery Office Quarterly Report, which continued without interruption throughout Dr. Tompkins' time as Chief of Surgery, and that neither the OIG Report nor the letter proposing Dr. Tompkins' termination acknowledged this method of documenting resident supervision. Finally, Dr. Tatum noted that the OKC VA Health Care System Center Memorandum 11-65 (dated March 13, 2015) entitled "Resident Supervision" clearly lists a number of positions responsible for monitoring and maintaining documentation of resident supervision, and does not mention "the Chief of the Service Line." Chief of Surgery is a "Chief of the Service Line." Dr. Tatum found that the policies and procedures provided as evidence on behalf of the agency did not indicate that the monitoring of documentation of resident supervision was in the direct purview of the Chief of Surgery.

4. The Agency asserted that there were two (2) aggravating factors: (1)Damage to the credibility and integrity of Surgical Service and the Agency, and (2) notoriety of the offense, based on *potential* media reports at the time of the release of the OIG report, which such media reports never happened. Dr. Tatum found that it was not possible to substantiate

Page 6 of 30

the claims made for either aggravating factor. He also noted that the OIG Report did not recommend removal of the former Chief of Surgery, *i.e.*, Dr. Tompkins.

5.     Dr. Tatum acknowledged that the timing of the prior suspension of Dr. Tompkins' privileges to perform hip and knee replacement surgeries raised a question of whether the earlier suspension was used as an initial and alternative means of terminating Dr. Tompkins' employment.

6.     Dr. Tatum found, "Terminating his [Dr. Tompkins'] employment as a staff physician for the causes specified in the removal letter is not appropriate and is highly inconsistent with any connection to his duties at the time of his termination."

7.     Dr. Tatum made the following recommendation: "It is recommended that Dr. Tompkins be fully restored to his position as staff physician in the practice of orthopedic surgery under the Surgical Service Line at the Oklahoma City VA Health Care System." Amend. Compl. ¶37, Exhibit 13 to Amend. Compl.

On August 17, 2018, Gigliotti issued a decision denying the requested grievance and remedy. His decision ***did not address any of the findings*** of the Grievance Examiner, instead stating merely that the Network Director "found that the offense was serious enough in nature, to rise to the level of discharge given Dr. Tompkins' assignment as Chief of Surgery." Gigliotti did not acknowledge in the decision that Dr. Tompkins was no longer serving as Chief of Surgery. Gigliotti fired Dr. Tompkins for unfounded allegations of shortcomings specific to Dr. Tompkins' assignment as Chief of Surgery (1) in a job he no longer held, and (2) did not call into question Dr. Tompkins' record of excellent patient care. The decision

Page 7 of 30

also stated, "It is noted that the leadership at the facility took administration action, once they received the required clearance from OIG officials."  Amend. Compl. ¶¶ 38-39, Exhibit 14 to Amend. Compl.

The VA Handbook provides that if a decision official modifies or rejects the examiner's recommendation, the written decision will include specific statements of the reasons for the modification, and that those modifications are limited to the grounds that the recommendation is contrary to law, regulation, or published Department Policy, or that the recommendation is not supported by the preponderance of the evidence. VA Handbook 5021/21, Part IV, Chapter 3. Gigliotti is charged with the duty to enforce and follow the policies of the VA, including the Handbook, but Gigliotti failed and refused to do so. Gigliotti did not list specific reasons on any of limited bases as required by the Handbook. Amend. Compl. ¶¶40-49. Gigliotti stated that he based his decision upon the OIG investigation rather than upon the evidence presented at the grievance hearing.  Importantly, the record bears out that the overall content of OIG report was not presented to Dr. Tatum as part of the evidence at the hearing. Amend. Compl. ¶¶50-51.

The Amended Complaint specifies in ¶¶51-53, 69-70 and 74-82  that Dr. Tompkins' was entitled to an unbiased decision-maker, that Gigliotti had prejudged the matter and was arbitrary and capricious in his decision, especially in regard to Gigliotti's disregard of the requirements of VA policy as set forth in the Handbook, and that Vlosich prejudged the issue and was determined to terminate Dr. Tompkins, no matter what the evidence showed, and that Vlosich acted arbitrarily and capriciously.

The Amended Complaint states that Robert Wilkie is charged with enforcing the VA's policies and procedures. Amend. Compl. ¶¶50-54.

The Amended Complaint alleges that Dr. Tompkins was denied his due process rights under the VA procedures and under the Fifth Amendment to the United States Constitution, clarifies that the only relief available to Dr. Tompkins is that of injunctive relief, and seeks reinstatement. Amend. Compl. ¶¶55-67, 82-87.

Contrary to the arguments made by defendants, plaintiff has stated his claims with particularity sufficient to demonstrate that his claims are plausible. The Court should deny the motion to dismiss.

## ARGUMENTS AND AUTHORITIES

### I.   SOVEREIGN IMMUNITY IS NOT PRESUMED UNDER THE ADMINISTRATIVE PROCEDURES ACT, ESPECIALLY FOR A CLAIM NOT SEEKING MONEY DAMAGES.

Dr. Tompkins is not seeking money damages.  Instead, he is seeking injunctive relief to restore him to a position he has unquestionably performed with distinction in providing excellent care to veterans.  "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. §702. "[T]he 1976 amendments to §702 of the Administrative Procedure Act, 5 U.S.C. §702, eliminated the sovereign immunity

defense in all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity." *Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984).

"Section 702 generally waives the sovereign immunity of the United States, its agencies, and officials in agency review actions seeking specific relief. The provisions of the APA are applicable 'except to the extent that- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" *Wyoming v. United States*, 279 F.3d 1214, 1236 (10th Cir. 2002). Moreover, "judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670, 90 L. Ed. 2d 623, 106 S. Ct. 2133 (1986), *superseded on other grounds* by 42 U.S.C. §405. Therefore, in order to avoid judicial review, defendants must demonstrate that statutes preclude judicial review. Defendants seek to do so by analysis of statutes to infer that Congress intended to preclude judicial review, since there is no provision in Title 38 specifically precluding such review.

The Court in *Wyoming, supra*, rejected the idea that the government's discretion was unlimited or that the government was unbound by any requirement to be reasonable. *Wyoming, supra*, at 1236. In doing so, the Court reviewed the statutory scheme and legislative history and found that Congress intended for the Department of the Interior to act appropriately and reasonably. *Id.* "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603,

Page 10 of 30

108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988). Moreover, "[t]he fact that a statute does not

explicitly provide for judicial review is not outcome determinative. Rather, the Supreme

Court set forth specific factors for courts to consider in analyzing whether, absent explicit

language or explicit legislative history, the presumption of reviewability has been overcome:

'The congressional intent necessary to overcome the presumption [of reviewability] may []

be inferred from contemporaneous judicial construction barring review and the congressional

acquiescence in it . . . or from the collective import of legislative and judicial history behind

a particular statute . . . [or] by inferences of intent drawn from the statutory scheme as a

whole.'" *High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1182 (10th Cir. 2006) (citations

omitted).

Defendants cite *Block v. Cmty Nutrition Inst.*, 467 U.S. 340, 104 S.Ct. 2450, 81

L.Ed.2d 270 (1984) for the statement of review procedures for consumers affected by milk

market orders, coupled with the provision of such procedures for milk handlers affected by

the procedures, was strong evidence that Congress intended to preclude consumers from

obtaining judicial review. However, in *Block*, the milk handlers were directly affected by the

milk market orders, while the consumers were only secondarily affected in that the price of

milk might be affected. The Court noted that handlers and producers, but not consumers

were involved in the process of milk market orders. The Court also noted, "In *a complex

scheme of this type*, the omission of such a provision is sufficient reason to believe that

Congress intended to foreclose *consumer participation* in the regulatory process." *Id.,* at 347

Page 11 of 30

134

(emphasis added). Unlike the scheme in *Block*, the review of a decision in the present case to terminate an employee for cause is not complex, and Dr. Tompkins is not distant from the decision, but is directly impacted by it. Similarly, *United States v. Erika, Inc*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) is inapposite. There, the Court noted that no judicial review was provided for the determination of Part B benefits because Congress intended those benefits to be smaller than Part A benefits. There was an important distinction that caused it to make sense to provide less process for the Part B benefits. In Dr. Tompkins' case, he loses his job whether the termination is pursuant to 38 U.S.C. §7463 or 38 U.S.C. §7462. [**NOTE**: It must be remembered that Vlosich attempted suspend Dr. Tompkins' primary surgical privileges, *i.e.*, hip and knee replacements, and ultimately his employment pursuant to Section 7462, but was stymied when it was demonstrated that Dr. Tompkins was a good surgeon.] Unlike the *Erika* case, there is no logical justification for a difference in the amount of process provided for the termination of employment.

Defendants are unable to demonstrate that Congress had clear intent to preclude judicial review of constitutional claims or that there is persuasive reason to believe that Congress's intent was to cut off that judicial review of final agency action by a doctor terminated by the VA.

### A.    Defendants' CSRA Analogy Fails.

Because the Defendants are not able to demonstrate that Congress intended that there be no judicial review for the termination of employment of Title 38 employees, Defendants

turn to the Civil Service Reform Act ("CSRA") for an analogy. Defendants cite *United States v. Fausto*, 484 U.S. 439, 108 S. Ct. 668, 98 L. Ed. 2d 830 (1988). It is first important to note that in deciding what the Court **believed** to be the intent of Congress in *Fausto*, the Court apparently erred, and **Congress acted in response to that opinion**:

> "In *Fausto*, the Supreme Court decided that the CSRA's silence regarding appeal rights for non-preference eligible members of the excepted service reflected congressional intent to preclude any review under chapter 75 for such employees. 484 U.S. at 448. In response, Congress passed the Civil Service Due Process Amendments in 1990 ("1990 Amendments") to provide MSPB appeal rights for some, but not all, non-preference eligible excepted service employees." *Bennett v. Merit Sys. Prot. Bd.*, 635 F.3d 1215 (Fed. Cir. 2011).

*Fausto* recognizes that "the CSRA comprehensively overhauled the civil service system, creating an elaborate new framework for evaluating adverse personnel actions against [federal employees]. It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Fausto*, 484 U.S. at 443. The CSRA is 147 pages when printed from the Equal Employment Opportunity Commission website. Compare this to the provisions in Title 38 regarding disciplinary and grievance procedures which contain only four sections. In determining that the prior failure to specifically provide for judicial review for nonpreference excepted service employees evidenced a Congressional intent that the nonpreference excepted service employees should be denied judicial review, the Court in *Fausto* noted the "comprehensive nature of the CSRA, [and] the attention that it gives throughout to the rights of nonpreference excepted service employees." *Fausto*, 484 U.S. at 448. [**NOTE:** CSRA distinguishes

Page 13 of 30

between employees entitled to a preference due to a status such as being a veteran and those not entitled to a preference.]

The issue in *Fausto*, as clearly defined in Justice Stevens' dissent (joined by Justices Marshall and Brennan), was "whether one act of Congress, the CSRA, has silently repealed other acts of Congress, the Tucker Act and the Back Pay Act." *Id*., at 464 (Stevens, J., dissenting). As Justice Stevens noted, "Fausto makes no claim of entitlement under the CSRA and *we do not resolve that issue* in this case." (Emphasis added.) *Id*.

In addition, the employee in *Fausto* was seeking judicial review for a "minor adverse action," *id.* at 450, *i.e.*, an eight (8) day suspension, as opposed to a termination of employment. Preference employees did not have a right of judicial review for minor adverse actions, and permitting it for a nonpreference employee would invert the system by preferring probationary and nonpreference employees over preference employees. *Id.,* at 449-50. There is no such inversion of any system in permitting a judicial review of a termination of employment in the circumstances pleaded in the Amended Complaint. *Fausto* is inapplicable, and CSRA is not analogous to the statutes covering Title 38 employees.

The case at bar is distinguishable from *Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181 (3rd Cir. 2013) not only because the employee there was covered by CSRA, but because the employee claimed that his dispute was not an employment issue and sought damages rather than injunctive and declaratory relief. Also, Defendants rely upon *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir. 1986) but acknowledge that the statutes now governing VA

Page 14 of 30

physicians had not been enacted at the time Franks was decided, rendering that case moot. The remaining cases cited by Defendants on pages 7-10 of their Motion are inapposite because they were decided under the CSRA. The Court in *Fligiel v. Samson*, 440 F.3d 747 (6th Cir. 2006) did apply the *Fausto* holding to a Title 38 employee *who was seeking damages*. Dr. Tompkins is not seeking damages, and pursuant to 5 U.S.C. §702, the action seeking relief other than money damages shall not be dismissed. Moreover, that opinion by the Sixth Circuit is not binding on this Court, and the paucity of opinions following its lead indicates that it was not a well-reasoned and not an oft-followed decision.

**B.**   **Title 38 Does Not Preclude Judicial Review for Major Adverse Actions**.

Dr. Tompkins has been subjected to a ***major adverse action***.  His employment as a surgeon was terminated for administrative deficiencies which allegedly occurred while he was the Chief of Surgery. As Dr. Tatum recognized, terminating Dr. Tompkins' employment for alleged failures that had nothing to do with the position he held at the time of the termination is unreasonable.  Moreover, Dr. Tatum concluded that the evidence did not even demonstrate that the administrative failures could come anywhere close to justifying termination.

Dr. Tompkins was accused of failing to ensure that no personnel used someone else's credentials to enter information into the electronic medical records system. To support this claim, the agency presented an email that noted one instance in which a surgeon entered notes using a resident's logon credentials and identified two (2) part-time doctors who did

not have current *logon* credentials.  Dr. Tompkins presented evidence that he sent out emails notifying staff that each person was required to enter medical record notes under his/her own credentials and that all personnel should ensure that their credentials were up to date.  Short of being in the room with every employee to monitor the entry of notes, there was no way for Dr. Tompkins to ensure that no one ever violated the policy which he made clear.  It was, of course, impossible, for Dr. Tompkins to watch the entry of all notes.  In addition, as Dr. Tatum noted, loss of logon credentials *was an issue across the entire VA system*.  The systems created by the VA made it impossible for Dr. Tompkins to attain the perfect record the VA is requiring.

Dr. Tompkins was accused of failing to ensure accurate time-keeping by residents and part-time doctors.  Due to the provisions of a collective bargaining agreement, residents and part-time doctors could not be required to use a clock in/clock out system.  Again, the systems put in place by the VA prevented Dr. Tompkins from attaining the perfect record which the agency apparently expected from him.  Even worse, the OIG report stated that there was a *potential* that $3,303.00 was paid in error, but could not state for sure that any amount was paid in error.

Dr. Tompkins was accused of failing to ensure that the supervision of residents was properly documented.  First, as Dr. Tatum found, a number of positions were listed as responsible for ensuring that this documentation occurred, but the Chief of Surgery position was not among those.  Dr. Tompkins had no direct responsibility to ensure that this

documentation was created and kept. Second, there were two methods in which such documentation was kept, and the OIG Report completely ignored one of those methods. That method, ignored by the VA and the OIG, was current throughout Dr. Tompkins' tenure as Chief of Surgery. An audit determined that of 211 records, only four (4) attending surgeons' notes were not found. In other words, there was a noncompliance rate of less than 2%. Finally, again, the VA made it impossible for Dr. Tompkins to do that which the VA required of him. Following the retirement of the person with responsibility for ensuring that the resident supervision documentation was complete, the VA did not authorize Dr. Tompkins to fill the position.

It is clear from these facts that Dr. Tompkins' was made a scapegoat for deficiencies created by the VA system. He was not terminated because he failed to do his job properly. He was terminated because VA created systems that did not allow the results VA demanded. It is unconstitutionally arbitrary to ignore the favorable findings of the grievance examiner and fire Dr. Tompkins for his supposed, but not proven or even substantiated, deficiencies in performance (1) in a position he no longer filled, (2) which, given the limitations of the VA system, he could not have corrected, and (3) which the VA itself has not corrected broadly throughout its system. It is not as if Gigliotti said Dr. Tompkins could no longer be the VA Chief of Surgery, but because of his alleged and unsubstantiated deficiencies as Chief of Surgery, Gigliotti said without any *articulated* basis Dr. Tompkins could no longer be a VA surgeon at all. When it became clear that the VA was to be exposed to public scrutiny

and the VA wanted to look like it was doing something to resolve its own deficiencies, the VA terminated a man who was providing excellent medical care to the nation's Oklahoma veterans.  This injustice causes harm not just to Dr. Tompkins, but to the veterans whom he was and still could be treating.

**Sovereign immunity is not absolute.**

"Two narrow exceptions to the general bar against suits seeking specific relief from the United States exist.  A court may regard a government officer's conduct as *so 'illegal'* as to permit a suit for *specific relief against the officer* as an individual if (1) the conduct is not within the officer's statutory powers or, (2) those powers, or their exercise in the particular case, are unconstitutional.   Absent these exceptions, sovereign immunity would unjustifiably protect the Government in the exercise of powers it does not possess." (Emphasis added.) *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002) (footnote omitted) (citation omitted).

The exercise of Gigliotti's statutory powers in the manner in which he exercised them in this case was beyond his powers.  Title 38 U.S.C. §7461 provides for adverse employment actions based upon charges based on conduct or performance.  In this case, it is clear from Dr. Tatum's findings that the adverse employment action, termination, was not based upon Dr. Tompkins' conduct or performance *as a surgeon*, the position he held at the time of the termination.  It is equally clear that the adverse action was based upon system deficiencies of the VA rather than upon Dr. Tompkins' conduct.  In each instance, the VA created systems which made it impossible for Dr. Tompkins to attain the perfection the VA required of him.

Page 18 of 30

Defendants rely upon several cases which are inapposite. *Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196 (S.D.Ga. Mar. 16, 2015) concerned an employee whose charges included professional conduct or competence, *i.e.* patient care. Dr. Tompkins has been confirmed to provide excellent patient care. *Pathak v. Department of Veterans Affairs*, 274 F.3d 28 (1st Cir. 2001) involved a suspension for a period of days, an adverse action which was not major, as was Dr. Tompkins' termination. The plaintiff in *Fligiel v. Samson*, 440 F.3d 747 (6th Cir. 2006) sought damages, unlike Dr. Tompkins, who seeks injunctive relief. The plaintiff in *Bonner v. Dep't of Veterans Affairs Pittsburgh Healthcare Sys.*, 477 F.3d 1343 (Fed. Cir. 2007) went through arbitration pursuant to a collective bargaining agreement. The charges against the plaintiff in *Goh v. Dep't of Veterans Affairs*, No. 1:14-CV-00315 LJO, 2014 WL 5093279 (E.D. Cal. Oct. 9, 2014) were in regard to professional conduct or competence, unlike the charges against Dr. Tompkins. The plaintiff in *Wirshing v. Mansfield*, No. CV 07-6927 DSF, 2008 WL 1130379 (C.C. Cal. June 17, 2008) sought accommodation under the Rehabilitation Act while he went through a drug diversion program. The Court did grant the defendants' motion to dismiss the APA claim on the basis that his termination was based upon his eligibility to serve and not upon a question of professional conduct or competence. However, this case, the only one which could possibly be considered to be like Dr. Tompkins's case, is distinguishable because the use of drugs could or would endanger patients, and because there was no question that the facts supporting the charge in *Wirshing* were true. The plaintiff in *Wirshing* acknowledged that he was in a diversion program and

Page 19 of 30

asked accommodation to complete that program. In contrast, it is plain in the present case that the facts alleged against Dr. Tompkins are not true, or that if true, they are a result of the VA's faulty systems and not Dr. Tompkins' failure to act appropriately.

Dr. Tompkins seeks *injunctive relief, not damages*. The APA permits judicial review for injunctive relief. The actions of Gigliotti in disregarding the facts demonstrated at the hearing and terminating Dr. Tompkins for problems caused not by Dr. Tompkins but by the VA's own defective systems were beyond his authority. He could not be found to have authority to take major adverse employment action based upon charges which were demonstrated to be untrue. Otherwise, "sovereign immunity would unjustifiably protect the Government in the exercise of powers it does not possess." *Wyoming, supra*, at 1225.

## II.  PLAINTIFF HAS PLEADED A PLAUSIBLE CLAIM FOR AN APA VIOLATION.

Defendants assert that Plaintiff has failed to demonstrate standing to seek judicial review of the agency's termination of his employment. "Courts have recognized that an individual may enforce procedural rights 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" *State of Utah v. Babbitt*, 137 F.3d 1193, 1215-16 (10th Cir. 1998). The Court in *Babbitt* found that the claim based upon the APA survived the motion to dismiss, because "general allegations of injury based on a legally cognizable right suffice at this stage." *Id.* at 1215.

The statutes regarding the termination of Title 38 employees, and the policies of the VA provide procedural protections for those Title 38 employees whom the VA seeks to

terminate.  Those procedures are designed to protect a threatened concrete interest –
continued employment.  By failing to provide the procedural due process set forth in statute
and in VA policy, the defendants inflicted concrete damage upon Dr. Tompkins.  In *Dorman
v. Wilkie*, 768 Fed. App'x 340 (6th Cir. 2019), the Court considered whether a doctor's
statutory due process rights had been violated.  The Court reviewed in detail provisions of
the VA Handbook, **noted that the VA Handbook clarified the policies of the VA**, and
recognized, ***"it is an elemental principle of administrative law that agencies are bound to
follow their own regulations."***  (Emphasis added.)  *Id.* at 354.  In *Cerwonka v. Dep't of
Veterans Affairs*, 915 F.3d 1351 (Fed. Cir. 2019), ***the government relied upon provisions
of the VA's handbook.***  The government did not argue in *Cerwonka* that the Handbook did
not control, although the government argued that a particular provision of the Handbook did
not apply in that particular situation.  In *Cerwonka*, the government recognized the existence
of the Handbook as part of the process and procedure.  The government cannot have it both
ways.  As a part of the process and procedures of the VA, the processes set forth therein must
have and must be given meaning.  That is where Dr. Tompkins' constitutional claims of lack
of due process also obtain.  The United States Court of Appeals for the Tenth Circuit
likewise noted in *Anupama Bekkem v. Wilkie*, 915 F.3d 1258 (10th Cir. 2019) that ***the
Handbook was part of the scheme which governs*** physician pay.

Dr. Tompkins has standing and has stated relevant statutes and policies, the violation
of which forms the basis for the complaint.  *S. Utah Wilderness All. v. United States Dep't*

Page 21 of  30

of the Interior, No. 215CV00194JNPEJF, 2016 WL 1260164, at 5 (D. Utah Mar. 30, 2016).

In *Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994), also cited by defendants, the

plaintiff could not demonstrate that a favorable outcome would provide a remedy because

the plaintiff would not be eligible to be awarded the concession if the facility on public lands

were rebuilt. Here, the remedy is attainable, *i.e.*, injunctive relief and reinstatement.

### III.     <u>PLAINTIFF ADEQUATELY PLEADS CONSTITUTIONAL CLAIMS</u>.

Dr. Tompkins had a property interest in his continued employment. "If the

government gives a public employee assurances of continued employment or conditions

dismissal only for specific reasons, the public employee has a property interest in continued

employment." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999). In *Stone*, the court

found that "the federal statutory employment scheme plainly creates a property interest in

continued employment." *Id*. Similarly, the Title 38 scheme creates a property interest in

continued employment.

Defendants rely upon *Hardison v. Cohen*, 375 F.3d 1262 (11th Cir. 2004) to claim that

Dr. Tompkins has no property interest in continued employment as a physician with the VA.

However, *Hardison* had a ***limited appointment as a resident***, in contrast to Dr. Tompkins,

who had served the VA as a competent surgeon with excellent outcomes for 30 years. "[I]f

the employee is hired for a limited appointment or is at will, then the employee does not have

a property interest in continued employment." *Stone*, 179 F.3d at 1375. *Nat'l Ass'n of VA*

*Physicians v. Derwinski*, No CIV. A. 87-2302, 1991 WL 120105 (D.D.C. June 19, 1991),

also relied upon by the Defendants, adds nothing of importance to the discussion, because the process there under consideration provided for an appeal to the administrator should the physician remain unsatisfied after the decision by a superior. In the case at bar, the VA asserts that it has the right to nullify the fair hearing by a grievance examiner by rejecting the grievance examiner's findings without stating the manner in which the grievance examiner's decision is in violation of the law or unsupported by the evidence. In other words, the hearing process was rendered meaningless, since the superior, in this case Gigliotti, could arbitrarily do whatever he wants, heedless of the evidence presented at the hearing, as if the hearing had never happened. The VA official, Gigliotti, was permitted to act in a manner that is untethered to any requirements of reasonableness and untethered to the evidence presented. In such circumstances, the VA may as well have denied the hearing completely, since the hearing and the conclusions of the hearing officer may be utterly disregarded. According to the VA, all it has to do is allow a hearing, even if the hearing is meaningless. Thus, the VA contends that it may act in an arbitrary and capricious manner and that an employee who has long provided excellent care for veterans has no remedy for such an action which should shock the conscience.

Defendants note that the Tenth Circuit agreed in *Darr v. Town of Telluride*, 495 F.3d 1243 (10th Cir. 2007), that "a public employee with a property interest in continued employment has a substantive due process right not to be terminated for arbitrary or capricious reasons," but then asserts that such determinations have not been applied to the

Page 23 of 30

146

Federal Government under the Fifth Amendment.  However, *"[a] Federal agency may not, consistent with the Fifth Amendment Due Process Clause, do that which a State is forbidden to do by the Fourteenth Amendment Due Process Clause."*  (Emphasis added.) *Stone*, 179 F.3d at 1374, n. 2.

Defendants assert that all that is required is an impartial tribunal.  However, Dr. Tompkins received a hearing before an impartial tribunal– Dr. Tatum.  Dr. Tatum determined not only that Dr. Tompkins should be reinstated, but that "[t]erminating his employment as a staff physician for the causes specified in the removal letter is not appropriate and is highly inconsistent with any connection to his duties at the time of his termination."  Exhibit 13 to Amend. Compl.

If one receives a hearing before an impartial tribunal but the VA then is free, with no constraints, to disregard the findings of that impartial tribunal, the result is the same as if the hearing were never provided.

Dr. Tompkins was denied both substantive and procedural due process.  Vlosich made a determination to terminate Dr. Tompkins' employment.  He first tried to terminate Dr. Tompkins' employment based upon the medical care Dr. Tompkins provided.  When independent evaluators reported that Dr. Tompkins was an excellent physician with "near textbook perfect" results, Vlosich sought another route to accomplish his goal, *i.e.*, he sought to terminate Dr. Tompkins' employment based upon alleged administrative failures during Dr. Tompkins' tenure as Chief of Surgery.  This was even though Dr. Tompkins had

voluntarily, and without coercion from the VA, stepped down as Chief of Surgery so that he could concentrate on providing excellent care to the nation's Oklahoma veterans.

At the hearing before the only impartial tribunal in this case, Dr. Tatum, it became clear that there was insufficient evidence to justify the termination. Dr. Tompkins did make efforts to ensure that staff entered notes into the electronic records systems using the appropriate credentials, as Dr. Tatum noted: "Dr. Tompkins did everything within his purview by advising all attendings, part-time attendings and residents make sure they get their PIV cards and to use their PIV Cards within every 30 days to make sure that there would be no expiration." The OIG report recognized that the Chief of Surgery was not the official with the authority to solve the problems involved in issuing new PIV cards. As Dr. Tatum noted, "Further, the OIG, in Recommendation 12, *recommends that the 'System Director,' not service chiefs such as Dr. Tompkins*, insure 'availability of functional equipment, adequate staffing, and enhanced access for Personal Identity Verification card completion.' Only the System Director and the VA itself had authority to provide the equipment and to enhance the process for access of PIV cards." Exhibit 13 to Amend. Compl. (emphasis added). As Dr. Tatum noted, "The VA Department of Surgery maintains a staff of approximately 45 full time and part-time physicians and approximately 75 residents per month. It is unrealistic to charge Dr. Tompkins or any other department chief with a failure to keep track of the attendance of approximately 120 physicians. *The issue is systemic in nature and not one of departmental monitoring*." Exhibit 13 to Amend. Compl.

Page 25 of 30

(emphasis added).    Dr. Tatum noted that the OKC VA Health Care System Center

Memorandum 11-65 (dated March 13, 2015) entitled "Resident Supervision" clearly lists a

number of positions responsible for monitoring and maintaining documentation of resident

supervision, and does not mention "the Chief of the Service Line."   Chief of Surgery is a

"Chief of the Service Line." Dr. Tatum found that the policies and procedures provided as

evidence on behalf of the agency did not indicate that the monitoring of documentation of

resident supervision was in the direct purview of the Chief of Surgery. In other words, the

VA purported to terminate Dr. Tompkins for inadequate record-keeping when in fact there

were records (only four (4) of 211 records were non-compliant) and Dr. Tompkins was not

the official charged with the duty to keep the records in any event.

     Dr. Tatum also found that the prior effort to suspend Dr. Tompkins' surgical

privileges and the subsequent attempt to terminate him for administrative duties as Chief of

Surgery after he resigned that position ***"leads only to the conclusion that the current attempt***

***to terminate Dr. Tompkins' employment . . . is targeting Dr. Tompkins in a discriminatory***

***and harassing manner." Id.*** The VA's own grievance examiner found that the VA and the

defendants were targeting Dr. Tompkins in a discriminatory and harassing manner.   Due

process requires judicial review under such circumstances.   The Fifth Amendment Due

Process Clause is rendered meaningless unless there is redress in the courts.

     Since the VA decided completely to disregard the findings and conclusions of the

Grievance Examiner, the "impartial hearing" was treated by the VA as a sham.

Page 26 of  30

"To satisfy the Due Process Clause, a hearing must be a real one, not a sham or pretense." *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019). When a decision-maker has predetermined the outcome prior to considering the evidence, the hearing is a sham. *Id*.

The hearing before Dr. Tatum was not a sham, but since Gigliotti completely disregarded the evidence presented at that hearing, and the findings and conclusions made by the impartial Grievance Examiner, Gigliotti's review was a sham, thus rendering the hearing a sham. When the decision-maker, Gigliotti, ignores the Grievance Examiner's finding and rulings, and fails to articulate specific reasons why the Grievance Examiner's recommendations are contrary to the preponderance of the evidence or contrary to law, all as expressly required, and then when the government claims there can be no judicial review, then the hearing, itself, is rendered a sham. As such, the resulting process *violated due process*. The United States Court of Appeals for the Tenth Circuit has recognized that *a sham hearing is not sufficient to satisfy due process*. "To hold otherwise would permit state actors to avoid an injunction requiring them to comply with federal due process standards simply by providing a sham hearing." *Columbian Fin. Corp. v. Stork*, 702 Fed. Appx. 717, 722 (10th Cir. 2017).

Defendants assert that the Handbook is not a part of the policy of the VA. However, as explained above, ""it is an elemental principle of administrative law that agencies are bound to follow their own regulations," *Dorman v. Wilkie*, 768 Fed. App'x 340, 354 (6th Cir. 2019), and the VA Handbook is a statement of the VA's regulations and policies. In

addition, only if the deciding official can demonstrate some manner in which the Grievance Examiner decided contrary to law or a preponderance of the evidence can the deciding official avoid the due process problem of providing a sham review.

The Plaintiff has stated constitutional claims. "[W]here Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988).

The Defendants cavalierly state that Plaintiff has failed to allege sufficient facts to implicate a rights violation. However, the facts alleged in the Amended Complaint are sufficient to demonstrate a violation of Dr. Tompkins' rights, both under the APA and the Constitution. *The allegations within the Amended Complaint are specific and without rebuttal.* The plaintiff pled 87 paragraphs and over 20 pages of specific factual matters that occurred or, more importantly, *that did not occur* contrary to mandatory provisions of the VA Handbook and the only process that was provided by the government itself, *i.e.*, defendant VA. Those mandatory provisions of the VA Handbook must be followed or the entire process is a sham. That is one of the fundamentals of due process, *i.e., a meaningful hearing.*

## CONCLUSION

The facts alleged set forth a scheme to terminate Dr. Tompkins' employment, first by attempting to terminate him for patient care issues, and then, when that effort failed, to terminate him for administrative failures that were systemic problems for the VA, and not

the fault of Dr. Tompkins, and which had nothing to do with the position that Dr. Tompkins held at the time of his termination. It is clear from the facts alleged that Vlosich and Gigliotti predetermined to accomplish the firing of Dr. Tompkins, and that Gigliotti's review of the Grievance's Examiner's recommendation was a sham. The VA put into place policies to avoid such a sham review and published those policies in its Handbook. The allegations of facts which demonstrate the VA's failure to follow its own procedures and its failure to provide Dr. Tompkins' with a review that was not arbitrary and capricious are sufficient to survive the Defendants' Motion. The Court should now deny the defendants' Motion and allow the plaintiff to proceed with discovery and the presentation of evidence.

Respectfully Submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail:dshadid@riggsabney.com
*Attorney for Plaintiff*

Page 29 of 30

152

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of January, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Thomas Majors
Rebecca A. Frazier
Assistant U.S. Attorney
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Tom.Majors@usdoj.gov
Rebecca.Frazier@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JOHN TOMPKINS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CIV-18-1251-J |
| v. | ) | |
| | ) | |
| 1. UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## CORRECTION TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND SUBSTITUTION OF LANGUAGE

COMES NOW the Plaintiff, John Tompkins, M.D., by and through his attorney, Danny K. Shadid, and hereby submits the following correction to and substitution for the below-quoted paragraph contained within the Plaintiff's Response to Defendant's Motion to Dismiss Amended Complaint (Doc. No. 34), which was filed of record on January 27, 2020. In so doing, plaintiff's undersigned counsel would show the Court and state to the Court as follows:

1.      The plaintiff's aforesaid Response contains the following paragraph on Page 26 of the Response:

> Dr. Tatum also found that the prior effort to suspend Dr. Tompkins' surgical privileges and the subsequent attempt to terminate him for administrative duties as Chief of Surgery after he resigned that position *"leads only to the conclusion that the current attempt to terminate Dr. Tompkins' employment . . . is targeting Dr. Tompkins in a discriminatory and harassing manner." Id.* The VA's own grievance examiner found that the VA and the defendants were targeting Dr. Tompkins in a discriminatory and harassing manner.  Due process requires judicial review under such circumstances.  The Fifth Amendment Due Process Clause is rendered meaningless unless there is redress in the courts.

Undersigned counsel incorrectly attributed the above-quoted language to the Grievance Examiner, Dr. Tatum, as being part of Dr. Tatum's Report (Exhibit 13 to the Amended Complaint) to defendant Gigliotti. The above-quoted language actually came from a letter, dated November 14, 2017, written by undersigned counsel to defendant Vlosich (Exhibit 6 to the Amended Complaint), which was Dr. Tompkins' formal response to the October 30, 2017, letter from Dr. Susan Bray-Hall, advising of the proposed termination of employment.  In that response letter, undersigned counsel did employ the use of the above-quoted language.

2.      During the drafting of the plaintiff's Response to the current Motion to Dismiss, undersigned counsel was aided by another attorney within the firm.  The above-quotation was incorrectly attributed to Dr. Tatum, apparently amid confusion between the said attorney and undersigned counsel. **Undersigned counsel takes full responsibility for this error.**

3.      In his report, Dr. Tatum did address the subject of defendant Vlosichs' earlier suspension of the plaintiff's surgical privileges as to hip and knee replacements and commented that the previous unfounded and unsupported suspension did raise questions as to defendant Vlosich's overall intent to terminate the plaintiff. (Exhibit 6, p. 5).

4.      In order to correct the erroneous quotation set forth above and contained on Page 26 of the plaintiff's Response to the current Motion to Dismiss, the plaintiff hereby submits the following paragraph in substitution for the above-quoted  paragraph:

Dr. Tatum affirmatively noted in his Report that the timing of the prior

summary suspension of Dr. Tompkins' surgical privileges raised a legitimate question as to whether the suspension was used as an alternate means of terminating Dr. Tompkins' employment.  Regarding the summary suspension, Dr. Tatum wrote at Page 5 of his Report:

> "There does not appear to have been any internal review or process that preceded the summary suspension of privileges. Despite Dr. Bray-Hall's and Mr. Vlosich's assertion that this event was entirely unrelated to the subsequent decision to remove Dr. Tompkins from federal service, ***the timing of this suspension legitimately raises the question of whether or not this was utilized as an initial and alternative means of terminating Dr. Tompkins' appointment.***" ( Emphasis added.)Amend. Compl., Exh. 6, at p.5.

Due process requires judicial review under such circumstances.  The Fifth Amendment Due Process Clause is rendered meaningless unless there is redress in the courts.

5. Undersigned counsel apologizes to the Court and asks that the plaintiff not be prejudiced by this error on the part of undersigned counsel.  Undersigned counsel asks the Court to accept the above substitution to replace the erroneous paragraph on Page 26 of the plaintiff's Response.

WHEREFORE, the plaintiff and plaintiff's undersigned counsel, respectfully pray the Court accept this correction and substitute the above-submitted language and quotation set forth in Paragraph No. 4, above, in place of the erroneous paragraph quoted in Paragraph No. 2, above, and as contained on Page 26 of the plaintiff's Response to the current Motion to Dismiss Amended Complaint.

Respectfully Submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail:dshadid@riggsabney.com
*Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of February, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Thomas Majors
Rebecca A. Frazier
Assistant U.S. Attorney
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Tom.Majors@usdoj.gov
Rebecca.Frazier@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN TOMPKINS, M.D.,** | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | **Case No. CIV-18-1251-J** |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF VETERANS AFFAIRS,** *et al.* | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS WITH BRIEF IN SUPPORT

---

In an effort to survive dismissal, Plaintiff focuses much of the Response brief (Doc. 34) detailing his version of events during the administrative proceedings[1] and conflating the various issues pending before the Court. Despite this, the matters pending before the Court as well as their analysis is simple. The Court must first determine if there has been a waiver of the United States' sovereign immunity for Plaintiff's APA claims. The details of the administrative proceeding are irrelevant to this analysis. Plaintiff fails to show that the United States has waived its sovereign immunity essentially conceding that 38 U.S.C. § 7463 governs his termination[2]. Because this statutory provision precludes judicial review,

---

[1] Large portions of Plaintiff's Response brief appear to be references to the administrative record, s*ee* Doc. 34, p. 4-7 ¶¶1-6; p. 15-18; however, Defendants do not address the accuracy of these statements contending that all such factual references should be disregarded because they are irrelevant to the Court's analysis of whether Plaintiff's termination is entitled to APA review.   It is also of note that Plaintiff fails to include any factual citations to this information and fails to clarify his source.

2 Doc. 34 p. 17: "In Dr. Tompkins case, he loses his job whether..." §7463 or §7462 applies.

Plaintiff is not entitled to an APA review of his termination[3]. *See Wyoming v. United States*, 279 F.3d 1214, 1236 (10th Cir. 2002)(explaining that the provisions of the APA are applicable unless a statutory provision precludes judicial review).

Plaintiff fails to state a plausible claim for a violation of his due process rights. His substantive due process allegations fail because he does not allege a violation of any fundamental rights. For his procedural due process claims to survive dismissal, Plaintiff must do more than simply state the words "bias", "impartiality", and "due process violation". He also must offer more than a hyper-technical assessment of Defendant Gigliotti's final decision. Despite Plaintiff's extensive 75-page amended complaint, he fails to allege facts which rise to the level of a colorable procedural due process violation. Plaintiff's Amended Complaint should be dismissed in its entirety.

<u>AUTHORITY AND ARGUMENT</u>

## I. PLAINTIFF FAILS TO IDENTIFY A WAIVER OF THE GOVERNMENT'S SOVEREIGN IMMUNITY

Plaintiff continually references Chapter 3 of the VA Handbook ("Handbook") in his Amended Complaint (Doc. 24 ¶¶ 8, 40-46, 51, 53, 54, 56, 61, 65, 81-87), arguing that the VA's alleged failure to adhere to these provisions entitles him to judicial review and relief. However, the Handbook provisions apply to Dr. Tompkins only because of his status as a

---

[3] Defendants' opening brief states that Plaintiff is seeking "money damages in the form of back pay" (Doc. 28 p. 11); however, back pay is a form of specific relief classified as equitable relief not money damages. *Wasson v. Brownlee*, No. CIV-04-945-C, 2005 WL 8157736, at *2 (W.D. Okla. Mar. 9, 2005); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1297–98 (10th Cir. 2009),

38 U.S.C. § 7401(1) employee (Doc. 24-1 p. 1, §1(b)(1), (c) and §2(e)).    Plaintiff's

assertions that Chapter 3 of the Handbook is applicable to this case are also, in essence, his

concession that the statutory provisions referenced by Defendants, specifically 38 U.S.C.

§ 7401(1) and 38 U.S.C. § 7463, are applicable.    Plaintiff fails to state otherwise.

In *Hakki v. Sec'y, Dep't of Veterans Affairs*, No. 8:18-CV-1269-T-35JSS, 2019 WL

7423554, at *2 (M.D. Fla. Sept. 26, 2019), a VA urologist sought APA review of his

Section 7463 termination. [4] *Id.*    The court determined that "[n]ow that constitutional due

process has been afforded to Dr. Hakki," it lacked jurisdiction to conduct an APA review

of the VA's Section 7463 based on the reasoning in *Fausto, Fligiel and Pathak*.    *Id.* at *6-

7; *see also Trujillo v. Capello*, No. 10-23007-CIV, 2011 WL 13220771, at *3–4 (S.D. Fla.

May 17, 2011)(holding that "judicial review is not provided for administrative decisions

that either do not involve a question of professional conduct **or** competence or that do not

result in a major adverse action" pursuant to Section 7463). As further explained in *Trujillo*:

> Both *Fliegel* and *Pathak,* applied the logic of *Fausto* to the Veterans' Benefits Act
> to hold that a VA health professional subject to an adverse personnel action not
> based upon professional conduct or competence is not entitled to judicial review.
> Dr. Trujillo attempts to distinguish *Fliegel* and *Pathak* by arguing that neither case
> involved criminal allegations against a physician. This distinction is overly-
> simplistic. Whether the healthcare professional was subject to an adverse personnel
> action pending the outcome of a criminal proceeding, based upon charges of sexual
> harassment (*Pathak*) or because of complaints of an overbearing management style
> (*Fliegel*) is irrelevant to whether the Veterans' Benefits Act provides for judicial
> review. What is relevant is whether the adverse personnel action taken against the
> healthcare professional is based upon professional conduct or competence.

---

[4] Dr. Hakki asserted, *inter alia*, that the grievance examination was contrary to the
Handbook and that he was denied constitutional due process in certain respects. However,
Hakki's constitutional claims are distinguishable from this case because Hakki was denied
an opportunity to cross-examine witnesses. *Id.*

*Id.* at *4.

Here, Plaintiff essentially concedes that Section 7463 is applicable to his case and presents no evidence or authority to the court establishing otherwise. The analysis before the Court then becomes quite simple. Because Dr. Tompkins' termination was an adverse action that did not implicate his professional conduct or competency, and he was appointed pursuant to § 7401(1), § 7463 governs his termination process.

VA employees contesting adverse actions pursuant to this provision are not entitled to a DAB nor are they entitled to judicial review. *Hakki*, 2019 WL 7423554, at *2. Had Congress intended to create an avenue for judicial relief for VA physicians such as Dr. Tompkins, it would have explicitly done so in § 7463 as it did in § 7462. Plaintiff's reference to the "paucity" of case law in this area provides additional support for Defendants' assertion that Plaintiff is not entitled to the APA relief he seeks, because Plaintiff fails to identify, nor can the government locate, a case permitting APA review of a VA employee's adverse action pursuant to § 7463[5].

## II. PLAINTIFF'S DUE PROCESS CLAIMS FAIL UNDER RULE 12(b)(6)

Regarding his due process allegations, Plaintiff conflates the issues raised by the Defendants. In his Amended Complaint, Plaintiff fails to reference **any** of the statutory

---

[5] In contrast, there is extensive case law related to judicial review of VA employment actions conducted pursuant to § 7462. *See Doran v. Wilkie*, 768 F. App'x 340, 349 (6th Cir. 2019)(judicial review pursuant to 38 U.S.C. § 7462(f)(2))*; Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *25–27 (S.D. Ga. Mar. 16, 2015); *Pocha v. McDonald*, No. CV 15-475 (DWF/FLN), 2016 WL 916417, at *8 (D. Minn. Mar. 10, 2016); *Rajan v. Principi*, 90 F. App'x 262, 263 (9th Cir. 2004); *Ward v. Brown*, 22 F.3d 516, 520 (2d Cir. 1994); *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016); *Claasen v. Brown*, 201 F.3d 435 (4th Cir. 1999); *Kreso v. McDonald*, 631 F. App'x 519, 524 (10th Cir. 2015).

provisions governing his appointment as a VA physician or his termination, *see* 38 U.S.C.§§ 7401(1) and 7463, he only references the Handbook. The government does not assert that its Handbook is irrelevant to these proceedings or that it is not bound to adhere to its provisions[6]. Rather, the government asserts that the Handbook is not the measure of constitutionally required process, and that Plaintiff must present some statutory basis for both his APA and due process allegations.

Plaintiff references *Doran v. Wilkie*, 768 F. App'x 340, 357 (6th Cir. 2019) to support his due process arguments, but it is *Doran* that provides even further clarity to this issue. The Sixth Circuit analyzed Doran's *statutory* procedural due process claims in the context of the VA's statutory provisions, 38 U.S.C. § 7461-62, and in light of the Handbook, and then also analyzed Doran's *constitutional* due process allegations. *Id.* To analyze Doran's constitutional due process claims, the court cited *Loudermill* and explained that "[t]he essential requirements of due process...are notice and an opportunity to respond." *Id.* at 357 (citations omitted).

Here, to the extent Dr. Tompkins asserts a statutory due process violation, he cannot rely solely on the Handbook; rather, there must be some reference to the statutory provision

---

[6] "An agency must comply with its own procedural rules" but "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Kreso*, 631 F. App'x at 524; *see also Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *12 (S.D. Ga. Mar. 16, 2015)(explaining that "[t]he statute [38 U.S.C. § 7462(b)(1) & (2)] sets forth" the process to which an employee is entitled, while the Handbook "clarifies...at minimum" what notice must include).

upon which the Handbook is based. Because Dr. Tompkins fails in this regard, he fails to state a claim. To the extent Dr. Tompkins alleges constitutional violations, the Handbook is not the measure of constitutionally required process, and his Amended Complaint fails to state a claim. Most importantly, the government adhered to both the Handbook and its statutory provisions, and Dr. Tompkins facts, as alleged, do not rise to a constitutional violation.

## A. Plaintiff's Substantive Due Process Claims Fail

Dr. Tompkins fails to allege a fundamental right sufficient to invoke substantive due process protection. *See Messeri v. Univ. of Colorado, Boulder*, No. 18-CV-2658-WJM-SKC, 2019 WL 4597875, at *10–11 (D. Colo. Sept. 23, 2019)(allegations of bias and a sham review process were essentially procedural due process claims, dismissing substantive due process allegations with prejudice). Therefore, Dr. Tompkins' substantive due process allegations should be dismissed.

## B. Plaintiff's Procedural Due Process Claims Fail

Next, Plaintiff alleges that both Gigliotti and Vlosich prejudged this matter and decided to terminate him. To exemplify bias, Plaintiff points to the Defendants executing memoranda in August 2017 agreeing with the findings in the OIG Report (Doc. 24 ¶¶ 28, 32, 52 & 72). Plaintiff also alleges that Gigliotti's final decision was insufficiently stated (*Id.* ¶44) and included evidence relied on by the grievance examiner ("GE") (*Id.* ¶¶49-51). Plaintiff's allegations fail to rise to the level of colorable constitutional claims.

Impartiality of a tribunal is a key element of due process and may be affected by a personal or financial stake in the outcome or personal animosity. *Cypert v. Indep. Sch.*

*Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 481 (10th Cir. 2011)(citations and quotations omitted); *see also Bjorklund v. Miller*, 467 F. App'x 758, 765–67 (10th Cir. 2012). However, there is a presumption of honesty and integrity in those serving as adjudicators. *Id*. Dr. Tompkins asserts bias simply because Defendants completed a memorandum related to the VA's OIG investigation, information available to both individuals only by virtue of their high-ranking employment with the VA (Compl. ¶¶5-7, 33 & 34).

This is insufficient to state a colorable due process violation. *See Zen Magnets, LLC v. United States of Am. Consumer Prod. Safety Comm'n*, No. 17-CV-02645-RBJ, 2018 WL 2938326, at \*10 (D. Colo. June 12, 2018)(explaining that an adjudicator's familiarity with the facts of a case gained in the performance of its statutory role will not disqualify the decision makers or demonstrate actual bias); *McClellan v. City of Nowata*, No. 13-CV-385-JHP-PJC, 2015 WL 75074, at \*10 (N.D. Okla. Jan. 6, 2015)(explaining that while "a tribunal is not impartial if it [is] biased with respect to the factual issues to be decided at the hearing", "the mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing.").

Additionally, Plaintiff fails to provide full context for Vlosich and Gigliotti's memoranda.  (Doc. 24, ¶¶28, 32).  The OIG report did not make a factual findings or determinations as to the Chief of Surgery's fault, culpability, or his innocence.  *See* Exh. 1, Excerpts from VAOIG-16-02676-132017.[7]  Instead, it identified multiple system

---

[7] Defendants only attach excerpts of the report which include specific references to the Chief of Surgery, but the full report is available online at

failures and made 24 recommendations, one of which was that the VISN Director "[r]eview the former Chief of Surgery's performance in relation to issues discussed in this report, and confer with appropriate VA offices to determine the need for administrative action, **if any**." *Id.*(emphasis added).   Defendants' concurrence with the findings in the report were to essentially review Dr. Tompkins' performance and to take any action they deemed appropriate.

In *Pangburn v. C. A. B.*, 311 F.2d 349, 358 (1st Cir. 1962), the CAB initiated two proceedings to investigate an airplane crash.   The pilot involved argued that the Board's public findings in the accident investigation prejudged the issue for adjudication because the Board had already found that the crash was due to pilot error.   However, the First Circuit explained:

> We cannot say that the mere fact that a tribunal has had contact with a particular factual complex in a prior hearing, or indeed has taken a public position on the facts, is enough to place that tribunal under a constitutional inhibition to pass upon the facts in a subsequent hearing. We believe that more is required. Particularly is this so in the instant case where the Board's prior contact with the case resulted from its following the Congressional mandate to investigate and report the probable cause of all civil air accidents. If we were to accept petitioner's argument, it would mean that because the Board obeyed the mandate of Section 701, it was thereupon constitutionally precluded from carrying out its responsibilities under Section 609.

*Id.*

---

https://www.va.gov/oig/pubs/VAOIG-16-02676-13.pdf(lasted visited February 13, 2020). Additionally, this document is properly before the Court. *See Rooker v. Ouray Cty.*, 504 F. App'x 734, 737 n. 2 (10th Cir. 2012)(document outside the pleadings may be considered without converting the motion to dismiss into a motion for summary judgment because it is referenced throughout the complaint, central to the plaintiff's due process claim, and there is not dispute as to its authenticity).

Plaintiff's allegations of impartiality are rooted in Defendants' performance of their statutory duties. 38 U.S.C. § 312.   This is insufficient to state a colorable constitutional claim. *See Hasie v. Office of Comptroller of Currency of U.S.*, 633 F.3d 361, 368 (5th Cir. 2011)(an agency's policy positions on a specific issue do not demonstrate prejudice in an individual adjudication and are not evidence of prejudgment).

Finally, Plaintiff alleges that Mr. Gigliotti's final decision is deficient; however, his real contention is that the discipline imposed by Gigliotti was excessive. The GE felt that stripping Dr. Tompkins of his Chief of Surgery duties was a sufficient reprimand, Gigliotti disagreed.   Because Plaintiff is dissatisfied with the outcome, after he was entitled to a full administrative hearing, an opportunity to present his evidence, cross-examine the government's witnesses, etc., Plaintiff now pursues a hyper technical interpretation of Gigliotti's final decision quibbling over de minimis issues such as the inclusion of specific terms and the exclusion of others[8].

The OIG report is referenced extensively in the GE's recommendation (Doc. 24-14), importantly, Gigliotti states that he reviewed the GE report, the evidence file supporting the discharge, and also references the OIG report (Doc. 24-15).   A review of the plain language in Gigliotti's final decision states that he reviewed the evidence at issue in this proceeding and in light of that evidence believed that termination, rather than some lesser reprimand, was warranted (Doc. 24-14).   The "specific statement" required by the

---

8 For example, Plaintiff states that the words "severe" and "impact" are not present in the excerpts of the OIG report submitted to Dr. Tatum but appear in Gigliotti's final decision (Doc. 24 ¶51), and the final decision fails to include specific terminology from the Handbook (*Id.* ¶51).

Handbook must provide reasons for rejection of the GE's recommendation. (Doc. 24 ¶44). The rejection itself must also be limited to certain grounds.   What is not required is that Gigliotti's specific statement only delineate, mirror, or reference verbatim the limited grounds for his action as stated in the Handbook (*Id*.). Plaintiff again conflates the requirements and alleges that Gigliotti's specific statements or reasons for his decision are deficient. A plain reading of the final decision shows that it is sufficient. (Doc. 24-15).

In sum, Plaintiff fails to allege that he did not receive a fair hearing, that he was unable to cross-examine witnesses, present evidence, or that Gigliotti failed to review that evidence.   Rather, Plaintiff is dissatisfied with the outcome in this case, and this dissatisfaction alone does not rise to the level of a colorable due process violation.

<u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Amended Complaint should be dismissed in its entirety pursuant to Rules 12(b)(1) and (b)(6).

TIMOTHY J. DOWNING
United States Attorney

*/s/ Rebecca A. Frazier*
REBECCA A. FRAZIER
Assistant U.S. Attorney
Okla. Bar Number: 22285
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Rebecca.Frazier@usdoj.gov

## CERTIFICATE OF SERVICE

_____X_____ I hereby certify that on February 14, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the electronic records currently on file, the Clerk of Court will transmit a notice of Electronic Filing to the following ECF registrant(s):

Danny K. Shadid, OBA 8104
Riggs, Abney, Neal, Turpen, Orbison & Lewis Law Firm
528 N.W. 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Fax: (405) 842-2913Email: dshadid@riggsabney.com
*Attorney for Plaintiff*

_____ I hereby certify that on _____ I served the attached document by U.S. Mail on the following, who is not a registered participant of the ECF System

*/s/ Rebecca A. Frazier*_____
REBECCA A. FRAZIER



**Department of Veterans Affairs**
**Office of Inspector General**

**Office of Healthcare Inspections**

Report No. 16-02676-13

# Healthcare Inspection

# Evaluation of System-Wide Clinical, Supervisory, and Administrative Practices Oklahoma City VA Health Care System Oklahoma City, Oklahoma

November 2, 2017

**Washington, DC 20420**

Exhibit 1

Eval of Sys-Wide Clinical, Supervisory, and Admin Practices, Oklahoma City VAHCS, Oklahoma City, OK

is no specific VHA target, the ED Chief told us that the recent diversion rate is less than ideal. System managers developed an ED workgroup, which met biweekly, and continued to implement several access improvement projects.

**EOC**. We inspected patient care areas including six inpatient units, the community living center, the ED, the Fast Track unit, and four outpatient clinics located at the Oklahoma City main healthcare facility. We also inspected the Ada, Altus, Ardmore, Blackwell, Enid, Lawton, North May, South Oklahoma City, and Wichita Falls community based outpatient clinics. We found no deficiencies during our infection prevention and life safety/emergency management reviews, but we identified compliance deficiencies with selected privacy, safety, security, and cleanliness requirements. We made 24 recommendations.

We recommended that the VISN Director:

- Review the former Chief of Surgery's performance in relation to issues discussed in this report, and confer with appropriate VA offices to determine the need for administrative action, if any.

We recommended that the System Director:

- Consult with the National Center for Organizational Development to facilitate organizational improvement following leadership changes and extensive inspections and investigations.

- Ensure use of the correct methodology to determine the severity assessment code for all reported patient safety events.

- Ensure compliance with the National Center for Patient Safety's guidelines on initiation and completion of Root Cause Analysis.

- Ensure that peer reviews are appropriately completed and address all relevant aspects of care provided by the reviewed clinician.

- Ensure a process is in place to identify and review cases where institutional disclosure may be indicated, and complete as appropriate.

- Ensure that the Quality, Safety and Value committee minutes include evidence of robust data analysis and action tracking to address performance opportunities, and monitor for compliance.

- Ensure adherence to all national peer review committee requirements, and monitor for compliance.

- Ensure that professional practice evaluations include performance data to support provider privileges and are conducted in accordance with Veterans Health Administration and System policy.

- Evaluate the current System policy and services provided by low volume/no volume providers to determine whether the System should continue to provide those services or seek community alternatives.

- The ADPCS' testimony in at least one Administrative Board of Investigation did not reflect full disclosure of the necessary details.

- The COS and Chief of Surgery both appeared reluctant to consistently address physician-related problems (such as clinic coverage) or otherwise arouse a negative confrontation with OU for fear that OU would discontinue certain residency programs and/or decline to provide subspecialty support.

- The Chief of Surgery admitted to writing a progress note on behalf of another attending physician because that provider did not have CPRS access. While this may have been done to ensure patient care, it did not comply with policy. (See Issue 5, *CPRS*.)

- The Chief of Surgery told us he was aware that a particular attending surgeon often did not attend clinic as scheduled or called off at the last minute for non-emergent issues, thus requiring patient appointments to be rescheduled. The Chief of Surgery told us that he "got the impression over the years that HR [MS] rules were difficult" and did not bother "spinning [his] wheels" to deal with problem employees.

- The ACOS/E did not perform many of the functions required of the position. (See Issue 6, *Resident Supervision*.) While we agree that the ACOS/E's office was under-resourced, we were not told about, nor did we identify, ongoing efforts on the part of the ACOS/E to improve staffing and other functions.

Further, the QSV Chief's role in relation to the quadrad and service chiefs was one of persuasion rather than authority. We found the QSV Chief to be knowledgeable about QSV policies but appeared limited in her ability to get others, such as service chiefs, to be responsive to data requests and to follow through on corrective actions.

During the course of interviews with staff, we found almost universal support for the new System Director. Staff commended his efforts to be transparent in communications and his willingness to make unpopular decisions and take long-overdue actions to correct deficiencies. One interviewee described the new System Director's tendency to "get his information from the ground up."

As of January 30, 2017, the COS, ADPCS, Associate Director, ACOS/E, and Chief of Surgery positions were all being recruited.

**Recommendation 1:** We recommended that the Veterans Integrated Service Network Director review the former Chief of Surgery's performance in relation to issues discussed in this report, and confer with appropriate VA offices to determine the need for administrative action, if any.

**Recommendation 2:** We recommended the System Director consult with the National Center for Organizational Development to facilitate organizational improvement following leadership changes and extensive inspections and investigations.

---

Eval of Sys-Wide Clinical, Supervisory, and Admin Practices, Oklahoma City VAHCS, Oklahoma City, OK

jam, fail to laminate, or otherwise do not print properly on occasion.  New printers and cameras were ordered on October 24, 2016.

Reportedly, three staff members were able to process PIV badges; however, not all of them were able to complete all elements of the PIV account creation and badge processing steps.   There was a 9-month backlog with the Office of Personnel Management for security assistants to get moderate risk background investigation–Tier 2 (non-sensitive) access.  The System's PIV coordinator was only recently granted this access after waiting almost 2 years.  Another system-level security assistant in HRMS was in the process of obtaining this access, but at the time of our interview with him, he was only able to check backgrounds over the phone, not via internet, and he was unable to initiate a new account.

Nation-wide issues related to PIV server capacity and the Card Management System (PIV portal) contract expiration were beyond the scope of this review.

<u>Managing Patient Care Without CPRS Access</u>

Several employees we interviewed, including the Chief of Surgery and the ACOS/E, had knowledge of providers, including residents, who entered information into a patient's EHR on behalf of another provider who did not have access to CPRS.  Providers we interviewed also reported they conferred extensively with residents about clinical information and documented this discussion in the patient's EHR.

We confirmed several cases where the documentation clearly reflected improper access (used someone else's logon passwords) or documentation (documented on behalf of someone else).  In addition, Health Information Management Service (HIMS) staff got "wet signatures" (signed by hand) on printed copies of certain notes, such as operative reports, and then scanned and uploaded those documents to CPRS.  While we do not condone these activities as they do not comply with VHA guidance, we acknowledge these "work-arounds" existed to ensure continuity of patient care.

Upon learning of the CPRS access issues, the new System Director took action to administratively suspend the privileges of providers without appropriate access.

**Recommendation 11:**  We recommended that the System Director require service chiefs to assure that all providers within their purview secure and maintain appropriate computer access to ensure quality and continuity of patient care.

**Recommendation 12:**  We recommended that the System Director ensure availability of functional equipment, adequate staffing, and enhanced access for personal identity verification card completion.

## Recommendations

**1.** We recommended that the Veterans Integrated Service Network Director review the former Chief of Surgery's performance in relation to issues discussed in this report, and confer with appropriate VA offices to determine the need for administrative action, if any.

**2.** We recommended the System Director consult with the National Center for Organizational Development to facilitate organizational improvement following leadership changes and extensive inspections and investigations.

**3.** We recommended that the System Director ensure use of the correct methodology to determine the severity assessment code for all reported patient safety events.

**4.** We recommended that the System Director ensure compliance with the National Center for Patient Safety's guidelines on initiation and completion of Root Cause Analysis.

**5.** We recommended that the System Director ensure that peer reviews are appropriately completed and address all relevant aspects of care provided by the reviewed clinician.

**6.** We recommended that the System Director ensure a process is in place to identify and review cases where institutional disclosure may be indicated, and complete as appropriate.

**7.** We recommended the System Director ensure that the Quality, Safety and Value committee minutes include evidence of robust data analysis and action tracking to address performance deficiencies, and monitor for compliance.

**8.** We recommended that the System Director ensure adherence to all Veterans Health Administration peer review committee requirements, and monitor for compliance.

**9.** We recommended that the System Director ensure that professional practice evaluations include performance data to support provider privileges and are conducted in accordance with Veterans Health Administration and System policy.

**10.** We recommended that the System Director evaluate the current System policy and services provided by low volume/no volume providers to determine whether the System should continue to provide those services or seek community alternatives.

**11.** We recommended that the System Director require service chiefs to assure that all providers within their purview secure and maintain appropriate computer access to ensure quality and continuity of patient care.

# Comments to OIG Report

The following Network Director's comments are submitted in response to the recommendations in the OIG report:

**OIG Recommendations**

**Recommendation 1.**  We recommended that the Veterans Integrated Service Network Director review the former Chief of Surgery's performance in relation to issues discussed in this report, and confer with appropriate VA offices to determine the need for administrative action, if any.

Concur

Target date for completion:  October 31, 2017

VISN response:  The Oklahoma City VA Health Care System is reviewing the former Chief of Surgery's performance as outlined in the report.  The VISN Director will review findings where indicated and employ action at the VISN level as appropriate

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|                                          |     |                        |
|------------------------------------------|-----|------------------------|
| JOHN TOMPKINS, M.D.,                     | )   |                        |
|                                          | )   |                        |
| Plaintiff,                               | )   |                        |
|                                          | )   |                        |
| v.                                       | )   | Case No. CIV-18-1251-J |
|                                          | )   |                        |
| UNITED STATES DEPARTMENT OF              | )   |                        |
| VETERANS AFFAIRS, et al.,                | )   |                        |
|                                          | )   |                        |
| Defendants.                              | )   |                        |

## ORDER

Currently pending is Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Brief in Support (Defs.' Mot.) [Doc. No. 28]. Plaintiff has responded (Pl.'s Resp.) [Doc. No. 34] and Defendants have replied [Doc. No. 38]. For the reasons discussed below, the Court GRANTS the motion, and DISMISSES Plaintiff's claims without prejudice.

## I.    Background

As stated in the Amended Complaint (Amend. Compl.) [Doc. No. 24], Plaintiff was a physician with the United States Department of Veterans Affairs (VA) and was involuntarily discharged on November 21, 2017 for "alleged administrative deficiencies occurring in 2015-2016." Amend. Compl. at 4-6. Plaintiff seeks judicial review under 5 U.S.C. §§ 702-706 (the Administrative Procedures Act (APA)) arguing his rights "under the due process clause of the Fifth Amendment to the United States Constitution" and "under the VA Policies and Procedures" were violated in the discharge and subsequent administrative review process. *Id.* at 1-4. As a remedy, Plaintiff seeks injunctive relief – specifically, an order reinstating his employment. *See id.* at 4, 21.[1] Because Plaintiff named the VA and various VA employees in their official capacities, all

---

[1] Although Plaintiff mentions "back pay," Amend. Compl. at 21, he is elsewhere adamant that he is not seeking monetary damages. *See id.* at 14, 16 (stating the only relief available to Plaintiff is

the claims are essentially against the United States.  *See Atkinson v. O'Neill*, 867 F.2d 589, 590

(10th Cir. 1989) ("When an action is one against named individual defendants, but the acts

complained of consist of actions taken by defendants in their official capacity as agents of the

United States, the action is in fact one against the United States.").

## II.   <u>Analysis</u>

Relevant here, Defendants seek dismissal based on sovereign immunity and the Court's

subsequent lack of subject matter jurisdiction.  *See* Defs.' Mot. at 13-22.  The Court agrees it lacks

jurisdiction and GRANTS dismissal without prejudice.[2]

### A.   **Standard of Review**

"Motions to dismiss for lack of subject matter jurisdiction 'generally take one of two forms:

(1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction;

or (2) a challenge to the actual facts upon which subject matter jurisdiction is based.'"  *City of*

*Albuquerque v. U.S. Dept. of the Interior*, 379 F.3d 901, 906 (10th Cir. 2004) (quoting *Ruiz v.*

*McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002)).  Here, Defendants' motion to dismiss presents

a facial attack on the sufficiency of Plaintiff's Amended Complaint.  So, the Court confines its

review to the pleadings and accepts as true the allegations in the Amended Complaint.  *See*

*Peterson v. Martinez*, 707 F.3d 1197, 1205-06 (10th Cir. 2013).

---

injunctive relief); *see also* Pl.'s Resp. at 14 ("Dr. Tompkins is not seeking money damages.
Instead, he is seeking injunctive relief to restore him to a position he has unquestionably performed
with distinction in providing excellent care to veterans.").

[2] Because the Court agrees it lacks subject matter jurisdiction, it does not address Defendants'
alternative arguments for dismissal.

### B.      Analysis

#### 1.      Sovereign Immunity

"[T]he United States, which is a defendant here, is immune from suit unless it expressly and unequivocally waives its sovereign immunity."  *Kansas by & through Kansas Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1240 (10th Cir. 2017).  The APA contains a limited sovereign immunity waiver, as "it permits 'a person suffering legal wrong because of agency action' to 'seek relief other than money damages' in federal court."  *Id.* (citing 5 U.S.C. § 702 (internal brackets omitted)).  However, the "APA's waiver of sovereign immunity is 'limited because it does not confer authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Id.* (citation and internal brackets and quotation marks omitted).

#### 2.      Plaintiff's Lack of a Judicial Review Remedy

Title 38 of the United States Code governs veterans' benefits and it was under this framework that Plaintiff was employed.  *See* 38 U.S.C. § 7401(1) (granting the VA Secretary authorization to appoint physicians); *see also Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1067 (9th Cir. 2008) ("Title 38 of the United States Code governs the appointment and employment terms of VA physicians[.]").  The question here is whether Title 38, in relevant part, expressly or impliedly forbids this Court from granting Plaintiff judicial review, thus negating the APA's waiver of sovereign immunity.  The Court finds it does.

When a 38 U.S.C. § 7401(1) employee is terminated (or other adverse employment action is taken) the employee shall have the right to appeal the action.  *See id.* § 7461(a).  "If the case involves or includes a question of professional conduct or competence in which a major adverse action was taken, such an appeal shall be made to a Disciplinary Appeals Board . . . ."  *Id.* §

7461(b)(1).   Professional conduct or competence involves either "[d]irect patient care" or "[c]linical competence." *Id.* § 7461(c)(3)(A-B).   Thereafter, "[a] section 7401(1) employee adversely affected by a final order or decision of a Disciplinary Appeals Board (as reviewed by the Secretary) may obtain judicial review of the order or decision." *Id.* § 7462(f)(1).   However, where the termination or adverse action "does not arise out of a question of professional conduct or competence," the "Disciplinary Appeals Board shall not have jurisdiction to review such matters . . . ." *Id.* § 7463(1).

Here, assuming the truth of Plaintiff's allegations, his termination was based on administrative deficiencies which, by statutory definition, do not involve professional conduct or competence.  *See* Amend. Compl. at 4-6; *see also* 38 U.S.C. § 7461(c)(3)(A-B).   So, while Plaintiff had a process to appeal his termination, *see id.* § 7463(d), he did not have the right to appeal to the Disciplinary Appeals Board.  *See id.* § 7463(1).

The Court finds no Tenth Circuit authority precisely deciding whether a VA physician who lacks access to a Disciplinary Appeals Board decision under 38 U.S.C. § 7463 is denied the opportunity for judicial review.   However, other circuits have so concluded.  *See Bonner v. Dep't of Veterans Affairs Pittsburgh Healthcare Sys.*, 477 F.3d 1343, 1345 (Fed. Cir. 2007) (addressing plaintiff's right to judicial review under other Title 38 sections but noting:  "Significantly, under the Department grievance procedures of § 7463, an employee cannot obtain review by a Disciplinary Appeals Board . . ., nor can he obtain judicial review of the Department's final decision."); *Fligiel v. Samson*, 440 F.3d 747, 752 (6th Cir. 2006) (holding that 38 U.S.C. § 7463 did not provide a provision for judicial review); *see also, e.g., Weber*, 521 F.3d at 1067 (holding a VA physician could not seek judicial review because "[Title 38] does not provide for judicial review of the decisions of summary review boards for probationary employees").   And, without

4

authorization for judicial review, Plaintiff cannot assert claims under the APA to avoid the United States' sovereign immunity.

For example, in *United States v. Fausto*, 484 U.S. 439 (1988), the Supreme Court was asked to decide "whether a nonveteran member of the excepted service may obtain, under the Tucker Act, judicial review of adverse personnel action for which the [Civil Service Reform Act (CSRA)] does not provide him a right of review." *Id.* at 443.  In reaching its decision, the court first reviewed the relevant CRSA language and held that Congress' decision to exclude "nonpreference members of the excepted service from the definitional sections of Chapter 75" "displays a clear congressional intent to deny the excluded employees the protections of Chapter 75 – including judicial review – for personnel action covered by that chapter." *Id.* at 447-48 (*superseded by statute as recognized in Bosco v. United States*, 931 F.2d 879, 883 n. 3 (Fed. Cir. 1991) ("Since *Fausto* was decided, the CSRA has been amended to provide review for nonpreference eligible members of the excepted service.")).  Having found plaintiff had no right to judicial review under the CRSA, the court held he could not circumvent Congress' intent by seeking judicial review under another statute, namely the Tucker Act.  *See id.* at 455.  This reasoning has been applied to claims arising under the APA.  *See, generally, Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1028 (10th Cir. 2017) (affirming the district court's dismissal of plaintiff's APA claims, based on a lack of subject matter jurisdiction, after finding agency letter did not constitute final decision and therefore plaintiffs lacked any judicial review); *see also Fligiel*, 440 F.3d at 752 (citing *Fausto* and holding that because 38 U.S.C. § 7463 – in contrast to § 7462 – did not provide a provision for judicial review "we find that Fligiel is precluded from invoking the protections of the APA to obtain the judicial review of her adverse employment action"); *Weber*, 521 F.3d at 1067 ("[u]nder *Fausto*, where a comprehensive remedial scheme exists to address

agency adverse actions, and Congress has clearly indicated that no judicial review is available, an individual may not choose other federal statutory avenues to obtain review"); *Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 32 (1st Cir. 2001) (finding that because the relevant statutory scheme "does not provide Pathak with a right to judicial review, the logic of *Fausto* dictates that he cannot go around [the statute] and assert federal jurisdiction by relying upon the [APA]"); *Kunk v. Salazar*, No. 07CV01617PABMJW, 2009 WL 3052292, at *4 (D. Colo. Sept. 22, 2009) (finding the court lacked subject matter jurisdiction because the relevant statutory authority did not permit judicial review).

The underlying reasoning in *Fausto* and the weight of authority above are persuasive.[3] Accordingly, because Congress did not grant Plaintiff the right to a Disciplinary Appeals Board decision under 38 U.S.C. § 7463, which is the trigger for judicial review, the Court finds the APA's sovereign immunity waiver does not apply and it therefore lacks subject matter jurisdiction over Plaintiff's constitutional and policy-related due process claims arising under the APA.

## III.   Conclusion

Based on the foregoing, Defendants' Motion to Dismiss Plaintiff's Amended Complaint with Brief in Support [Doc. No. 28] is GRANTED and Plaintiff's claims are DISMISSED without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A

---

[3] Plaintiff seeks to distinguish several of these cases. First, Plaintiff suggests *Fausto* was incorrectly decided and is inapplicable because it analyzed the CSRA, which Plaintiff argues is a much more comprehensive framework than the relevant portions of Title 38 of the United States Code. *See* Pl.'s Resp. at 18-19. But *Fausto* has not been overruled. Instead, later statutory amendment superseded its direct holding. *See supra* at 5. Moreover, several of the cases cited herein have applied the *Fausto* reasoning in employment cases arising under Title 38. *See id.* at 5-6. Plaintiff also attempts to distinguish both *Pathak* and *Fligiel*, claiming that in *Pathak* the plaintiff had only been suspended for days (in contrast to Plaintiff's termination) and the plaintiff in *Fligiel* sought money damages (in contrast to Plaintiff's request for injunctive relief). *See* Pl.'s Resp. at 20, 24. However, neither *Pathak* nor *Fligiel* turned on those points and the Court finds them persuasive despite Plaintiff's argument to the contrary.

longstanding line of cases from this circuit holds that where the district court dismisses an action

for lack of jurisdiction, as it did here, the dismissal must be without prejudice.").  Still pending is

Defendants' dispositive motion addressing Plaintiff's original Complaint.  [Doc. No. 18].  That

motion became moot when Plaintiff filed the Amended Complaint and it is DENIED as such.

A separate judgment shall be entered.

IT IS SO ORDERED this 3rd day of April, 2020.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHN TOMPKINS, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-18-1251-J |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| VETERANS AFFAIRS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## JUDGMENT

Pursuant to the Order filed separately this same date, Defendants' motion to dismiss [Doc. No. 28] is GRANTED and Plaintiff's claims are DISMISSED without prejudice.  As such, Judgment is granted against Plaintiff and in favor of Defendants.

ENTERED this 3rd day of April, 2020.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

JOHN TOMPKINS, M.D.,       )
                        )
        Plaintiff,      )
                        )     Case No. CIV-18-1251-J
v.                        )     Western District
                        )
1. UNITED STATES DEPARTMENT  )
OF VETERANS AFFAIRS,      )
                        )
2. ROBERT WILKIE, in his Official Capacity, )
                        )
3. RALPH T. GIGLIOTTI, in his Official  )
Capacity, and,             )
                        )
4. KRISTOPHER WADE VLOSICH, in his )
 Official Capacity.         )
                        )
        Defendants.   )

## NOTICE OF APPEAL

     NOTICE is hereby given that John Tompkins, M.D., plaintiff in the above-named case hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Order (Doc. No. 39) dismissing this case and granting the defendants' Motion to Dismiss Amended Complaint and the corresponding Judgment (Doc. No. 40) both of which were entered on April 3, 2020.

Respectfully submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
Of Counsel
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS LAW FIRM
528 NW 12th Street
Oklahoma City, OK 73103
Phone: (405) 843-9909
Facsimile: (405) 842-2913
E-mail:dshadid@riggsabney.com
Attorney for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of April, 2020, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Thomas Majors
Rebecca A. Frazier
Assistant U.S. Attorney
United States Attorney's Office
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8804/8700 - (fax) 553-8885
Tom.Majors@usdoj.gov
Rebecca.Frazier@usdoj.gov